**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

The United States of America )
)
)
Plaintiff ) File: 07-181
) The Hon. Emmit Sullivan
against – ) Oral argument prayed
)
Zhenli Ye Gon )
)
Defendant )

FILED
SEP 20 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# DEFENDANT RULE 12 MOTION TO DISMISS THE INDICTMENT HENCE TO DISMISS THE CASE FOR ITS ENTIRETY *WITH PREJUDICE*

Table of Contents:

Defendant's Rule 12 Motion to Dismiss 1.

Table of Contents 1

Table of Authorities 2

Memorandum of points and authorities in support of defendant's motion to dismiss the indictment with prejudice 5

I. Introduction 15

II. Procedure posture 24

III. ARGUMENT 25

1. INDICTMENT IS FATALLY DEFFICIENT ON ITS SURFACE: GOVERNMENT 'S FAILURE TO PROVIDE ADEQUATE NOTICE OF THE CRIME CHARGED 25

2.. FATAL DEFFICIENCY IN CONSPIRACY CHARGE 30

3.. VINDICTIVE PROSECUTION IN VIOLATION OF DUE PROCESS 33

4. THE INDICTMENT SHOULD BE DISMISSED FOR PROSECUTORS' INTENTIONAL CONCEALMENT OF EXCULPATORY EVIDENCE AS TO GRAND JURY 37

5.  DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN
    TO GOVERNMENT'S FAILURE TO RESPECT THE GRAND
    JURY AS AN INDEPENDENT LEGAL BODY                     44


5.      DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN
        TO THE GOVERNMENT'S EGRGIOUS OMMISSION ALLOWING
        THE MEXICAN AUTHORITIES TO DESTROY THE PHYSICAL
        EVIDENCE OF ITS FRAUD: THE 19 METRIC TONS OF
        CHEMICALS IN QUESTION                             47

6.  DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN TO THE
    GOVERNMENT'S MOST RECENT IMPLICIT  ADMISSION OF THE TOTAL
    COLLAPSE OF CHARGING "EVIDENCE", WHICH APPEARS OF WILLFUL
    "FRAUD"  FROM MEXICAN GOVERNMENT, IN SUPPORT OF FRIVOLOUS
    CHARGE.                                               49

IV. CONCLUSION                                            52


Certificate of Service                                    53

# Table of Authorities:

United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976). 18

*United States v. Boone*, 951 F.2d 1526, 1542 (9th Cir. 1991); 26

*United States v. Buckner*, 610 F.2d 570, 573 (9th Cir. 1979) 455 U.S. 961 (1980) 26

*United States v. Giese*, 597 F.2d 1170, 1177 (9th Cir. 1979). 26

United States v. Pickett, 353 F.3d 62, 67 (D.C. Cir. 2004). 26

*Jones V. United States, 526 US 227 (1999)* 27

*U.S. V. Miller 471 US 130, 134, 135 (1985)* 27

*Johnson V. U.S. 613 A2d, 1381, 1384 (DC Cir. 1992)* 27
*Clemons V. U.S. 400 A2d, 305-306 (DC 1979)* 28
*Patterson v. U. S. 575 A2d, 305, 306 (DC 1990)* 28

*United States v. Olderbak*, 961 F.2d 756, 760 (8th Cir. 1992) 27-28

*United States v. United States Sav. & Loan*, 9 F.R.D. 450, 452 (D.D.C. 1949) 31

United States v. McBride, 498 F.2d 683, 685 (D.C. Cir. 1974); 31

U.S. v. Russell, 269 U.S. at 763-64 31

Jones v. United States, 526 US 227 (1999) 31

Hamling v. United States, 418 U.S. 87, 116 (1974); 31

United States v. Conlon, 628 F.2d 150, 155 (D.C. Cir. 1980) 31

U.S. v. Threadgill, 172 F.3d at 366 31

Cochran and Sayre v. United States, 157 U.S. 286, 290 32

Rosen v. United States,161 U.S. 29, 34 32

Hagner v. United States, 285 U.S. 427, 431 32

Potter v. United States 155 U.S. 438 32

Bartell v. United States 227U.S. 427                                                32

Berger v. United States, 295 U.S. 78,82                                             32

United States v. Debrow, 346 U.S. 374, 377, 378                                     32

United States v. Montelongo, 420 F.3d 1169, 1173 (10th Cir. 2005).                  33

Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)                                    33

United States v. Meyer 810 F.2d, 1242, 1245 (DC Cir. 1987)                          36

Moran v. V. Burbine 475 US 412 (1982)                                               37

North Carolina v. Pearce, 395 U.S. 711, 724 (1969)                                  37

Alabama v. Smith, 490 U.S. 794 (1989)                                               37

United States v. Jackson, 390 U.S. 570, 581(1968))                                  37

Guam v. Fegurgur, 800 F.2d 1470, 1473 (9th Cir.1986).                               37

Blackledge v. Perry, 417 U.S. 21, 28 (1974);                                        38

United States v. Groves, 571 F.2d 450, 454 n.1 (9th Cir. 1978)                      38

United States v. DeMarco, 550 F.2d 1224, 1227 (9th Cir. 1977)                       38

United States v. Ruesga-Martinez, 534 F.2d 1367, 1369 (9th Cir. 1976)              38

United States v. Shaw, 655 F.2d 168, 171 (9th Cir. 1981)                            38

United States v. Groves, 571 F.2d at  453                                           38

United States v. Spiesz, 689 F.2d 1326, 1328 (9th Cir. 1982)                        38

United States v. Burt, 619 F.2d 531, 536 (9th Cir. 1980)                            38

United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999) (per curium)             38

Brooks v. United States, 450 U.S. 927 (1981)                                        39

City of Houston v. Hill, 482 U.S. 451, 462-63 (1987)                                39

U.S. v. DeMarco, 550 F.2d at 1227                                                   40



United States v. Groves, 571 F.2d at 453

37Brady v. Maryland 373 US 87                                             42

United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976).              42


U.S. v. Short and Green, 777 F. Supp. 40, 1991, U.S. Dist. Lexis 16380    42

U.S. v. Reid 911 F.2d 1456 (10th Cir. 1990)                              44

Nogan v. United States, 712 F2d 757, 759 (2nd Cir. 1983)                 45

U.S. v. Taylor 487 U.S. at 338-39                                        46

United States v. Doran, 882 F.2d 1511, 1517 (10th Cir. 1989)            50

United States v. Vaughn, 370 F.3d 1049 (10th Cir. 2004).                50

Zedner v. United States, 126 S.Ct. 1976, 1984-85 (2006)                 51

United States v. MacDonald, 456 U.S. 1, 8 (1982).                       52

**U.S. Constitution, Federal Statute Cited**:

U.S. Constitution: Amendment V. and VI;

Rules of Federal Criminal Procedures: Rule 12

18 USC 3161; 18 USC 3288;

Other Authorities and Cross-References:

ABA Standards, Section 3.6(b) (2nd ed. 1980)

U.S. Attorney's Manual, Section 9-11, 334

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| | ) |
| The United States of America | ) |
| | ) |
| Plaintiff | ) File: 07-181 |
| | ) The Hon. Emmit G. Sullivan |
| against – | ) Oral argument prayed |
| | ) |
| Zhenli Ye Gon | ) |
| | ) |
| Defendant | ) |

**DEFENDANT RULE 12 MOTION TO DISMISS THE INDICTMENT HENCE TO DISMISS THE CASE FOR ITS ENTIRETY *WITH PREJUDICE***

Defendant Zhenli Ye Gon, by and through undersigned counsels, respectfully moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) of the Federal Rules of Criminal Procedures, for an order to dismiss Count One, the sole count of criminal charge brought in the indictment.

Defendant respectfully moves that the Grand Jury Indictment charging the defendant for Conspiracy in drug trafficking in violation of 21 USC. §959, 21 USC. §960, 21 USC. §963, and 18 U.S.C. §2, together with the whole case for its entirety, with prejudice, without reference to geographic territorial restriction, be dismissed. The fatally flawed Grand Jury Indictment, henceforth the entire case for its totality, must be dismissed with prejudice:

a. ***Prosecutorial dilatory, neglectful conducts in bad faith as prejudicial to Defendant;***
b. ***Failure to provide the Defendant with adequate notice of the crime charged;***
c. ***Vindictive prosecution in gross violation of due process against Defendant;***

d. ***Willful concealment of exculpatory evidence having caused prejudicial consequence to Defendant***

e. ***Complete and total failure to plead a sufficient cause of action*** and for such other reckless, fatal, and incurable deficiencies.

The Motion to dismiss is based upon the following findings of legal, factual and evidentiary grounds:

1. The Prosecutors knew and should have known that based upon the evidence and information, including such exculpatory evidence and information they have either received from the Government of Mexico, the place of origin of the alleged offense, or the Government of the People's Republic of China, an integral part of the chain of custody of alleged "criminal evidence" and the starting point of the alleged "drug cartel", it has been crystal clear that there is no such a thing as alleged "illicit drug trafficking" in this instant case. This well established factual truth has been further fortified by partial revelation of the truth, certain critical exculpatory evidence as the "party's admission", the Forensic Laboratory Testing Report conducted by the National Forensic Laboratory under the Attorney General's Office of the Republic of Mexico, in connection to Defendant's presentation of such voluminous documentary evidence as Purchasing Contracts, Bills of Lading, Cargo Packing lists. Such an exculpatory evidence was willfully concealed to the Grand Jury on July 26, 2007, the processing has precluded the defendant's presence though he is available for testimony before grand jury.

2. The Prosecutors knew and should have known that exculpatory evidence did exist when the Government interviewed and interrogated these key witnesses in China, specifically, in Chifeng Arker Pharmaceutical Technology Co. Ltd, (hereinafter referred to as "Chifeng Arker") situated in Inner Mongolia, the People's Republic of China during the later of March, 2007. Based upon the the best information, all witnesses interviewed by the USDOJ's fact-finders dispatched there, denied that Chifeng Arker, the only and sole supplier of chemical agents in dispute to Defendant and his Mexico based enterprise, namely, Unimed, had ever sold, supplied, packed, shipped, insured, cleared with export controls, with ***anything other than*** **what had been provided and specified under the Sales/Purchase contracts** concluded between Defendant Zhenli Ye Gon and Chifeng Arker, ***through out the entire period outside the timeframe of the Defendant's Pseudoephedrine importation license.*** However, allegedly for such bad faith to merely patronize an incurably corrupted foreign power's politicized agenda in color of law, the prosecutors willfully concealed such exculpatory evidence before the Grand Jury.

3. The Prosecutors have completely ***failed to provide the Defendant with adequate notice of the crime charged***. Though both the Indictment and Officer Chavez' Affidavit in Support of the Indictment involved mere speculative and conclusive remarks concerning the Defendant's alleged conspiracy in knowingly aiding and abetting manufacturing and distributing 500 grams of more Methamphetamine "into the United States", all charging documents, except for DEA Officer K. Hooton's most misleading, least

credible Affidavit issued on March 22, 2007, has certain evasive remarks.) has completely failed to present with minimum degree of certainty: co-conspirator(s), principal criminal(s) having been aided and abetted by this defendant, any visible, invisible but realistically imaginable U.S. links. The government's actions and omissions are a typical case of the failure to provide adequate notice of the crime charged, a ground for dismissal. ***As matter of factual impossibility, the fact that the sole supplier of the chemical substance now in dispute is an integral part of the government of the People's Republic of China itself is an exculpatory evidence, even though this factor is by no means a mere element to be considered in light of common sense.***

4. Document and information, particularly, DEA Officer K. Hooton's Affidavit of March 22, 2007, demonstrates that the U.S. Government has been jointly working with, highly likely commanding and bossing, the law enforcement of Mexican Republic since March 2006 in the joint case investigation in this instant criminal investigation, nevertheless, it allowed, or take no efforts to prevent, or even likely to urge, the office of the Attorney General of Mexico to destroy the most important and concrete evidence, say, the entire shipment of 19.8 metric tons of what Mexican Government alleged "pure" or "partially" psuedo-ephedrine" in self-contradictory, self-destructive, multiple government version of chemical agents attributed to defendant allegedly "criminal liability" based upon the governments' tainted forensic examinations. The Prosecutor's intentional or reckless misconduct leading to the destruction of evidence is a proven neglectful and dilatable conduct most likely stemming out of its bad

faith to cover up the ultimate truth of this instant case before this Honorable Court;

5. Apparently for the purpose of misleading the Court and public opinion, confusing the jury, paving its way to gain undue prosecutorial advantage, the prosecutors in this instant case, wrongfully accused this Defendant for excessive gambling, and alleged "net loss" of "102 million U.S. dollars in Casino at Las Vegas, Nevada; the Government also accused this Defendant for his efforts to import "Hydroxyl Benzyl-N-Menthyl Acetamide", Government also accused this Defendant's efforts to build the Latin America's largest pharmaceutical conglomerate by importing great number of assembly lines from Germany and other countries, Government also mistakenly accused this Defendant for his wife's alleged "conviction" and "several years prison term"; Most importantly, the root cause that triggers all these unsupported "illegal drug allegations" is stemming from the government's information concerning this Defendant's custody of approximately 210 Million U.S. dollars. All these have formed the solid basis for vindictive prosecution in gross violation of this Defendant's due process rights, rendering this case dismissible with prejudice, per se.

6. The indictment, particularly the principal case investigator, Special Agent Eduardo Chavez's Affidavit Statement, referred to importation, manufacture and distribution of Methamephetamine for more than ten times, however, the indictment has completely failed to present any single evidence which may

even remotely link the defendant to any meth related activities, neither in the United States, nor in the state of Mexico, or anywhere else;

7. The Indictment failed to present any credible evidence to prove that the Defendant had imported pseudoephedrine into the United States, while it is not even sufficient to prove that the chemical agents imported by Defendant's company, Unimed, and seized by Mexican Customs, ended up in 82nd Infantry Battalion is not what Defendant claimed legitimate chemical agents, but "pseudoephedrine" or "N-Acetylpseudoephedrine". To prove such fact only requests U.S. Forensic Laboratory Testing Report upon untainted samples, the Indictment and its only Supportive Affidavit Statement issued by Officer Chavez mentioned his conversation with USDEA's FC, (Forensic chemists), however, for unknown reason, the government has so far failed to provide any such forensic chemist report in substantiate the government's allegation on "pseudo-ephedrine". An alleged "impression" from un-recorded conversation may not be a credible evidence to prove such a serious drug charge. On the other hand, the Government does have Mexican FC's forensic examination reports, the government is apparently reluctant to build its charge upon such Mexican FC reports because these "Made in Mexico" products are either having birth mark of fraud and perjury, or conclusively exculpatory, the Government of the United States in this instant case refused to jump into the truth;

8. The indictment charges Defendant to "aid" and "abet" manufacture of methamephetamine. The Indictment has gone so far that it has even given the

quantity of the meth manufactured under the aiding and abetting by this Defendant: 35,658 kilograms. However, the same indictment has left such logically following questions completely unanswered: **Who are the persons being aided and abetted?** Where is the meth manufacturing location? Where are these meth manufacturing equipments? Facilities? Who is (are) the buyer(s)? U.S. DEA Officer Hooten, in his affidavit issued on March 22, 2007 has mentioned Meth manufacturing machineries, allegedly seized by Mexican AFI, concerning its production capacity: "millions of tablets every day", "frequently used by the operator of clandestine laboratories to produce large quantities of tablets containing 3.4-methylenedioxymethamphetamine…" However, neither indictment, nor Affidavit in support of the indictment, did mention Officer Hooten's earlier version of "meth mass production equipments". In the racing of wild speculations, Officer Eduardo Chavez's Affidavit acclaimed the Mexican authorities' seizure of two lager clandestine meth labs in the West Hemisphere (Guadalajara and Jalisco, Mexico) in January and December 2006 respectively, we did not see any linkage that was sketched by the Government to implicate this defendant's involvement. Much less has the government provided any information concerning alleged "meth manufacturing" in the United states.

9. Officer Eduardo Chavez also admitted that on April 26, 2007, he and other USDEA officers re-searched Defendant Ye Gon's manufacturing plant in Mexico, and collected *samples of chemical residue*, "including samples which tested positive for the presence of ephedrine". Government has failed to

mention that the Defendant was legitimately allowed to leave “residue” of pseudo-ephedrine in his warehouse, laboratory or his factory. Because he was a licensed importer and distributor during the period from 2002 through end of 2004. He is also a legally authorized distributor until 2006, theotically including this very moment, of all remaining pseudoephedrine inventory under the 2002-2004 government issued import permit, so long as all regulations are strictly observed, while no bad faith or mans rea is involved. Therefore, any peudoephedrine/ephedrine left-over from what had been imported during the licensed importation-distribution periods is legally allowed to dispose under the COFEPRIS supervision, and recorded by the log book. Such exculpatory factors were intentionally concealed from the Grand Jury;

10. Officer Eduardo Chavez’s Affidavit made an allegation concerning a hand-note referring to “Flour” and “book” signed by an “Amigo, and addressed to “Zhenlin” (“Zhenli”?). Government has failed to disclose to either the Grand Jury or to this Honorable Court that “new” handwritten Note is actually “hand-written Note” number II. From Affidavit Statement issued by USDEA Officer K. Hooten on March 22, 2007 asserted his finding of a “hand-written note listed 20 metric tons of Safrole”, “used in clandestine manufacturing of MDMA, a schedule II controlled substance”, was found in Defendant’s Mexican Residence, “in addition to cash and firearms”. For better record purpose, we call it “handnote number 1”. Defendant Ye Gon was confused that he has never involved in any single particle of Safrole through out his life time thus far. While Mexican Authorities also denied its involvement in finding of

such Safrole-MDMA "handwritten recipe". (See K. Hooten's Affidavit Statement, page 6 and page 9, as Exhibit #1) That handwritten note number I no longer appears in government's charging documents. However, its transfigured replica, now, a so-called "AMIGOS message", as handwritten note number II, takes the original place of its predecessor. (See U.S. SA Eduardo Chavez: Affidavit in Support of Indictment, page 6, Exhibit #2) The "Flour-book" Amigor Message has failed since its foundational requirements of Fed. R. Evid. 801(d)(2)(E) were not met and the documents were not relevant to the charged conspiracy.

11. The Indictment charges that Defendant's drug trafficking activities has started since the year of 1999. there is completely no evidence in support such an allegation. Moreover, for this critical part, the Indictment appears contradictory to the fact presentation by Officer Eduardo Chavez' Affidavit, the sole document in support of the Indictment.

12. The Indictment was not properly signed by foreperson. This misconduct represents a serious government irregularity. But most importantly, such Grand Jury Indictment obtained by the Government through such means at the back of the Defendant as discussed supra is apparently the government's bad faith efforts to circumvent all constitutional safeguard as what due process commands, and also circumventing such criminal procedural safeguards as probable cause hearings, in order to obtain undue prosecutorial advantage, by tramping upon, and complete disregard the defendant's constitutional rights,

civil rights, and minimum decency of criminal procedures in a civilized judicial system under the constitutional democracy.

Based upon the foregoing, this Grand Jury Indictment should be dismissed for its fatal deficiency committed in bad faith. There is no sheer evidence in substantiate the Government's probable cause to prove make any person believe that Defendant has committed offences under 21USC 959,960, 963 and 18USC 2. The undeniable truth is that this is a frivolous criminal case but the one of political tenet. The U.S. Government is under the great pressure for patronizing a corrupted regime which is the ultimate source of all frivolous charges supported by nothing but fraudulently made-up "evidence", an evidence of government sponsored fraud and perjury.

With the collapse of evidence in charging drug related offense failed, the government's derivative allegation for money forfeiture, without even bothering to conduct a forensic auditing, which shall become legally enforceable upon the charge of principal offenses. While evidence in support of principal charges fails, forfeiture actions shall fall unsupported. Defendant respectfully moves for dismissal of the forfeiture section of the Indictment based upon same legal, factual and evidentiary basis, provided such a motion shall not construed to be prejudicial to Defendant's any other pretrial efforts to claim his legal title to his legitimate property unlawfully seized and forfeited by the Government of the United States under within the same scheme of frivolous charges originated from the State of Mexico.

Wherefore, Defendant respectfully moves that the entire case together with the grand jury indictment be dismissed with prejudice, A Memorandum of Points and Authorities

in Support of the Defendant's Motion to Dismiss is hereby respectfully attached to this

Motion. A Memorandum of Points and Authorities in Support of Motion is also

respectfully submitted.

A pretrial hearing and oral argument upon this motion held by this Honorable

Court is also respectfully prayed. Concerning the Defendant's present situation as being

held for pretrial detention without bail, he respectfully pray that such oral argument

session concerning this motion is held as expeditiously as possible.

Respectfully submitted:

Ning Ye, Esq. (DC Bar Number MD26804)
Counsel for the Defendant
DC Office:
1150 Connecticut Avenue, NW
Suite 900
Washington, DC 20036
Telephone: (202) 862-4334

Email: ynyale@aol.com

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE**

## I. INTRODUCTION.

Defendant Zhenli Ye Gon was arrested on July 23, 2007, without being shown of any arrest warrant. The sole count Indictment, unsigned, whose issuing date is not clear, charges the Defendant, for the related parts, the following offenses: "From in or about 1999, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including the date of filing of this Indictment, in the countries of Mexico, El Salvador, the United states, and elsewhere, the defendant, Zhenli Ye Gon, and other known and unknown to the Grand Jury, did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree with each other and with other co-conspirators ***unknown*** to the Grand Jury...to aid and abet in manufacture of 500 grams or more of mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance into the United States...", in violation of 21 U.S.C. §§ 959 and 960, 963 and 18 U.S.C. § 2; (Please see Grand Jury Indictment, pp 1-2)

The Indictment fatally fails to plead the essential elements of Federal drug offense of manufacturing of methamphetamine in and out of the United States, it fails to plead the offense of "conspiracy" by failure to bring any co-conspirator(s), it also fails to plead the aiding and abetting offense, instead incanting the statute by rote without any articulation of a legal or factual basis for the charge: a complete absence of any credible evidence of any probative value of any kind in substantiating its charge except for mere speculations. Moreover, it has completely violated the "constitutional disclosure requirement" in the landmark case as Brady v. Maryland 373 US 87 when it is found that the Prosecutor in this case intentionally concealed critical exculpatory evidence in favor of Defendant, including, but may not be limited to, the DEA officials criminal investigation conducted in Inner Mongolia, China during the last week of March, 2007. Not a single word has

ever been mentioned either in Grand Jury Indictment or in the principal investigator, the SA Eduardo Chavez's Affidavit, the lone document in support of the Indictment Petition. With all these violations for the records, the proper result is dismissal. United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976).

There is fatal deficiency in violation of Rule 12(b) in the undated Grand Jury Indictment and the sole evidence in support of the Indictment, namely, the Affidavit Statement submitted in support of the government's petition for grand jury indictment by SA Eduardo Chavez.

There is a complete absence of any incriminating evidence demonstrating that the defendant has ever involved in any criminal activities involving manufacture, distribution of methamphetamine in the United States. There is no evidence demonstrating that the defendant has ever involved in any criminal activities involving manufacture, distribution of methamphetamine in the State of Mexico or anywhere else. There are several pieces of "evidence" attempting to prove that the Defendant has committed such offense as of "crime against public health" by "illegally importing Psuedoephedrine into the State of Mexico". Such "evidence" was turned out either to be of fraud, or simply exculpatory. On June 25, 2007, Mr. Eduardo Medina-Mora, the Attorney General ordered the destruction of all 19 tons of what he alleged "pseudoephedrine" being entrusted to 82nd Mexican Army Infantry Battalion in Mexico. This case, from its original place, the state of Mexico, appears a frivolous one. All supporting evidence, if any, has been totally collapsed on Mexican side, due to its widely infected epidemic of government sponsored fraud. Under the growing political pressure, the U.S. Government takes the case and

initiated the criminal prosecution against the Defendant in the U.S. District Court for the District of Columbia.

The Defendant did not involve in any illegal importation, or any other transaction of either Methamehpetamine (meth), MDMA, or controlled substance or precursor chemicals, or any "mixture containing detectable amount of controlled substance" or "precursor chemicals" in the United States, neither has he involved in any such offenses in Mexico or anywhere else. .

Defendant Zhenli Ye Gon is a naturalized Mexican citizen of ethnic Chinese origin,. Defendant Ye Gon is also father of three U.S. born minor children. Defendant is a law abiding, successful business entrepreneur, engaging in variety of legitimate business activities.  One of several of his solely owned business entities is Unimed Pharmaceutical Corporation, now destroyed by the police forces of Mexico, a pharmaceutical conglomerate which imported 22 state of art assembly lines using the world's most advanced cutting-edge technology from Germany, Italy Switzerland and the United States.  That flag ship in the entire Latin America's fleet of pharmaceutical industry has the projected production capacity taking at least 10% share of annual production of  pharmaceuticals for the entire nation of Mexico.    It is designed to produce antibiotics, birth control medicine, cardiovascular related medicine, cold medicines, solid and liquid, medicine in oncology, and hospital IV bags, etc.  The plant together with a residential compounds designed for employees' dormitory, was situated in the suburb of Mexican City, adjacent to Marriott Hotel, a transparent, publicly

accessible group of building compounds, with no divisions of army to protect its normal, legitimate business operation.

During the period from mid 2002 through the end of 2004, Defendant was lawfully transacted, imported and distributed "pseudo ephedrine" in Mexico, with the government permit, issued by the Federal Department of Public Health. Defendant, with the permit, under the quota assigned upon each permit, issued by the Department of Public Health, and under the strict supervision of Mexican Federal Commission for Protection Against Sanitary Risks, was engaging in importing and distribution of pseudoephedrine, a controlled substance. Unimed's normal business operation in relation to Pseudoephedrine was undertaken under the government permit, the quantity of importation had never exceeded the government assigned quota, all the buyers are Mexican Government designated buyer, the sale price, was normal market price for legitimate pharmaceutical wholesale price. All these transactions were recorded with COFEPRIS controlled log book, and it would also be required to report to the United Nations. During that period, specifically in 2003, Defendant contracted with Chifeng Arker Pharmaceutical Technology Corporation for the latter to help build one *polytechnic laboratory*, incomplete upon defendant's order, within the Unimed pharmaceutical giant complex. It was originally designed to introduce Chifeng Arker's cutting-edge know-how in numerous synthesis technology. For the reason unknown to Chifeng Arker, Defendant Ye Gon had stopped all plans in relation to pseudoephedriene before his Pseudoephedrien permit became expired. Therefore, Defendant Ye Gon had ordered a stop construction of the critical section of that polytechnic laboratory. Under the Defendant's order, the future chemical reaction process, purification section and testing

lab remained *undone*, water supply system remained undone. The facilities did not have major electric power supply. With these measures, no one would be able to use such an unfinished laboratory to produce pseudoephedrine. The policy reason behind the Defendant's interruption of such project in middle is that he had decided to abandon the out-dated pseudoephedrine market, instead to grab the novel technology of Phenylephrine HCL. When Defendant Ye Gon, being a pioneer in Latin America's pharmaceutical technology, he obtained the cutting-edge technical know-how in synthesizing Phenylephrine HCL, using non-controlled chemical raw materials, namely, Hydroxy-Benzyl-N-Methyl-Acetethamtne (Acetethamtne), also known as ACETAMIDE".

Acetethamtne, or ACETAMIDE, is such proprietary key ingredients to produce phenylephrine HCL, and at least such eight (8) other legitimate pharmaceutical products as Albuterol Inhalation, also known as Aersol (Subtanmol) in WHO's nomenclature, whose technical know how has been obtained by Defendant Ye Gon, and planned for Unimed mass production using those 22 state of art assembly lines imported into Mexico, mostly purchased from Germany. Approximately in 2003-2005 period, nevel technology in Phenylephrine HCL has been gradually used in U.S. pharmaceutical industry to replace the outdated one of Pseudoephedrine. In Latin America continent, however, such a cutting edge technology had been known to few, if not none, of other pharmaceutical companies. It will be a good opportunity for Defendant to take the continent's lead, or even to take the monopoly the market using novel technology.

Phenylephrine HCL is a legitimate drug, not in controlled list, either in Mexico, or in the United States.

Therefore, when Mexican Government ceased to issue the Defendant the permit of importing pseudoephedrine, the Defendant immediately stopped importing and purchasing pseudoephedrine, except for disposing the remaining pseudoephedrine following the COFEPRIS direction, under the latter's supervision, recorded in the pseudoephedrine log book, which has been clean and neat. Continuing store and distribution of the remaining pseudoephedrine imported under the government issued permit, under the supervision of the Department of Health is lawful in Mexico.

What triggered the outburst of this entire case is a shipment of 19 tons of non-precursor chemical property imported from China into Mexico through proper Mexico's customs clearance and confiscated by the latter in December 2006.

About this event, the U.S. investigator, Officer Eduardo Chavez's Affidavit in support of Indictment, wrote in following, quoted:

> "On December 5, 2006, Unimed once again attempted to import 19,797 metric tons of Hydroxy-Benzyl-N-Methyl-Acetethamtne which was flagged for inspection by Mexican Customs at the Pacific Sea port of Lazaro Cardenas, Mexico. A sampling of the substance conducted by the Mexican Customs Central Laboratory identified it as N-Acetylpseudoephedrine, a derivative of pseudoephedrine/ephedrine. The substance is controlled by Mexican Federal health law as well as Mexican federal precursor law making it illegal for Unimed to import." ((Please see SA Eduardo Chavez's Affidavit in support of the Government's Indictment, page 1 and page 3). Id. P3.

Therefore, the government found "...Ye Gon willfully intended to import a restricted chemical into Mexico, violating Mexican law, for the express purpose of manufacturing pseudoephedrine/ephedrine, a listed by Title 21, United States Code Section 802(34)".

Referring to Government's criminal charge specified in its Grand Jury Indictment: Conspiring to commit and committed the offense against the United States by aiding and

abetting in manufacture of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine." Here, the Defendant was charged for controlled substance and now controlled substance has been found through Mexican Customs Crime Lab's forensic examination.

Apparently acting on bad faith, the U.S. Government has intentionally concealed the following compelling exculpatory evidence in favor of the Defendant, from both this Honorable Court and the Grand Jury:

The Mexican Customs' Crime lab's report, when it was cited by Special Agent Eduardo Chavez to the Grand Jury, the Government has concealed several well documented frauds committed by Mexican authorities, and others:

> The Mexican Customs Crime Lab's finding based upon its forensic laboratory test into the samples from the same shipments, i.e., 19 MT allegedly "N-Acetylpseudoephedrine" *convertible* to meth, was contradicted with the Forensic finding made by the National Forensic Laboratory under the Attorney General's Office of that country when it conducted the same forensic laboratory testing upon the samples from the same Ye Gon shipment: The sample was not found as the pure "N-Acetylpseudoephedrine". Instead, it was pronounced to have "consisted of a mixture of Acetamide, N-(2(acetyloxy)-1-menthyl-2-phenylethyl)-N-menthyl and Ephedrien Acetate." (See Mexican Case Dossier page 85898, also see Mexican Attorney General's Order to Destroy)

Acetamide, is also known as Acetethamtne, exactly is what was specified in the purchase contract concluded between Defendant Ye Gon and Chifeng Arker Pharmaceutical Technology Ltd. in Inner Mongolia, China. Chifeng Arker Pharmaceutical Technology Ltd., is ***a PRC state owned enterprise, being inspected and certified by the Food and Drug Administration (FDA) of the United States***. The chemicals specified in Unimed-Chifeng purchase contract is a legitimate, non-precursor chemical property, the fact was at least twice certified, wholly or partially, by the Attorney General of Mexico.

The same lab report further proclaimed, the fact was also concealed by the U.S. Government in seeking for grand jury indictment:

> Acetemide "is **NOT considered by the General Health Law to be a psychotropic and/or narcotic drug, Nor is it a chemical precursor or essential chemical to the Federal Law for Control of Chemical precursor**..." see Id (emphesis added).

It is true that the Mexican crime lab's contradictory report pronounced the testing results as follows: "The sample analyzed is N-AcetylPseudoephedrine." Further, it completely negated the existence of Acetemide: "This is not N-menthyl-Acetylamino" directly battling with the forensic finding with the National Lab under the Attorney General.

Further concealed from this court and the grand jury is the well documented fraud committed by the original source of the Mexican Customs Forensic Lab. The same testing report further certify the following facts:

> ***"We treated the samples by adding chiorohydric acid and heat, we obtained the testing results of pseudoephedrine".*** (emphasis added. See Mexican Customs Central Administration of Laboratories, Case Dossier page 85898, Exhibit #3)

This apparent government practice of fraud by contaminating the samples through harsh treatment before testing was caught by Dr. LaVerne L. Brown, faculty of Howard University, School of Pharmacy, a detached and independent expert:

> "Conclusions made in the Chemical Forensics documents indicated that the white powder substance from Unimed Pharmaceutical was determined to be a mixture containing acetamide. In the documents, acetamide was described as a substance that was considered by the General Health Law to be neither a narcotic drug nor a precursor to such illicit drugs.
>
> However, a report from Customs Administrator suggests that the white powder substance confiscated from Unimed Pharmaceutical did not contain acetamide, but instead SOLELY of substance characterized as a derivative of the alleged controlled contraband. These conclusions were determined only after exposing the

sample to harsh chemical conditions and heat. Clearly the two reports are contradictory."

Dr. Brown's Expert opinion further points out: ""... it is my professional opinion that preferred methods of characterization involve procedures that do not alter the chemical make-up of the sample under investigation."

The procedures in obtaining forensic testing results conducted by National Forensic Laboratory under the Mexican Attorney General's Office did not show its better respect of the generally observed clandestine guideline of the forensic chemical laboratories of the world, its finding of unclear ratio of "pseudoephedrine" was also obtained after its pre-treatment of sample by using the alkaline extraction from the questioned samples.

**II. <u>PROCEDURE POSTURE</u>.**

A motion to dismiss for failure of the indictment to sufficiently allege a crime is permitted under Federal Rule of Criminal Procedure Rule 12(b). Such a motion can be made at any time during the proceedings. Rule 12(b) provides: "Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. The following must be raised prior to trial: (1) Defenses and objections based on defects in the institution of the prosecution; or (2) Defenses and objections based on defects in the indictment or information."[1]

The sufficiency of an indictment is determined by three factors: "(1) whether it contains the necessary elements of the crime alleged, (2) whether it informs the defendants of the crime charged with sufficient clarity to allow them to adequately defend against the charges, and (3) whether it is stated with the sufficient clarity to bar

subsequent prosecution for the same offense." *United States v. Boone*, 951 F.2d 1526, 1542 (9th Cir. 1991); *United States v. Buckner*, 610 F.2d 570, 573 (9th Cir. 1979), cert. denied, 455 U.S. 961 (1980).

To allege conspiracy under 18 U.S.C. 371, an indictment must show the three elements necessary for conspiracy: "the agreement, the unlawful object towards which the agreement is directed, and an overt act in furtherance of the conspiracy." *United States v. Giese*, 597 F.2d 1170, 1177 (9th Cir. 1979). In analyzing whether an indictment has accomplished these requirements, the allegation should be questioned in a manner "to be construed according to common sense with an appreciation of existing realities." *Id.* at 1178.

The sole-count Indictment charging the Defendant for conspiracy in aiding and abetting manufacturing methamephetamine in the United States, without any support of any credible evidence has violated Defendant's due process rights under 5th and 6th Amendment.

**III. ARGUMENT**

**1. INDICTMENT IS FATALLY DEFFICIENT ON ITS SURFACE: *GOVERNMENT 'S FAILURE TO PROVIDE ADEQUATE NOTICE OF THE CRIME CHARGED***

The Sixth Amendment mandates that "in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI; see also Russell, 369 U.S. at 762. This constitutional requirement was incorporated in Rule (7)(c)(1) of the Federal Rules of Criminal Procedure, which states that the Indictment "must be a plain, concise, and definite written statement of essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Notice to the defendant

of the essential facts which underlie the charge alleged is necessary to protect the defendant and ensure that he is aware of the charges he must be prepared to meet. United States v. Pickett, 353 F.3d 62, 67 (D.C. Cir. 2004). Under the U.S. constitutional and statutory mandates, the charging document must therefore provide notice of the charges, adequate for preparation of the defense. Jones v. United States, 526 US 227 (1999) The charging document must also provide enough detail to permit evaluation of a claim of double jeopardy. U.S. v. Miller, 471 US 130, 134-135 (1985), Johnson V. United States 613A2d, 1381, 1384 (DC Cir. 1992).

The 21 U,S,C, § 959 Covers the Drug Offense Committed Outside United States, While the Accused Offense Against the Defendants is Completely Unsupported, as we have analyzed in part of Introduction. The problems of the Indictment goes much further away. First of all, the Indictment has greatly confused all parties: the Defendant, the Grand Jury, possibly this Honorable Court, from its very beginning. "From in or about 1999, the exact date being unknown to the Grand Jury…" (Indictment, page 1) The starting time of the accrual of all alleged offense does not only appear absurdly groundless, it also directly contradicts to the timeframe description in Officer Eduardo Chavez's Affidavit, the lone information in support of that failed Indictment. The Affidavit traced all events back to the year 2004 as its earliest date of alleged accrual of so-called drug related offenses.

The confusion of the time of the alleged accrual of cause of action triggering this instant criminal prosecution is by no means a harmless error, it is serious deficiency in an indictment by bad faith: Government's attempt to incriminate the defendant's almost all

legitimate and normal business operation in a groundlessly, and disproportionately extended timeframe.

Concerning the notice of crime charged, the indictment is unconstitutionally insufficient for two foremost reasons, among others: (a) it fails to specify both the "conspiracy" and "aiding and abetting" offenses in which Mr. Ye Gon was allegedly involved according to the unsupported allegation made by the Indictment; and (b) the worst prominently and the most visibly, it fails to articulate the American-based criminal activity (in addition to the same failure in articulating the alleged "criminal activities" in the State of Mexico and elsewhere.) While the indictment, in color of law, generally tracks the language of 21 U.S.C. § 959, it is hopelessly insufficient for failing to allege the elements establishing the conspiracy and aiding and abetting. Because the Government has totally collapsed in specifying the Defendant's role in the alleged conspiracy, neither did it do anything to establish or even adequately allege any factual basis concerning aiding and abetting charges, therefore, the Defendant cannot properly raise a defense to these charges, **whose severe consequence is prejudicial to the vital penal interests of the defendant.** While "the charging document failed to give fair notice of the charges, thereby causing ***substantial prejudice*** to the Defendant", leading to an "*apparent miscarriage of justice*." Clemons v. United States, 400 A2d 305, 306 (DC Cir. 1979) See also "Patterson v. United States, 575 A2d 305, 306 (DC Cir.1990)

When compared to a sufficient indictment alleging conspiracy, this indictment is clearly insufficient: "the indictment in this case sufficiently apprised the defendants of ***the time frame*** of the alleged drug activity, ***the members of the alleged conspiracy***, and the ***type of drugs*** involved." *United States v. Olderbak*, 961 F.2d 756, 760 (8th Cir.

1992)(emphasis added) In the instant case, not only are the members of the conspiracy not identified, but the conspiracy itself, in *terms of time frame, names and specification of of drugs, members of alleged conspiracies, members of the persons allegedly "aided and abetted" in alleged illicit drug activities, are* either not defined, or vaguely and wildly speculated without evidentiary support, or even worse, by fraudulent allegation. As defense counsel noted in oral argument, or on other credible public sources, more than 10,000 drug dealers, including several hundreds of ranking police officers, were arrested by Calderon cabinet and more than 30 Mexican drug cartel members have been extradited into America and as the Chavez affidavit makes clear, two major meth labs were raided and eliminated by Law Enforcement in Mexico. Surely the Government should be able to proffer some link, clearly pinpointing certain linkage between spots in general mapping after this instant case has been put in place for U.S. –Mexico joint investigation in **March 2006, 18 full month ago. Unfortunately, none has been presented to this Honorable Court**. Much less to the Grand Jury. ***This is not just an ordinary failure, it appears a total collapse, rendering this entire criminal charge a frivolous one, a highly politicized bubble with no serious substance.*** Law in this jurisdiction is clear, an Indictment must state the species. It must descend to particulars. The statutory language must be accompanied with such a statement of facts and circumstances as well informed the accused of the specific offense, coming under the general description, with which he is charged. United States v. Nance, 533 F 2d 699, 701 (DC Cir. 1976).

The prejudicial effect of this frivolous nature in the indictment is indicated by the Government's inability to specify the illegal conduct with which Mr. Ye Gon is charged.

Because the Government has not indicated a single particular conspiracy which the Defendant allegedly participated in, the Government has enabled itself to proceed on **ever changing, inconstant, disparate and conflicting factual theories.** The Government has alleged in detention hearings that the Defendant ***imported*** pseudoephedrine, or ephedrine, a controlled substance. After the Defendant pinpointed that the forensic testing was apparently contaminated with Mexican government fraudulent practices, the Government changed its tone, now alleged that the Defendant illegally imported "mis-labeled" precursor or intermediate chemicals in order to **manufacture** pseudoephedrine. Thirdly, the original version of the Government's probable cause allegation went even wilder, it attempts to make links between the Defendant and the charge against him by proffering that he also worked with mass production of MDMA, a Schedule II controlled substance using twenty metric tons of Safrole, according to DEA Officer K. Hooton's Affidavit Statement issued on March 22, 2007. Query: Which specific drugs are in play? Such a collapse of evidence does not prevent the government from its ever renewing fishing trip going on and on.

Moreover, the indictment also accuses the Defendant to "knowingly aid and abet" others to traffic such illicit drugs as methamphetamine or its mixture into the United States, however, from nowhere Defendant can locate any single word concerning any persons, natural or juridical, to such "principals" having ever been aided and abetted. The notice of "aiding and abetting" crime as charged has also apparently collapsed in this instant case.

Since nothing in the indictment or any of the Government's proffers indicate which specific conspiracy it is alleging, or the nature of the US-based criminal activity,

the Defendant cannot raise a proper defense or protect himself from double jeopardy. "It is required ... that the charge be set forth with such particularity as will reasonably indicate the exact offense which the accused is alleged to have committed and which will enable him intelligently to prepare his defense and, if found guilty, to plead his conviction in a subsequent prosecution for the same offense. *A vague, general and indefinite description of the alleged crime is insufficient.* The averments must be such as clearly to designate, not only the particular kind of offense, but the specific criminal act for which the accused is to answer." (emphasis added) *United States v. United States Sav. & Loan League*, 9 F.R.D. 450, 452 (D.D.C. 1949)

Further, the Supreme Court of the United States laid out two primary criteria for measuring the sufficiency of an indictment (1) whether the indictment contains the elements of the offense intended to be charged and *sufficiently apprises* the defendant of what he must be prepared to meet, and (2) whether the record shows with *accuracy* to what extent the defendant may plead a former acquittal or conviction in case any other proceedings are taken against him for a similar offense. United States v. McBride, 498 F.2d 683, 685 (D.C. Cir. 1974); Russell, 269 U.S. at 763-64; see also Hamling v. United States, 418 U.S. 87, 116 (1974); United States v. Conlon, 628 F.2d 150, 155 (D.C. Cir. 1980) ("The test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment.").

The first criterion is analyzed into two separate inquiries to simplify the analysis: (1)(a) whether the indictment contains the essential elements of the offense charged, and (1)(b) whether the indictment describes the elements with particularity and without any uncertainty or ambiguity. See U.S. v. Threadgill, 172 F.3d at 366. Unfortunately, the

instant Indictment, together with its sole supportive document, i.e., Special DEA Officer Eduardo Chavez' Affidavit Statement in Support of the Indictment either provides "little", "thin", or completely none, infected with false information, concerning such essentials of what is charged: when (1999?!), where ("inside United States?!"), who/whom (who are "co-conspirators?, principals to be aided and abetted?) whats (Methamphetamine? Pseudoephedrine? Safrole? MDMA? Or simply Hydroxy Benzyl-N-Menthyl-Acetathamtne?) hows (manufacture? Distribute? Trafficking?) Seventeen months after the U.S.-Mexico joint task force fact-finding mission after March 2006, the indictment has presented zero credible, free of fraud accounts on the crime charged.

In a number of cases, our Federal Courts have emphasized two of the protections which an indictment is intended to guarantee, reflected by two of the criteria by which the sufficiency of an indictment is to be measured. These criteria are, first, whether the indictment "contains the elements of the offense intended to be charged, `and sufficiently apprises the defendant of what he must be prepared to meet,'" 369 U.S. 749, 764 and, secondly, "`in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' Cochran and Sayre v. United States, 157 U.S. 286, 290 Rosen v. United States,161 U.S. 29, 34 Hagner v. United States, 285 U.S. 427, 431 See Potter v. United States 155 U.S. 438, Bartell v. United States 227U.S. 427, Berger v. United States, 295 U.S. 78,82 United States v. Debrow, 346 U.S. 374, 377, 378

**Here, the description of such alleged charges as conspiracy, aiding and abetting, and drug trafficking, is far too vague to properly protect the defendant from later prosecution for the same acts or to allow for preparation of a defense.**

**While it constitutes a juicy media sound bite, the Government's Mexican drug cartel bubble coupled with complete absence of illicit drug activities, much, much less a specific US-based criminal activity, warrants dismissal of the indictment with prejudice.**

## 2.. FATAL DEFFICIENCY IN CONSPIRACY CHARGE

Defendant was sur-charged for criminal conspiracy. The threat posed to society by [conspiratorial] combination arises from the creative interaction of two autonomous minds. It is for this reason that the essence of a conspiracy is an agreement.

However, there is no conspiracy in this case. For a conspiracy to exist, the law requires that "two or more persons conspire . . . ." Even if taken as true, the Government's indictment does not make such an allegation. Conspiracy in drug related charges consists of four elements." United States v. Montelongo, 420 F.3d 1169, 1173 (10th Cir. 2005). "The government must prove beyond a reasonable doubt (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." Id. (internal quotation marks omitted). The Government is so eager to fix the gap caused by absence of co-conspirators, therefore, it made a quantum leap over the time, by unilaterally, also mistakenly declared that the Ms. Marx Yu, the Defendant's wife held in custody in Mexico since March 15, 2007, was "convicted" and would be "sentenced" for years in prison, falling in short to clarify which part of the Mexican government has "convicted" Ms. Marx Yu, President Felipe Calderone, or any of Mexican Court, has convicted Marx Yu?

This imaginative "pre-trial conviction" against any person in related case by "prosecutors" in government's fantasy world would certainly not help support the government's conspiracy charge. This sort of deficiency is a typical case of the government's failure to provide adequate notice of the crime charged.

Further deficiency is also seen in absence of any persons, or entities who were aided and abetted in methamphetamine, or its mixture's manufacture, distribution, and trafficking, when the Defendnat himself was charged for knowingly aided and abetted to transact methamphetamine, or its mixture into the United States.

The indictment alleges an "unknown co-conspirator" appears to be a mere speculation. Defendant Zhenli Ye Gon was indicted on charges of one count of "unlawfully, knowingly, intentionally combine, conspire, confiderate and agree with each other and with other co-conspirators ***unknown*** to the Grand Jury…to aid and abet in manufacture of 500 grams or more of mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance into the United States…" (Please see Grand Jury Indictment, pp 1-2), in violation of 21 U.S.C. §§ 959 and 960 and 18 U.S.C. § 2; Zhenli Ye Gon's acts are the acts of a single entity, it cannot be said that "two or more" persons have conspired here. The required "plurality," for a conspiracy does not exist.

It is widely reported that since President Felipe Carderon's hi-pitch war on drugs, more than 10000 drug suspects have been arrested, including 384 ranking police officers, and at least 30 alleged drug lords, have been extradited into the United States from Mexico. Officer Chavez' Affidavit also pinpointed that two major Meth production labs

on the West Hemisphere have been detected, found and destroyed. In connection of these facts to 18-full month of fact finding, evidence collection, and criminal investigation, the Government's Indictment did not provide any single evidence to establish such linkage of criminal activities.

.Because, as a matter of law no conspiracy has been alleged, Defendant Ye Gon respectfully requests that the Court grant its motion and dismiss Count One of the indictment.

**3.. VINDICTIVE PROSECUTION IN VIOLATION OF DUE PROCESS**

A Vindictive prosecution is the government's wrongful action:

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978). Facts and circumstances has clearly demonstrated that the instant Indictment is a typical product of vindictive prosecution, which should be dismissed for its violation of due process.

Apparently for the purpose of misleading the Court, confusing the jury, paving its way to gain undue prosecutorial advantage, while deviating from what it alleged as "illicit trafficking of Meth into the United States," the prosecutors in this instant case, being probed by the Honorable Sullivan, the presiding Judge, went on and on to have accused this Defendant for excessive gambling, and alleged "net loss" of "102 million U.S. dollars in Casino at Las Vegas, Nevada; the Government also accused this Defendant for his efforts to import "Hydroxyl Benzyl-N-Menthyl Acetamide", Government further accused this Defendant's efforts to build the Latin America's largest

pharmaceutical conglomerate by importing great number of assembly lines from Germany and other countries, Government also mistakenly accused this Defendant for his wife's alleged "conviction" and "several years prison term"; Most importantly, the urge under undue influence and pressure of an infamous foreign regime ***which prompts*** the Government to decide to prosecute while in absence of any inculpable evidence is this ***Defendant's speaking out of the truth to the media*** in response to a corrupted foreign government's defamation campaign tarnishing him to be the "world's largest illegal drug kingpin", while the root cause that triggers all these unsupported "illegal drug allegations" is stemming from the government's information concerning this Defendant's custody of approximately 210 Million U.S. Dollars, most of it is allegedly the PAN entrusted campaign slush funds. All these have formed the solid basis for vindictive prosecution in gross violation of this Defendant's due process rights, rendering this case dismissible with prejudice. The law is clear in this Jurisdiction, a vindictiveness is "any situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights." United States v. Meyer 810 F.2d, 1242, 1245 (DC Cir. 1987)

The defendant was charged for drug trafficking. The fact finding indicated that what Defendant meant to purchase, and actually signed contract to have purchased from the Government of the People's Republic, was "Hydroxy' Benzyl-N-Menthyl Acetamcetne", which, according to Mexican Attorney General's Office, is neither "Psychotropic, nor narcotic drugs, neither it under controlled substance list according to that country's general law of public health". To purchase "Hydroxy' Benzyl-N-Menthyl Acetamcetne", a non-controlled substance, is not an unlawful action. If this case goes to

trial, Defendant would lay out everything on the table to explain why he did need large

quantity of "Hydroxy' Benzyl-N-Menthyl Acetamcetne" from the Government supplier,

the People's Republic of China in the light of his state of art pharmaceutical mfg

involving 22 assembly lines. .

Anything other than such a normal and legitimate business  activities, such as taking

entrusted custody of large amount of cash at home, gambling at casinos of Las Vegas,

none of these activities has given rise to criminal prosecution on "illicit drug trafficking".

Prosecution against this defendant, as what the Indictment has fulfilled, triggered by all

these legitimate, irrelevant activities in its nature, is a vindictive prosecution, which is a

prima facie violation of the Defendant's Due process rights.  "Vindictive Prosecution

violates Due Process", period.  Moran v. V. Burbine 475 US 412 (1982).


Although a prosecutor has broad discretion in his charging decisions, there are

two important limitations on this authority. First, a prosecutor may not bring charges with

a vindictive motive, since "'penalizing those who choose to exercise' lawful rights

including constitutional rights, 'would be patently unconstitutional.'" North Carolina v.

Pearce, 395 U.S. 711, 724 (1969), overruled on other grounds by Alabama v. Smith, 490

U.S. 794 (1989) (quoting United States v. Jackson, 390 U.S. 570, 581(1968)); see Guam

v. Fegurgur, 800 F.2d 1470, 1473 (9th Cir.1986).

In finding of vindictive prosecution, to dismiss such an indictment with prejudice

based upon such finding does not even require the evidence of the prosecutors' bad faith,

even though there are sufficient proof of government's bad faith in this instant case.

Because the prohibition on vindictive prosecutions is intended not only to prevent against

prosecutions actually motivated by prosecutorial animus, but also to prevent the chilling of the exercise of constitutional rights by defendants, no evidence of actual bad faith is necessary to establish such a claim. Blackledge v. Perry, 417 U.S. 21, 28 (1974); United States v. Groves, 571 F.2d 450, 454 n.1 (9th Cir. 1978); United States v. DeMarco, 550 F.2d 1224, 1227 (9th Cir. 1977); see also United States v. Ruesga-Martinez, 534 F.2d 1367, 1369 (9th Cir. 1976) ("the mere appearance of vindictiveness is enough to place the burden on the prosecution") Once the defendant shows that charges have been increased after he has exercised a constitutional or statutory right, the defendant has demonstrated an "appearance of vindictiveness" on the part of the prosecutor. United States v. Shaw, 655 F.2d 168, 171 (9th Cir. 1981) (citing United States v. Groves, 571 F.2d at 453). With this prima facie showing, or other evidence of "a realistic likelihood of vindictiveness," vindictiveness is presumed and the burden shifts to the government to prove that the increase in the severity of the charge was not based on a vindictive motive. See United States v. Spiesz, 689 F.2d 1326, 1328 (9th Cir. 1982); Shaw, 655 F.2d at 171; United States v. Burt, 619 F.2d 531, 536 (9th Cir. 1980); see also Ruesga-Martinez, 534 F.2d at 1369 (when prosecution reindicts the accused after he exercises a procedural right, the prosecution "bears a heavy burden of proving that any increase in the severity of the alleged charges was not motivated by a vindictive motive"). "[A]n indictment must be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action," ***the indictment must be dismissed***. United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999) (per curium); see Spiesz, 689 F.2d at 1328 (emphasis added).

The suspicious vindictive motive in Prosecutor's action can be further found in given circumstances. Until July 24, 2007, the Defense counsel's due diligent search of the Government's website indicated that this Defendant was not in Government's wanted list, even though he had been said to be a "fugitive" by President Carderon's defamation campaign. Things became drastically worsen since this defendant spoke out of the truth to a relatively large press conference held in Washington DC, National Press Club, an totally legitimate efforts in response to Mexican government government's sponsored defamation campaign. The Defendant's holding out himself had triggered the government's immediate reaction. Arrest, detention and this grand jury indictment were all followed.

The law gives the prosecutors"the broad discretion accorded prosecutors in deciding whom to prosecute." However, such a power is not 'unfettered,' and a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights."); Brooks v. United States, 450 U.S. 927 (1981) (stating that a court must reconcile the rule that a prosecutor has broad discretion to file charges **where there is probable cause** with the rule that vindictive  conduct by prosecutors is unacceptable and requires control);  see also City of Houston v. Hill, 482 U.S. 451, 462-63 (1987)  ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation  from a police state."). Lest there be any doubt from the prosecutor's words that  this prosecution is vindictive, the sequence of events confirms this. Because future defendants may be deterred from exercising their constitutional and statutory rights by increased charges filed against a defendant, vindictiveness is presumed under these circumstances. See Shaw, 655 F.2d at

171; DeMarco, 550 F.2d at 1227; United States v. Groves, 571 F.2d at 453. "The conclusion is inescapable on this record that the government brought the marihuana charge in retaliation for the appellant's exercise of his statutory rights on the cocaine charge); DeMarco, 550 F.2d at 1227-28 (In that case, the court dismissed indictment charging the making of false statements to an IRS agent after such charges were added in response to defendant's assertion of his statutory venue rights to be tried in the district of his residence. )

**For the cause of apparent vindictive prosecution against this Defendant in gross violation of due process, this indictment must be dismissed with prejudice.**

## 4. THE INDICTMENT SHOULD BE DISMISSED FOR PROSECUTORS' INTENTIONAL CONCEALMENT OF EXCULPATORY EVIDENCE AS TO GRAND JURY

Neither this Honorable Court, nor Grand Jury has been presented with any exculpatory evidence in this case due to Government's willful concealment of such exculpatory evidence. Instead, what government has done is to mis-paint the Defendant being the illicit methamphetamine trafficker by messing up such exculpatory evidence in accommodating a foreign regime's political agenda.

Among all these exculpatory evidence, the top line, and foremost exculpatory evidence, taking it into judicial notice is that the sole supplier, that had been in chain of custody of the so-called "criminal drug trafficking" evidence, say, that 19.8 metric tons of the allegedly "illicit drugs" is the Peoples' Republic of China, which has never been quoted as the "co-conspirator" or "people to be aided and abetted". Chifeng Arker

pharmaceutical company is the PRC government owned, PRC government officially run state enterprise, an integral part of the People's Republic.

The second exculpatory evidence is the transcripts, minutes, official business records of the USDOJ's fact-finding force interviewing the key witnesses of the Chifeng Arker in later March of 2007. These government records clearly indicates that what Defendant actually purchased from the PRC government supplier, and what he really meant to purchase therefrom, was not any controlled substance, but non-controlled, harmless chemical property.

The third exculpatory evidence is Mexican Attorney General's office's fact finding that "Hydroxy' Benzyl-N-Menthyl Acetamcetne" is neither "Psychotropic, nor narcotic drugs, nor is it under controlled substance list according to that country's general law of public health. All these are either well documented, or well debriefed to the U.S. Department of Justice. The Prosecutor should have been fully aware that this Defendant is completely innocent from any illegal drug trafficking charges.

Therefore, This Indictment should be dismissed for the Government's intentional concealment of exculpatory evidence to Grand Jury.

The entire weight of incriminating charges in this instant case is built upon the presumption that the chemicals shipped by Chinese supplier, Chifeng Arkar Corporation in Inner Mongolia, Chinainto Mexico for its recipient, Unimed, is either Methamphetamine, or pseudoephedrine, or ephedrine, or ephedrine derivative. All of

these and either of these items are controlled substance, while importing them without government issued special permit is illegal.

Moreover, the Defense team for Defendant Ye Gon also repeatedly wrote to the U.s. Department of Justice, by laying out numerous weighty evidence which indicated that the chemical agents later shipped to the Defendant's Mexican company were found to be a legitimate chemical property, in the meantime, the incriminating evidence cooked up by Mexican Government has clear birth mark of fraud, based upon scientific reading and scientific analysis. All these have formed overwhelming exculpatory evidence basis.

This exculpatory information may have greatly retarded the Government's determination to take any legal actions against Defendant Ye Gon. When Defense Team repeatedly approached the Government requesting for ways leading to solutions, the Government appeared not to be in a hurry to respond, no matter the growing pressure from Mexican authorities. Defendant's name had never appeared on the DEA's wanted list even though he was alleged to be an fugitive, but no Government website publicly listed him as wanted until our final due diligence check on July 14, 2007, hours after his arrest. Nevertheless, when Government was preparing the indictment related documents and did the Grand Jury testimony, it apparently appears that the Government had intentionally concealed all these exculpatory evidence in favor of the Defendant.

The Government's misconduct in its intentional concealment of the exculpatory evidence has completely violated the "constitutional disclosure requirement" established in the landmark case as Brady v. Maryland 373 US 87, when it is found that the Prosecutor in this case intentionally concealed critical exculpatory evidence in favor of

Defendant, including, but may not be limited to, the DEA officials criminal investigation conducted in Inner Mongolia, China during the last week of March, 2007. Consequently, the Indictment was obtained by intentionally defrauding the Grand Jury, such a violation usually triggers the proper result of dismissal. United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976).

The Brady Rule has been seen followed in this Jurisdiction. In U.S. v. Short and Green, 777 F. Supp. 40, 1991, U.S. Dist. Lexis 16380, when the Prosecutor failed entirely to illicit testimony before the grand jury concerning co-defendant Short's testimony which is exculpatory as to Defendant Green". The same Court held, for the relevant part: "Thus, while the government may elect to present Short's complete statement to the grand jury for another determination of probable cause as to Green, the Court cannot allow the present indictment to stand." Id. P 41.

A prosecutor's willful concealment of exculpatory evidence from grand jury is not a violation of law, but a serious violation of professional ethics. The ethical violation in this instant case is so prominent because the entire case appears so frivolous, so politicized, evidencewise. ABA Standards relating to the prosecution function, *i.e.*, Section 3.6(b) (2nd ed. 1980) provides that "the prosecutor should disclose to the grand Jury any evidence which he knows will tend to negate guilt". The U.S. Attorney's Manual sets forth the Department of Justice view of Appropriate Conduct by prosecutors appearing before Grand Jury. The Manual advises a prosecutor who is "personally aware of substantial evidence which directly negates…guilt" to notify the grand jury of this evidence." U.S. Attorney's Manual, Section 9-11, 334. The government was and should



have been fully aware with all those exculpatory evidence which has directly negated alleged guilty charge of "illicit drug trafficking".

Indictment dismissed where prosecutor withheld evidence from the grand jury. United states v. Reid, 911 F. 2d 1456 (10th Cir. 1990) For the cause of the prosecutors' willful concealment of exculpatory evidence in bad faith, which is prejudicial to the vital penal interests of the Defendant as guaranteed by our Constitution, this **indictment** should be dismissed **with prejudice.**

**5. DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN TO THE FACT THAT THE GOVERNMENT'S FAILURE TO RESPECT THE GRAND JURY AS AN INDEPENDENT LEGAL BODY**

It is amazing to see that so-called Grand Jury Indictment, which ripped off the Defendant's opportunity of having a hearing of probable causes , was not signed by a foreman. The Grand Jury hearing appears to have been held on July 26, 2007, three days after this Defendant was incarcerated, hence available for testimony. The Grand Jury proceedings appears being handled in such a lousy manner that it has well deviated from its origin: To protect the basic rights of criminal defendants. The Grand Jury Indictment was found not having been signed by any foreperson.

While precedents in this jurisdiction views an absence of foreman's signing of the Indictment a serious government irregularity, not necessarily leading to dismissal of the indictment as a whole. However, in the broad based environment of this instant case, such a serious irregularity has clearly indicated that the government's behavior which shows little, or completely no respect of the Grand Jury as an independent legal body. It is logical development of Prosecutor's failures in various aspects.

Such a failure in form concerning the Grand Jury Indictment obtained by the Government through such means at the back of the Defendant being rendered in darkness as discussed *supra* is apparently the government's bad faith efforts to *circumvent* all constitutional safeguard as what due process commands, and also circumventing such criminal procedural safeguards as probable cause hearings, in order to obtain undue prosecutorial advantage, by tramping upon, and complete disregard the defendant's constitutional rights, civil rights, and minimum decency of criminal procedures in a civilized judicial system under the constitutional democracy. Therefore, failure of signature here appears an ethical violation. A prosecutor has an "ethical obligation to boserve the status of the grand jury as an independent legal body" Nogan v. United States, 712 F2d 757, 759 (2nd Cir. 1983). Also see ABA Standards for Criminal Justice at 3.48, U.S. Attorneys' Manuel, Section 9-11. 015.

What remains a serious problem, as an addition to the weight of other grounds in support of Defendant's request for dismissal with prejudice, is the prosecutor's general disrespect of Grand Jury procedures and its ominous tendency in disregard of constitutionally and statutorily protected rights of defendant in this case. A dismissal of such a document of serious irregularity is apparently appropriate.

**6. DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN TO THE GOVERNMENT'S EGRGIOUS OMMISSION ALLOWING THE MEXICAN AUTHORITIES TO DESTROY THE PHYSICAL EVIDENCE OF ITS FRAUD: THE 19 METRIC TONS OF CHEMICALS IN QUESTION**

The Indictment must be dismissed with prejudice because the government's action and omission in relation to a serious destruction and elimination of evidence, highly likely exculpatory as to "illicit drug" charge as to this Defendant, while

inculpatory as of fraud as to Mexican government, taken by the government of Mexico in may 2007, is egregious, dilatory and neglectful. Such premature elimination of critical evidence was apparently made under the urge of covering up concrete evidence of Mexican government's fraud, it therefore, out of bad faith, and severely prejudicial to this Defendant's constitutionally protected vital penal interests.

Starting as early as March 2006, according to USDEA Officer K. Hooton's Affidavit Statement issued on March 22, 2007, the U.S. Department of Justice, USDEA had formed joint task force to start joint criminal investigation against suspicious illicit drug activities with the AFI of Mexico. In December 2006, the joint task force has intercepted 19.796 metric tons of allegedly "controlled chemical substance with the terminal recipient of Unimed at Mexican Sea port. After different national Forensic Laboratories took the samples from these 19.8 metric tons of chemical agents, under the name of hydroxy benzyl-N-Menthyl Acetamcetne, and tainted the samples, having left well documented fraud in mis-handling the forensic testing, the Mexican Attorney General's Office ordered to destroy the total 19.8 metric tons of chemical agents in disputes, apparently in the intention to cover up its fraud. Being partner of the joint task force, the U.s. government apparently had allowed such destruction of evidence to happen. Such an action or omission is egregious, dilatory and neglectful, to say the least.

The test is whether Government's action is seen "egregious", is to see whether the government's conduct is "neglectful" and "dilatory", to justify a dismissal of indictment ***with prejudice***. U.S. v. Taylor 487 U.S. at 338-39 (emphasis added). Consequently, this **indictment** must be dismissed **with prejudice.**

**7. DISMISSAL OF THE INDICTMENT IS APPROPRIATE GIVEN TO THE GOVERNMENT'S MOST RECENT IMPLICIT ADMISSION OF THE TOTAL COLLAPSE OF CHARGING "EVIDENCE", WHICH APPEARS OF WILLFUL "FRAUD" FROM MEXICAN GOVERNMENT, IN SUPPORT OF FRIVOLOUS CHARGE.**

The Defendant's Motion for dismissal of grand jury indictment has been further fortified by the Government's most recent move for one-year extension of time which allows the Mexican Government with more time to make up more fraudulent evidence possibly by and through gross abuse of procedures by on-going torture and maltreatment against the innocent, and likely irrelevant inmates held since March 2007.

Government's Motion for More time to restart its "fishing expedition trip of fishing the incriminating evidence by luck is an implicit admission of the undeniable fact that the currently accessible charging evidence is either infected with epidemic of fraud and perjury, or appears exculpatory. The entire case, which had been in its place since March 2007, appears so frivolous that has pressed the Government to restart its fishing trip all over again after an extensive crimination investigation and case preparation has been in place for almost 6 months. Such a motion for enlargement of time should be instantly denied for lack of good faith and the Indictment should be dismissed with prejudice.

Dismissal of this instant case by dismissing its indictment with prejudice is apparently an appropriate, decent, and necessary disposition serving the interests of justice in all aspects given to the circumstances that defendant was arrested and detained without bail upon the Government's request, while in complete absence of credible, probative, free-of-fraud evidence.

In this instant case, government such willful, bad faith misconduct as intentional concealment of exculpatory evidence collected from China, and knowing of Mexican government having committed apparent fraud and perjury while fabricating such key incriminating evidence as of its Forensic Examination Reports by National Forensic Laboratories, without disclosing such fraud-turned exculpatory evidence, is much, much more serious than a *"neglectful"* misconduct. It may be the world's most "egregious" willful misconduct in bad faith. Well before the initiation of the arrest of the Defendant, the government had been informed by the Defendant's legal counsel on numerous occasions, with presentation of all those documentary evidence that fraud had been most likely committed by the government of Mexico. On June 25, 2007, when Mexican Government decided and ordered to destroy the key evidence of 19 metric tons of what they falsely alleged "pseudoephedrine." instantly, Defendant's counsel immediately noticed the government again. Several expert opinion indicating such serious irregularities on Mexican side were also forwarded to the government, having clearly demonstrated that the ultimate source of this instant prosecution to patronize the egregious foreign government's wrongful behavior, had also been delivered to the Government for its attention. Under all these circumstances, the government prosecution under a foreign power's of this case apparently without credible, probative, free-of-fraud evidence to back up its accusation, and the government's efforts in seeking for pretrial incarceration, should be deemed as an egregious act, or to say the least, a reckless act in bad faith. Furthermore, while petitioning for such an extensive one-year continuation of the time in obvious violation of both Defendant's due process rights and his rights under the Speedy Trial guarantee, taking the fact that he was incarcerated in pretrial

incarceration, the Government furthered its bad faith misconduct by further concealing the fact that it had got the Mexican government's "assistance" from day one of accrual of this case, and they had received an exculpatory evidence from their China trip in March 2007, having determined to continue to defraud this Honorable Court as of today by continuing to conceal the China related exculpatory evidence.  Instead, the government raised an apparently inappropriate, unreasonable request for substantial delay which, in its essence, to allow the Mexican Government to have more time to fabricate more fraudulent, perjurous evidence through further abuse of the procedures and torture of innocent, even irrelevant detainees in Mexico.

Therefore, the Governmen's more appropriate action should be a voluntary dismissal of its own fatally flawed indictment, instead of seeking for more time to continue or restart its aimless fishing expedition trip.  In absence of such an action, Defendant moves to dismiss the Indictment with prejudice, given to the additional facts that the Government's serious misconduct has pressed it to move for a substantial extension of time under the circumstances that its only accessible evidence, no matter how "little" and "thin", is the evidence made up by fraud, while the Defendant was held in custody without bail just based upon such fraudulent evidence known to the Government.

The Government's apparent inability to prepare the case for trial within 70 days is not because it does not have incriminating "evidence" (in allegedly "illegally importing "pseudoephedrine" "into Mexico") , even though being found by Judge Alan Kay as **"little" and "thin"**.  It is because the evidence it has is either frivolous, fraudulent, or exculpatory to the Defendant.   Under such a circumstances, dismissal with prejudice is

not just proper, but necessary. "[i]f a defendant is not brought to trial within the seventy-day deadline, dismissal of the indictment is mandatory." United States v. Doran, 882 F.2d 1511, 1517 (10th Cir. 1989).(2) The "indictment shall be dismissed on motion of the defendant." United States v. Vaughn, 370 F.3d 1049, 1055 (10th Cir. 2004). Furthermore, 18 U.S.C. 3162(a) provides, for the relevant part, concerning the dismissal of the indictment:

> "In determining whether to dismiss . . . with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Prejudice to the defendant is among the factors the text of 3162 directs the district court to consider. United States v. Taylor, 487 U.S. 326, 334 (1988); see also id. at 344-46 (Scalia, J. concurring).

Here, the seriousness of the offense cannot just be judged by a foreign power's politicized PR campaign, by any irresponsible, unsubstantiated statement. It should be based upon evidence, free of fraud and perjury.

Section 3161(c)(1) provides in relevant part:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an . . . indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

The seventy-day deadline takes into account various excludable events that do not count against the seventy-day period. See 18 U.S.C. 3161(h). Thus, for example, continuances may be excluded from the seventy-day period if the district court makes a finding on the record that "the ends of justice served by taking [the] action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. To allow



the Government to re-start its aimless fishing expedition trip after it finds, but refuses to acknowledge, that the evidence presented before it by the Mexican counterpart has been totally collapsed for its apparent fraud and perjury, is not to serve the end of justice at all. Under the circumstances, dismissal of indictment may be of only appropriate disposition, instead of undue delay for the purpose to encourage government's compliance of the procedures, instead of committing intentional, severe misconducts.

The Supreme Court stated:

> "This scheme (of dismissal-added) is designed to promote compliance with the Act without needlessly subverting important criminal prosecutions. The more severe sanction (dismissal with prejudice) is available for use where appropriate, and the knowledge that a violation could potentially result in the imposition of this sanction gives the prosecution a powerful incentive to be careful about compliance. The less severe sanction (dismissal without prejudice) lets the court avoid unduly impairing the enforcement of federal criminal laws though even this sanction imposes some costs on the prosecution and the court, which further encourages compliance." Zedner v. United States, 126 S.Ct. 1976, 1984-85 (2006) (quoting 18 U.S.C. 3288).

The failure of the Government's compliance here appears willful, egregious and in bad faith, the indictment should therefore be dismissed with prejudice.

An instant denial of the Government's Motion for undue delay, and entering an order of the dismissal of the Indictment with prejudice appear appropriate and necessary in light of the Defendant's constitutional rights and the principles of equity given to the fact that the Defendant was kept in pretrial custody, which could now face an prolonged term in punitive nature for the same charge without bail upon the government's baseless, bad faith charges:

> "The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy

incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. MacDonald, 456 U.S. 1, 8 (1982).

Consequently, in the light of the foregoing analysis, the appropriate disposition of this instant case is to dismiss the Indictment with prejudice.

## IV. CONCLUSION

Wherefore, Defendant respectfully moves that this Honorable Court dismiss the Grand Jury Indictment with prejudice, without reference to territorial restriction to the applicability of such a dismissal. In the foregoing light, Defendant, by through counsels, respectfully moves that the Indictment be dismissed pursuant to Rule 12 of Federal of Criminal Procedures. Alternatively, this Honorable Court may order an immediate hearing on oral argument concerning Defendant's Motion.

Respectfully submitted by:

/s/Ning Ye, Esq.

Ning Ye, Esq. (DC Bar Number MD26804)
Counsel for the Defendant
1150 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Telephone: (202) 862-4303;
Email: ynyale@aol.com
Fax: 202-828-4130

CERTIFICATE OF SERVICE

On this 19th day of September, 2007, I electronically filed this Rule 16 Motion with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following addressee:

Paul Laymon, Esq.
U.S. Dept. of Justice
1400 New York Avenue, NW, 8th floor
Washington, DC 20530

/s/Ning Ye, Esq.

Ning Ye, Esq.   (DC Bar Number MD26804)
Counsel for Defendant
1150 Connecticut Avenue, NW, #900
Washington DC 20036
202-862-4334; 301-641-7345
Email: ynyale@aol.com

CR 07-181 - EGS
EXHIBIT
#1
FILED
SEP 2 0 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

STATE OF NEVADA )
) ss:
COUNTY OF CLARK )

Officer K. Hooten, P# 4675, being first duly sworn, deposes and states that he is the affiant herein, and that he is a Police Officer with the Las Vegas Metropolitan Police Department (LVMPD), having been employed by the Department for 13 years. Affiant is currently assigned to LVMPD narcotics section, having been so assigned for a period of nine years. Affiant is also a federally deputized Task Force Officer with the DEA Group 1 Federal Narcotics Task Force, having been so assigned for a period of four years.

That there is probable cause to believe that certain property hereinafter described will be found at the following described premises, to-wit: (1) **3298 Dove Run Creek Drive, Las Vegas, Nevada 89135**, further described as a single story residence, brown in color stucco, with a grey tile roof and off-white colored trim. The front door of the residence faces west. The residence has a black security door covering the front door. The numbers 3298 are affixed to the bottom of the mailbox, which is located in front of the residence and to the south of the driveway. (2) **400 Proud Eagle Lane, Las Vegas, Nevada 89114**, further described as a two story residence, off-white in color stucco, with a grey tile roof and beige colored trim. The front door of the residence faces west. The numbers 400 are affixed to a lighted box, which is located on the front house to right of the front door. (3) **2290 Casa Bella Court, Las Vegas, Nevada 89117**, further described as a single story residence, off-white in color stucco, with a reddish-brown tile roof and tan colored trim. The front door of the residence faces west and is a double door with glass inserts. The residence has a three-car garage with one double garage door and one

single garage door, both of which are to the right of the front door. The numbers 2290 are affixed to the wall immediately to the right of the front door and the left of the double garage door. The numbers 2290 run vertically along this wall, and they are underneath a brown in color porch light. (4) and the persons of adults located at the premises at the time of the execution of this search warrant.

The property referred to and sought to be seized consists of the following:

A) Documents and other items, in any form, tending to identify co-conspirators, including but not limited to letters, notes, memoranda, address and phone books, lists of names, buy/owe sheets, shipping and receiving bills;

B) Documents and other items tending to show dominion and control over premises, including but not limited to bills or other correspondence;

C) Likely proceeds of narcotics trafficking, such as U.S. Currency and other negotiable instruments.

D) Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records.

E) Articles of personal property evidencing or containing evidence of the existence of a conspiracy to possess and sell controlled substances, including personal telephone and address books, telephone bills, photographs and documents consisting of lists of names and or numbers, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

F) Articles of personal property evidencing or containing the evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of money

and assets [illegible]ved from or to be used in the sale of co[illegible]lled substances, including books, [illegible]pts, records, bank statements and records, business records, money drafts, money orders and cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes and storage lockers, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

G) Proceeds and articles of personal property which are the fruits, instrumentalities and evidence of trafficking in controlled substances, including U.S. currency, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks and bonds, which were obtained from the sale of controlled substances or proceeds there from.

H) Photographs of participants and fruits and evidence of the trafficking of controlled substances.

I) Weapons, firearms, ammunition and any booby-trap devices.

J) Equipment used to detect police activities and surveillance, including radio scanners, wire transmitter detectors and closed circuit camera systems.

K) Documents and articles of personal property showing or containing data showing the identity of persons occupying, possessing, residing in, owing, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape recordings, telephone beeper or pager devices, cellular telephones, wireless telephones, rolodexes, telephone answering pads, storage records, vehicle or vessel records, canceled mail envelopes, correspondence, opened or unopened, financial documents such as tax returns, bank records, safety deposit box records, canceled checks and other records of incomes and expenditures, credit card and bank records, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

L) Documents showing travel to and from source/distribution areas for narcotics and documents showing travel to and from consumer areas for narcotics including foreign and domestic passports.

The property hereinbefore described constitutes evidence which tends to demonstrate that the criminal offenses of Trafficking of Controlled Substance have been and continue to be committed in violation of Chapter 453 of the NRS and Money Laundering in violation of Chapter 207 of the NRS.

The statements contained in this affidavit are based upon my personal participation in this investigation and information received from other law enforcement sources, subpoenas, physical surveillance, electronic surveillance, telephone toll records, pen register and trap and trace devices, confidential sources, records checks and my knowledge, training and experience, as well as that of other Special Agents and local law enforcement officers also familiar with narcotics and money laundering investigations

In support of your affiant's assertion to constitute the existence of probable cause, the following facts are offered: That Officer K. Hooten, P# 4675, working with DEA Special Agents Daniel Holcomb and David Behar and agents from DEA Mexico City office learned the following information;

1. In March 2006, the DEA's Mexico City Country Office (MCCO) initiated a joint investigation with Mexico's Agencia Federal de Investigacion (AFI) that targeted Zhenli YE Gon, aka: Zhenli YEGON; aka: Zhenli YE. This investigation targeted the illegal importation of pseudoephedrine from China and other countries into Mexico by YE Gon, using his business, UNIMED

PHARMACEUT AL, (UNIMED). A check of public reco in Mexico indicates that YE Gon is the managing director of UNIMED, which is a publicly registered company.

2. On December 5, 2006, authorities from the Michoacan, Mexico State Police (MSP) and Mexican Customs seized approximately nineteen (19) tons (38,000 lbs) of chemicals at the seaport of Lazaro Cardenas, Michoacan, Mexico. Prior to this seizure, the DEA's MCCO provided methamphetamine and precursor chemical training to MSP officers. When MSP and Mexican Customs authorities tested the chemicals, the chemicals tested positive for the presence of pseudoephedrine. Based on my training and experience, I know that pseudoephedrine is used in the clandestine manufacturing of methamphetamine. The container that contained the chemicals that tested positive for pseudoephedrine was being shipped from the EMERALD IMPORT AND EXPORT CORPORATION, Hennessey Road #139, Unit D 10F, Wanchi, Hong Kong, China, to UNIMED, SA de CV, Boulevard Miguel Aleman Valdez #175, Colonia San Pedro Totoltepec, Toluca, Estado de Mexico, Mexico. As stated in paragraph 1, *supra*, YE Gon is the managing director of UNIMED.

3. On February 16, 2007, the AFI's Maritime Interception Team (MIT) seized approximately forty (40) tons (80,000 lbs) of raw pharmaceutical chemicals

at the Port of Ma  anillo. Colima, Mexico. According to  ecords, these chemicals were being shipped to UNIMED PHARMCHEM, Mexico S.A. de C.V., Avenida Morelos #24, Colonia Centro, Mexico City, D.F., Mexico. As stated in paragraph 1, *supra*, YE Gon is the managing director of UNIMED.

4. In early March 2007, authorities from the AFI seized six (6) machines used for the mass production of medicine tablets at a seaport in state of Veracruz Llave, Mexico. Each of these tablet-making machines was valued at approximately $160,000, and they were all destined for UNIMED in Mexico City, Mexico. Each of these tablet-making machines was capable of producing millions of medication tablets every day. Based on my training and experience, I know that tablet-making machines such as these are frequently used by the operators of clandestine laboratories to produce large quantities of tablets containing 3,4-methylenedioxymethamphetamine, which is more commonly known as MDMA or Ecstasy, a Schedule I controlled substance. I also know, based on my training and experience, that it is uncommon for legitimate pharmaceutical companies that manufacture medicinal tablets to order more than one or two tablet making machines at a time. Furthermore, based on my training and experience, I know that ordering six tablet-making machines at one time is consistent with a company or individual operating a clandestine MDMA laboratory trying to obtain enough

tablet-making ma… …nes to produce massive amounts o… table… …ontaining MDMA.

5. In the course of the investigation of YE Gon and UNIMED, DEA agents in the MCCO and Mexican law enforcement officers identified Sierra Madre 515, Colonia Lomas de Chapultepec, Mexico City, Mexico, as an address used by YE Gon in Mexico City, Mexico. On March 15, 2007, agents from the AFI, the Mexican Attorney General's Office of Organized Crime (PGR/SIEDO) and the Policia Federal Prenventia (PFP) executed a Mexican search warrant at Sierra Madre 515, Colonia Lomas de Chapultepec, Mexico City, Mexico. During the execution of the search warrant, Mexican agents arrested Tomoiyi MARX-Yu, who was identified as YE Gon's wife, as well as several other people inside the residence.

6. When Mexican agents searched the residence at Sierra Madre 515, they found the following vehicles:

a. A black 2006 Mercedes Benz S600L sedan;

b. A grey 2006 Range Rover, registered to YE Gon and purchased on April 6, 2006, for $115,000 cash;

c. A grey 2003 Mercedes Benz G500 SUV, registered to MARX-Yu and purchased on December 23, 2002, for $115,000 cash;

d. A grey Toyota Camry sedan;

Yu;

f. A grey Mercedes Benz CL450 SUV;

7. Mexican agents also found the following firearms and ammunition during the search of Sierra Madre 515:

a. 9mm Beretta semi-automatic pistol;

b. .32 caliber Beretta semi-automatic pistol;

c. .45 caliber Heckler and Koch semi-automatic pistol;

d. 9mm Heckler and Koch semi-automatic pistol:

e. 9mm Beretta semi-automatic pistol;

f. 9mm Tec-9 submachine gun;

g. 7.62 x 39mm Norinco AK-47 assault rifle;

h. Approximately 400 rounds of ammunition;

8. Mexican agents also found the following money during the search of Sierra Madre 515:

a. $205,564,763 U.S. Currency

b. $39,010 U.S. Traveler's Checks

c. $201,460. Euros

d. $17,306,520 Mexican Pesos

e. 80 Canadian Dollars

f. $113,260 Hong Kong Dollars

g. $17,000 Japanese Yen

h. $5,200 Counterfeit U.S. Dollars

The total amount of money seized in U.S. Dollars using the Interbank Exchange Rate for March 15, 2007, not including the counterfeit bills, was $207,429,869. The money seized by Mexican agents was hidden in several suitcases, wardrobe closets, false walls, shelving units and floor compartments. Several of the closets inside the residence were filled from top to bottom and front to back with stacks of U.S. and other currency. Based on my training and experience, I know that the possession of such a vast amount quantity of currency is associated with large scale drug trafficking, and that the owners of such drug trafficking proceeds frequently maintain the proceeds until they can find a way to launder it, hereinafter referred to as legitimized.

9. In addition to the money, vehicles, and firearms, Mexican agents also seized a handwritten note that listed known precursor chemicals and quantities of those chemicals. Specifically, the handwritten note listed 20 metric tons of Safrole. Based on my training and experience, I know that Safrole is a precursor chemical used in the clandestine manufacture of MDMA, and Safrole is listed by the DEA in

WHEREFORE, Affiant requests that a Search Warrant be issued directing a search for and seizure of the aforementioned items at the location set forth herein.

AFFIANT

SUBSCRIBED and SWORN to before me this 22nd day of March, 2007.

JUDGE

1. 3298 Dove Run Creek Drive, Las Vegas, Nevada 89135.
2. 400 Proud Eagle Lane, Las Vegas, Nevada 89114.
3. 2290 Casa Bella Court, Las Vegas, Nevada 89117.

CR 07-181-EGS

EXHIBIT #2

Exhibit #5

FILED
SEP 20 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

赤峰艾克制药科技股份有限公司
CHIFENG ARKER PHARMACEUTICAL TECHNOLOGY CO., LTD.
地址：中国内蒙古赤峰市红山区清河路北段 邮政编码 P.C.: 024001
Add.: North Qinghe road, Hongshan District, Chifeng, Inner Mongolia 024001, CHINA
电话 Tel.: 86 476 8243939 传真 Fax: 86 476 8243477
E-mail: arker@263.net Web.: http://www.arker.com.cn

# 售 货 合 同
# SALES CONTRACT

编号 NO.: 06AK0062
日期 DATE: OCT. 18, 2006
签约地 SIGNED AT. CHIFENG, CHINA

买方 Buyer(s): Unimed Pharmaceutical S.A. de C.V.
地址 Add.: Morelos No.24 Col. Centro 06040 Mexico D.F.
兹确认售予你方下列货品，其成交条款如下：
We hereby confirm having sold to you the following goods on terms and conditions as specified bellow:

| | |
|---|---|
| (1)货物名称 Name | 1-(N-甲基-乙酰氨基)乙基-苯甲醇<br>HYDROXY BENZYL-N-METHYL ACETETHAMTNE |
| (2)数量 Quantity | 19,797KG |
| (3)单价 Unit price | USD35.00/KG CIF MEXICO CITY |
| (4)金额 Amount | USD692,895.00 SAY U.S. DOLLARS SIX HUNDRED NINETY TWO THOUSAND AND EIGHT HUNDRED NINETY FIVE ONLY |

(5)包装：25 公斤/纸板桶
Packing: IN 25KG NET FIBRE DRUMS

(6)质量标准：内控标准
Specification: IN HOUSE SPECIFICATION

(7)装运港及目的港：由天津港海运至墨西哥城
Loading port: FROM TIANJIN SEAPORT TO MEXICO CITY BY SEA

(8)装运期：2006 年 10 月 30 日前
Time of shipment: BEFORE OCT. 30, 2006

(9)保险：由卖方办理
Insurance: TO BE INSURANCED BY SELLER

(10)付款条件：预付
Terms of payment: OT/T IN ADVANCE
如果买方不能按此付款条件执行，售方有权不经通知取消本合同书，或接受买方对本合约未执行的全部或部分，或对因此遭受的损失提出索赔。
If the buyer(s) fails to fulfill this term of payment, the seller(s) reserves the right to rescind this Sales Contract without further notice or to accept whole or any part of this Sales Contract non-fulfilled by the buyer(s) or to lodge a claim for direct losses sustained.

(11)品质/数量异议：如果买方提出索赔，凡属品质异议须于货到目的口岸之日起 30 天内提出，凡属数量异议须于货到目的口岸之日起 15 天内提出，对所装货所提任何异议属于保险公司，轮船公司及其他有关运输机构或邮递机构所负责者，售方不负任何责任。
Quality/Quantity discrepancy: In case of quality discrepancy, claim should be filed by the buyer(s) within 30 days after the arrival of the goods at port of destination, while for quantity discrepancy, claim should be filed by the buyer(s) within 15 days after the arrival of the goods at port of destination. It is understood that the seller(s) shall not be liable for any discrepancy of the goods shipped due to cause for which the Insurance Company, Shipping Company and other transportation organization / or Post Office are liable.

(12)本合同内所述全部或部分商品，如因人力不可抗拒原因，以至不能履约或延迟交货，售方概不负责。
The seller(s) shall not be held liable for failure or delay in delivery of the entire lot or a potion of the goods under this Sales Contract in consequence of any Force Majeure incident

(13)买方于收到本售货合同后请立即回签一份，如买方对本合同有异议，应于收到后五天内提出，否则认为买方已同意接受本合同所规定的各项条款。
The buyer(s) is requested to sign and return one copy of this Sales Contract immediately after receipt of the same. Objection, if any, should be raised by the buyer(s) within 5 days after the receipt of this Sales Contract, in the absence of which it is understood the buyer(s) has accepted the terms and conditions of the Sales Contract.

(14)仲裁：凡因执行本合同所发生的或与本合同有关的一切争议，应由双方通过友好协商解决，如果协商不能解决，应提交中国国际经济贸易仲裁委员会，根据该会的仲裁规则进行仲裁。仲裁裁决是终局的，对双方都有约束力。
Arbitration: All disputes arising from the execution of, or in connection with this contract, shall be settled amicably through friendly negotiation. In case no settlement can be reached through negotiation, the case shall then be submitted to China International Economic And Trade Arbitration Commission in Beijing, for arbitration in accordance with its provisional rules of procedure. The arbitral award is final and binding upon both parties.

卖方 The Seller(s):
赤峰艾克制药科技股份有限公司
CHIFENG ARKER PHARMACEUTICAL TECHNOLOGY CO., LTD.

Sales Manager:

General Manger:

买 方 The Buyer(s):
UNIMED PHARMACEUTICAL S.A. DE C.V.

Signature:

| Name of Product 物质名称 | Acetethamtne 乙基-苯甲醇 | Pseudoephedrine Hcl 盐酸伪麻黄素 | Ephedrine 麻黄素 |
|---|---|---|---|
| Molecular Structure 分子结构 | $C_{12}H_{17}O_2N_1$ | $C_{10}H_{16}ClNO$ | $C_{10}H_{15}NO$ |
| Chemical Structure 化学结构 | OH, CH, $CH_2CH_3$, N, $CH_3$, C=O, $CH_3$ | H, OH, H, N, $CH_3$ · HCl, H, $CH_3$ | HO, H, H, N, $CH_3$, $H_3C$, H |
| Molecular Weight 分子重量 | 207 | 201 | 165.23 |
| Controlled Substance 控制物品 | No 否 | Yes 是 | Yes 是 |

Destruction of

EXHIBIT
#3

<Pg 1>
<seal· UNITED MEXICAN STATES,
OFFICE OF THE ATTORNEY GENERAL
FOR THE REPUBLIC>

ASSISTANT OFFICE FOR THE INVESTIGATION OF ORGANIZED CRIME

<handwritten. 333>
A P. PGR/SIEDO/UNEIDCS/191/2006.

RESOLUTION ORDERING THE FINAL DESTINATION OF THE WHITE-COLORED SUBSTANCE IN CONTAINER NUMBER PONU 1424478

17325

In Mexico City, the Federal District, on the 28th (twenty-eighth) day of May in the year 2007 (two thousand seven)-----------------------------------------------

<obscured by seal> the records and proceedings contained in the present criminal investigation, for resolution with respect to the final destination of the white-colored substance contained in 849 (eight hundred forty-nine) barrels in Container number PONU 1424478, kept in the interior of the facilities of the 82 Infantry Battalion <obscured by seal> in Lazaro Cardenas, Michoacan ----------------------------------

---------------------FINDINGS OF FACT----------------------------------------------------

----- A) – On October 13th of the year two thousand six, criminal investigation number PGR/SIEDO/UEIDCS/AC/191/2006 was begun upon initiation of detailed report number PGR/SIEDO/UEIDCS/AC/399/2006 against ZHENLI YE GO, GEORGINA AGUILLON ORTIZ, JUAN JOSE ESCANDON PAZ, and any others who are responsible for the crimes in VIOLATION OF THE FEDERAL LAW AGAINST ORGANIZED CRIME and CRIMES AGAINST HEALTH and those that result in offense to society

----- B) On February 28th of the year 200- <last digit obscured by marking>, official communication number 563 was received, dated the twenty-sixth of February, year two thousand seven, signed by Atty. Sergio Alberto de Leon Azua, an official from the Office of the Public Prosecutor for the Federation, by means of which criminal investigation number AP/PGR/MICH/LC/150/06 was remitted to the SIEDO due to INCOMPETENCE, and by which the disposition of container number PONU 1424478, with tracking number 51139587, containing the white-colored, granular substance evaluated by institutional scientists, who concluded that it contained ACETAMINE and EPHEDRINE ACETATE, was left in the facilities of the 82nd Infantry Battalion

----- C) Security Order dated December 2, year Two Thousand and Six regarding container number PONU 1424478, which contains a white, granular substance.

---------------------REASONING OF LAW----------------------------------------

--- First. – That articles 16, first paragraph, 21 and 102, Section A of the Political Constitution of the United Mexican States; 40 and 41 of the Federal Criminal Code, 1st subsection 1, 2nd subsection IX, 104, 123, 181, 182, and 183 of the Federal Criminal Procedure Code, 1 subsection 1, 2, 3, 5, and 7 of the Federal Law for the Administration and Transfer of Goods in the Public Sector; 4 of the Organic Law of the Office of the Attorney General of the Republic, and 1st, 27, and 28 of its Regulations, this Social Representation of the Federation is competent to order the DESTRUCTION of the WHITE-COLORED POWDERY and GRANULAR substance identified as

<logo: UNITED MEXICAN STATES, GENERAL PROSECUTOR'S OFFICE OF THE REPUBLIC>

COORDINATION OF INSTITUTIONAL PLANNING, DEVELOPMENT, AND INNOVATION

GENERAL OFFICE FOR COORDINATION OF EXPERT WITNESS SERVICES
<handwritten and circled: 130>

EXECUTIVE OFFICE OF LABORATORIES

OFFICE OF THE CHEMICAL LABORATORY

CHEMICAL FORENSICS DEPARTMENT
PAGE: 85898
AP/PGR/MICH/LC/158/2006

ISSUE: CHEMICAL REPORT RENDERED
Mexico City, December 04, 2006

MR. SERGIO ALBERTO DE LEON AZUA.
Officer of the Prosecuting Office of the Federation
Director of the Lazaro Cardenas Agency.
City of Lazaro Cardenas, Michoacan.
Hand delivered.

REPORT

Approaching the Problem:
It was requested that we determine the chemical natural of a white, granular substance which was contained in six containers made from a clear, synthetic material with a white lid made of the same material, marked 1, 2, 3, 4, and sample 1' was taken from the front of the container PONU 142447/8 dated 12/02/06 and sample No, 2' was taken from the central part of the container PONU 142447/8 dated 12/02/06, and all of the rest was placed in a bag of transparent synthetic material, for the motive of discerning whether the substance belonged to the groups considered to be psychotropic or narcotic drugs according to the General Health Law or chemical precursors and/ or essential chemical products.
<stamp: illegible>

TECHNIQUES EMPLOYED
Infrared Photospectrometry
Gas Chromatography Coupled with Mass Spectrometry
Mass Spectrometry by Direct Insertion Probe

RESULTS
With spectrometry in the infrared region of the electromagnetic spectrum, applied to the products of alkaline extraction from the questioned samples, subsequent to hydrolysis, spectrums were obtained with bands of absorption characteristic of EPHEDRINE (spectrums attached).

hereby certify that the attached document is a true and exact copy of a Lab Report (type of document), presented before me this 18 day of June 20 07
[signature]
Notary Public
My commission expires Oct 31, 2008

<logo: UNITED MEXICAN STATES, GENERAL PROSECUTOR'S OFFICE OF THE REPUBLIC>

FILED

SEP 2 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CR 07-181-EGS

EXHIBIT #4

COORDINATION OF INSTITUTIONAL PLANNING, DEVELOPMENT, AND INNOVATION

GENERAL OFFICE FOR COORDINATION OF EXPERT WITNESS SERVICES
<handwritten and circled: 131>

EXECUTIVE OFFICE OF LABORATORIES

OFFICE OF THE CHEMICAL LABORATORY

CHEMICAL FORENSICS DEPARTMENT
PAGE: 85898
AP/PGR/MICH/LC/158/2006

After applying the Gas Chromatography Coupled with Mass Spectrometry technique to the samples as well as their extracts using a 30-meter capillary column with a stationary methylphenyl silicone phase at 5% and ultra-pure helium as a mobile phase, chromatographs were obtained with retention times characteristic of a mix of EPHEDRINE ACETATE and ACETAMIDE, N-(2-(acetyloxy)-1-methyl-2-phenylethyl)-N-methyl-, and upon monitoring by Mass spectrometry, caused a mass/charge spectrum with a fragmentation pattern characteristic of EPHEDRINE ACETATE and ACETAMIDE, N-(2-(acetyloxy)-1-methyl-2-phenylethyl)-N-methyl- (Chromatographs and mass spectrums are attached).

The molecular ion (M+1) 208 was obtained by means of Direct Insertion Mass Spectrometry, which corresponds to the molecular weight plus one of EPHEDRINE ACETATE.

Based on the information above, the following conclusions have been formulated:

CONCLUSIONS

FIRST.- The six (6) samples of the previously described white, granular substance in this report consist of a mixture of ACETAMIDE, N-(2-(acetyloxy)-1-methyl-2-phenylethyl)-N-methyl- and EPHEDRINE ACETATE .

SECOND.- ACETAMIDE, N-(2-(acetyloxy)-1-methyl-2-phenylethyl)-N-methyl- is NOT considered by The General Health Law to be a psychotropic and/ or narcotic drug, NOR is it a chemical precursor or essential chemical according to the Federal Law for Control of Chemical Precursors, Essential Chemical Products, and Machines for the Manufacture of Capsules, Tablets, and/ or Compressed Tablets.

THIRD.- EPHEDRINE ACETATE is a chemical derivative of EPHEDRINE, which is considered by the General Health Law to be a Psychotropic drug, and is considered to be a Chemical Precursor by Federal Law for Control of Chemical Precursors, Essential

<letterhead: SECRETARY OF THE TREASURY

<logo: SAT>

619

<handwritten and circled: 11A>

<illegible number ending in ENE-2346>

TAX ADMINISTRATION SERVICES
GENERAL CUSTOMS ADMINISTRATION
CENTRAL ADMINISTRATION OF LABORATORIES AND SCIENTIFIC SERVICES
ADMINISTRATION OF SCIENTIFIC SERVICES

NUM: 326- SAT- IX- C-. 19135
FILE: 326. 02. 02/879

Issue: Analysis Report
"2006, Bicentennial Year of Natalicio de Benemerilo de las Americas, Don, Benito Juarez Garcia"

Mexico City, April 20, 2006

CUSTOMS ADMINISTRATOR AT MANZANILLO.
AV. AZUETA S/N EDIF FEDERAL 1er.
PISO COL. BURÓCRATA.
C.P. 28200 MANZANILLO, COL.

Based on article 38 of the Federal Tax Code, articles 43 to 45 of the Customs Law, 60 to 67 of the Customs Law Regulations, 8 section III of the Tax Administration Services Law, 2, 9, section II, 10 sections XIX, XLIII and XLVIII and II including subsection B of the Internal Regulations for the Tax Administration Services, the undersigned hereby relays to you the analysis results for the merchandise sample taken through sampling form 160-03026/ 2005, dated December 13, 2005, created in this customs office, for the purpose of identifying the merchandise under declaration 3052-5002544, dated December 12, 2005, processed by customs officer NELSON PRIDA BARRIO for the importer UNIMED PHARMCHEM MEXICO, S.A. DE C.V., in which the merchandise was declared as N-METHYL-ACETYLAMINO, under section <partially illegible> .11.99, and whose results are described below:
Description: A WHITE POWDER
Results: THE SAMPLE ANALYZED IS N-ACETYL PSEUDOEPHEDRINE, WHOSE CHEMICAL NAME IS N-ACETYL-D-2-METHYLAMINO-1-PHENYL-PROPAN-1-OL, A DERIVATIVE OF THE ALKALOID OF THE EPHEDRINE FAMILY, WHOSE DEFINED CHEMICAL MAKEUP IS SOLELY PRESENTED.
THIS IS NOT N-METHYL-ACETYLAMINO.

THIS COMPLIES WITH THE TEXT OF PART 29. 39 ON THE RATES OF THE LAW FOR GENERAL IMPORT AND EXPORT TAXES. HOWEVER, THE SECTION THAT SHOULD HAVE BEEN APPLIED IS 2939.99.99

WE TREATED THE SAMPLE BY ADDING CHLOROHYDRIC ACID AND HEAT, WE OBTAINED THE TESTING RESULTS OF PSEUDOEPHEDRINE

hereby certify that the attached document is a true and exact copy of a Lab Reports presented before (type of document)
me this 18 day of June 2007
Notary Public
My commission expires Oct 31 2008

CHLOROHYDRATE, WHICH IS A CHEMICAL PRECURSOR USED IN THE CLANDESTINE MANUFACTURE OF AMPHETAMINES; BECAUSE OF THIS IT IS SUBJECT TO SPECIAL VERIFICATION AND CONTROL MEASURES UNDERTAKEN BY THE SECRETARY OF HEALTH.

METHODOLOGY. INFRARED FOURIER TRANSFORM SPECTROSCOPY, MASS SPECTROMETRY, PROTONIC MAGNETIC RESONANCE SPECTROMETRY, AND QUALITATIVE CHEMICAL ANALYSIS.

SINCERELY,
THE ADMINISTRATOR OF SCIENTIFIC SERVICES
<signature>
Q. I. JOSE FERNANDO JAUREGUI ZAVALA.

<illegible stamp>

JFJZ/AMSR/mrrh

HOWARD
UNIVERSITY

College of Pharmacy, Nursing and
Allied Health Sciences
School of Pharmacy

FILED
SEP 20 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ning Ye, Esq.
Attorney at Law
Washington, DC Office
1150 Connecticut Ave. #900, NW
Washington, DC 20036

CR 07-181-EGS

July 13, 2007

Dear Attorney Ning Ye:

As an addendum to my previous review of the documents involving the analysis of the white powder substance confiscated from UNIMED Pharmaceutical, additional observations are noted.

- Conclusions made in the Chemical Forensics documents indicated that the white powder substance confiscated from UNIMED Pharmaceutical was determined to be a mixture containing acetamide. In the documents, acetamide was described as a substance that was considered by the General Health Law to be neither a narcotic drug nor a precursor to such illicit drugs.
- However, a report from the Customs Administrator suggests that the white powder substance confiscated from UNIMED Pharmaceutical did not contain acetamide, but instead consisted SOLELY of a substance characterized as a derivative of the alleged controlled contraband. These

2300 4th Street, NW
Washington, DC 20059

Telephone 202 806 6530
Facsimile 202 806 4636
www.howard.edu

conclusions were determined only after exposing the sample to harsh

chemical conditions and heat.

Clearly the two reports are contradictory; thus serious inaccuracies in the

documented analysis of the white powder substance are exposed.  Given the

stated inaccuracies, the methods for characterization should be further

scrutinized.  For example, it is my professional opinion that preferred methods of

characterization involve procedures that do not alter the chemical make-up of the

sample under investigation.  Yet, the analysis of the white powder substance as

documented in the Customs Administrator report appears to be based on results

obtained AFTER the sample was exposed to chlorohydric acid and heat.  Since

there is no other evidence in the Customs Administrator report to support the true

identity of the white powder BEFORE exposure to the harsh chemical

environment, the report is deemed scientifically unreliable.

Sincerely,

LaVerne L. Brown, Ph.D.
Assistant Professor
Howard University
Department of Pharmaceutical Sciences