UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | :Cr. No. 07-181 (EGS) |
| | : |
| V. | : |
| | : |
| ZHENLI YE GON | : |

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
REVOKE ORDER FOR DEFENDANT'S DETENTION WITHOUT BAIL

Procedural Background

The United States respectfully responds to the defendant's third attempt for pre-trial release. The record shows that on June 15, 2007, Magistrate Judge John Facciola found probable cause to arrest the defendant when he signed an arrest warrant for the defendant. On July 26, 2007, a Grand Jury in the District of Columbia found probable cause when they returned an indictment against the defendant. At his initial presentment hearing on July 24, 2007, Magistrate Judge Deborah Robinson granted the government's motion for temporary detention. After a hearing was held on August 3, 2007, Magistrate Judge Alan Kaye found that no condition or combination of conditions would secure the defendant's presence at trial and that the defendant was a danger to the community, and ordered the defendant held without bond pending trial. Finally, on September 7, 2007, this Court held a hearing *de novo* on the defendant's bond status and again determined that the defendant should be held without bond pending trial in this matter.[1]

---

[1] Specifically, at the September 7, 2007 hearing, the Court noted :
"I find that there's absolutely no condition, no combination of conditions that the Court could impose vis-a-vis personal bond that would assure this defendant's presence in future court proceedings. There's a powerful incentive to flee, the fact that he's facing at least the possibility of thirty years to life if he's found guilty of this offense and maybe more. So there's no combination of conditions that this Court can think of that will ensure his presence. And

The defendant now makes the same arguments as before without providing any new information to this Court.

As set forth herein, there is a statutory presumption in favor of detention because the defendant is charged with Conspiracy to Aid and Abet the Manufacture of 500 grams or more of a mixture and substance containing Methamphetamine, knowing that it would be unlawfully imported into the United States, in violation of 21 United States Code Sections 959 and 963, and 18 United States Code Section 2.  This offense carries a statutory mandatory minimum penalty of ten years, and a maximum penalty of life imprisonment.  Moreover, the defendant has no ties to the local community.  However, he has strong family and business associations with individuals in Mexico and the Republic of China, the ability and means to flee if released from custody, and would pose a danger to the community unless he is detained.

Factual Background

Between January 2004 and December 2006, the defendant through UNIMED, his pharmaceutical company,  acquired more than 100,000 kilograms of ephedrine, pseudoephedrine or products from which pseudoephedrine could be manufactured,  from Chifeng Arker, a pharmaceutical manufacturer in Inner Mongolia.  In December of 2006, a shipment imported into Mexico by UNIMED with shipping documents indicating that it contained 19.797 metric tons of Hydroxy-Benzyl-N-Methyl-Acetethamine was flagged for inspection by Mexican Customs at the Pacific seaport of Lázaro Cárdenas, México.  According to DEA forensic chemists,

---

indeed if the government's proffer of the evidence is true, he is a significant threat to this society.   I find as a matter of fact the magistrate judge was absolutely correct in the issue for detention."
Motions Hearing Transcript, dated 9-7-07, pages 87-8.

Hydroxy-Benzyl-N-Methyl-Acetethamine does not correspond to any known chemical.  However, a sampling of the substance conducted by the Mexican Customs' Central Laboratory identified it as N-Acetylpseudoephedrine, a derivative of pseudoephedrine/ephedrine.  This substance is controlled by Mexican federal law, because it can be easily converted into pseudoephedrine, an important ingredient used in the manufacture of Methamphetamine, a Schedule II controlled dangerous substance in the United States.   According to the Mexican Federal Commission for the Protection Against Sanitary Risks (hereafter referred to by its Spanish acronym, "COFEPRIS"), at the time of the December 2006 shipment, UNIMED did not have any legal authority to import, export, manufacture, or distribute any product containing pseudoephedrine or ephedrine.[2]  Thus, it was a violation of Mexican law for UNIMED to import this chemical.

In March, 2007, Mexican authorities executed a search warrant at the defendant's home. This search yielded $205 million in United States Currency, and approximately $2 million in the currency of other counties, including Mexican Pesos and Euros.  That search also yielded seven weapons, including multiple handguns, a fully automatic AK-47 assault rifle, a silencer and ammunition.  A confidential source of information (hereinafter CS 1) has stated to DEA investigators that the defendant asked CS1 to purchase weapons for him because he was barred from doing so due to the fact that he did not have a United States identification.  CS1 stated that CS1 purchased 2 or 3 guns for him at gun stores in Las Vegas and in Los Angeles.

---

[2] "COFEPRIS" is charged with oversight and regulatory control over all pseudoephedrine/ephedrine, imports, exports, and distribution within Mexican territory. COFEPRIS indicated that as of the time of the December 2006 shipment received by Unimed, the state of affairs in Mexico was that all legitimate pharmaceutical laboratories operating in México went through COFEPRIS to obtain permits to buy and/or sell pseudoephedrine/ephedrine, and that UNIMED did not have such a permit.

In March of 2007, Mexican authorities also executed a search warrant at UNIMED's corporate headquarters in Mexico, which revealed an additional $111,000 in United States currency, documentation regarding several bank accounts located in the United States, China, and Hong Kong, and wire transfer confirmation pages from casas de cambios to banks throughout the United States and Europe.[3]  Also found during the execution of that search warrant was a handwritten note addressed to YE GON in Spanish with the following text (English translation), "Zhenli, I hope that you are fine, due to the detention of the flour, my associates and I had some problems and had to spend the three books that you provided us.  I am fine now and have contact with customs.  Call me to work."  The note contained a cellular telephone number and was signed "Amigos".[4]  It is common among drug traffickers to use code words to attempt to disguise their illicit activity.  The training and experience of DEA agents with expertise in the field of methamphetamine distribution indicates that "flour" may be a code word for the N-Acetylpseudoephedrine seized in December 2006 and "books" may refer to money YE GON provided these individuals to get the illegal chemical through customs.  The writer makes reference to having "contact with customs", possibly referring to a cooperating individual within

---

[3] Casas de cambios are Mexican money exchange houses which are used legitimately to convert currencies and wire money both domestic and internationally.  From a law enforcement standpoint, these casa de cambios have been widely used by drug trafficking organizations in México and South America to insert their illegal drug proceeds into the legitimate world financial systems in an attempt to disguise the origin of the money and launder its criminal history.  In this case, records indicate that money brought to these exchange houses by YE GON or on his behalf were in United States dollars and not for exchange, but rather for wire transfers to various United States and European banks accounts.

[4] The original Spanish text of the note reads: *Zhenlin: Espero que se encuentre bien, a raíz de que detuvieron la harina, mis compañeros y yo tenemos algunos problemas por lo que tuvimos que gastar los tres libros que nos obsequio, ahorita ya estoy bien y tengo contacto en la aduana. Lamame para trabajar. Celular 0445529575116. ***Atte AMIGOS"*

customs who can facilitate future movements of illicit goods.

UNIMED's sales of legitimate pharmaceutical products grossed approximately $90,000 (if converted to United States Dollars, hereinafter USD) per month in 2005 and 2006.

UNIMED's pharmaceutical manufacturing plant in Toluca Mexico was also searched on March 15, 2007. On April 26, 2007, DEA forensic chemists and special agents traveled to the UNIMED manufacturing plant to analyze any chemicals or residues still present. This plant had been secured by Mexican authorities since the execution of their federal search warrant on March 15, 2007. DEA forensic chemists took samples of chemical residue found in equipment and locations throughout the site, including samples which tested positive for the presence of ephedrine. The analysis and the equipment located at the plant lead to the conclusion that the plant was used for the production of pseudoephedrine/ephedrine using an N-Acetyl derivative as the starting material.

N-Acetylpseudoephedrine is a derivative of pseudoephedrine/ephedrine that can be converted back into pseudoephedrine/ephedrine at a conservative ratio of approximately 1:0.6 (i.e. one pound of N-Acetylpseudoephedrine would yield 0.6 pounds of pure pseudoephedrine/ephedrine). At this rate, YE GON and UNIMED's importations of suspected N-Acetylpseudoephedrine totaled approximately 86.885 metric tons which conservatively converts into approximately 52,240 kilograms of pseudoephedrine/ephedrine. DEA forensic chemists indicate that a conservative yield of methamphetamine is at least 70% of the amount of pseudoephedrine/ephedrine used. Therefore, the amount of pseudoephedrine, ephedrine, and pseudoephedrine derivatives imported by the defendant would potentially yield an amount of approximately 36,568 kilograms of pure methamphetamine.

Furthermore, experts in the field of methamphetamine distribution estimate that in June of 2007, black market prices for one kilogram of pseudoephedrine/ephedrine in México were approximately $3,200 to $4,000 USD, and prices for a kilogram of methamphetamine in the United States were $17,600 to $22,000 USD. Therefore, the suspected sale of UNIMED's illegal importations of N-Acetylpseudoephedrine could have resulted in an average monetary gain of approximately $188,064,000 USD.  Anticipated future sales of methamphetamine in the United States would yield approximately $724,046,400 USD.

Defendant has admitted his association with drug dealers.  Defendant told a source of information (hereinafter SOI) that in March 2006, a Mexican organized crime group began blackmailing YE GON in México.  According to YE GON, the group wanted to store cash at YE GON's residence in México City.  In addition to storing cash, the group wanted YE GON to launder their money.  YE GON told the SOI that he knew the money in his house was "dirty money" and the proceeds of narcotics trafficking.  YE GON also said that he continually received threats against himself and his family, so he believed that he had no choice but to launder the money.  YE GON stated that the traffickers instructed him to use his bank accounts to send the money to Las Vegas where he could launder it by gambling.  Defendant lost more than $125 million gambling in Las Vegas from January 2004 through March 2007.

Legal Analysis

A.   Pretrial Detention Is Necessary To Assure the Defendant's Appearance At Trial And The Safety of the Community

The federal bail statute authorizes a defendant's pretrial detention when no "condition or combination of conditions will reasonably assure the appearance of the person .. . and the safety of any other person and the community." 18 U.S.C. § 3142(e).  The statute further provides that

there is a rebuttable presumption that the defendant should be detained if there is probable cause to believe that he committed an offense for which a maximum term of imprisonment of ten years of more is prescribed under the Controlled Substances Act. 18 U.S.C. § 3142(e).

The existence of the indictment in this case establishes probable cause as a matter of law. See e.g., United States v. Mosuro, 648 F.Supp. 316, 318 (D.D.C. 1986), citing Gerstein v. Pugh, 420 U.S. 103, 117, n.19 (1975) (an indictment returned by a properly constituted grand jury sufficiently determines the existence of probable cause); and United States v. Motta-Vargas, 2007 WL 12 32187, *2 -3 (D.D.C. April 25, 2007) (unpublished.) (an indictment provides probable cause to believe the defendant actually committed the offense).  Moreover, the Government is permitted to proceed by proffer to establish other facts relevant to the bail decision. United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996).  Finally, two Magistrate Judges in the District of Columbia and this Court have each found probable cause in every stage of this case and independent of one another.

Several other factors in the detention statute also support the Government's request for pretrial detention. As an initial matter, the weight of the evidence against the defendant is substantial. 18 U.S.C. § 3142(g)(1).  Without conceding or implying that the proffer here constitutes the sum total of all of the evidence against the defendant,[5] the government would like to highlight a few facts for the Court:

1. In an obvious attempt to try to explain the unexplainable, the defendant has admitted to CS1 that his association with drug dealers provided the basis for his accumulation of so much

---

[5] The government may or may not elect to provide additional factual proffers at any oral argument or other proceeding involving this matter

cash. His explanation for this admission is inherently incredible. Drug dealers would not randomly select a legitimate businessman to store illegal proceeds in cash in his home, and would certainly not permit him to gamble away their profits in order to "launder" the money. His claims of being threatened and blackmailed are equally ludicrous, because it is hard to imagine a plausible blackmail threat that would involve a person being forced to go to luxurious casinos to stay for months at a time while gambling away millions of dollars of other people's money.

    2. The quantity of ephedrine, pseudoephedrine or products containing pseudoephedrine acquired by UNIMED between January 2004 and December 2006 (more than 100,000 kilograms) is substantially in excess of what could be consumed for legitimate business purposes.

    3. Legitimate businesses need not mislabel their inventory. However, illegal manufacturers of pre-cursor chemicals like the defendant have a need to hide their contraband by using fake labels, as the defendant and UNIMED did with the December 2006 shipment imported into Mexico.

    4. Legitimate business men would not store such large amounts of cash in their homes (over 200 million USD and other currency) or corporate headquaters (over 100 thousand USD). Nor would they have a need for such a cache of firearms and ammunition as was found in the defendant's home during the March 2007 search warrant. The large amount of United States Currency seized is particularly relevant. There is no indication that UNIMED ever did or claimed to do business in the United States. If, as the defendant claims, he was a legitimate *Mexican* business man with established bank accounts in Mexico and China, the cash in his possession would not be in United States currency unless the ultimate product/products that he provided were sold in the United States.

5. The handwritten note found in the UNIMED corporate headquaters is also very significant. The note referenced "flour" and "books." However, UNIMED never claimed to distribute flour or books as a part of its business. Since it is very common among drug traffickers to use code words to attempt to disguise their illicit activity, the obvious conclusion here is that "flour" is a code word for the N-Acetylpseudoephedrine seized in December 2006, "books" is a code word for money, and "contact with customs" is used to describe actions which further movement of illicit goods.

6. UNIMED'S monthly gross income of approximately $90,000 USD is simply not sufficient to support the defendant's gambling habit (including losses of 125 million USD from January 2004 to March 2007), nor would this amount of monthly income explain the amount of cash found in his home during the search warrant in March 2007.

In sum, the defendant, through his company UNIMED, was illegally importing and mislabeling large quantities of chemicals into Mexico containing ephedrine, pseudoephedrine or substances from which ephedrine or pseudoephedrine could be easily made–all of which are pre-cursor chemicals used to manufacture methamphetamine. UNIMED had no legal authority to import or manufacture these drugs and produced quantities that far exceeded any legitimate use. Indeed, the defendant's legitimate pharmaceutical business could not mathematically support the large sums of money that he spent and had hidden in his home. Legitimate business men have no need for seven weapons, including assault rifles and a silencer, or to have others purchase guns for them in a clandestine manner. Legitimate businessmen do not hide large sums of money in their homes, illegally import their products and mislabel shipments. In addition, the large amounts of cash in United States currency indicate that the defendant was being paid in the currency where

the ultimate product would be sold–the United States.  Finally,  the note left for the defendant shows that he is in communication with other co-conspirators through coded language in order to get the drugs or precursors through customs so that they can go from one country to another.

Similarly, the fact that the defendant is not a citizen of the United States argues in favor of his detention pending trial. 18 U.S.C. § 3142(g)(3)(A).  See United States v. Townsend, 897 F.2d 989 (9th Cir. 1990).  The government believes that the defendant is a citizen of both China and Mexico, and in fact, he has held passports for both countries. Moreover, at this time, the defendant no longer has legal status in the United States, because his visa is no longer valid. Currently, there is a detainer in place from United States Immigrations and Customs Enforcement (hereinafter ICE).  Consequently, if the defendant were ever released, ICE agents can take him into custody to begin deportation proceedings.

Several courts have ordered pretrial detention of foreign defendants without any contacts to the United States. E.g., United States v. Vargas, 804 F.2d 157 (1st Cir. 1986)(Chilean defendant in drug importation case who had no family ties to U.S. was properly detained when no conditions or combination of conditions would reasonably assure his appearance at trial); United States v. Geerts, 629 F.Supp. 830 (E.D. Pa. 1985) (defendant was citizen of Netherlands who faced possibility of approximately fifty years imprisonment on customs related charges and had no significant ties to United States; he thus presented serious risk of flight which justified pretrial detention).  Here, the defendant's only family tie to the United States is an infant child from an extramarital relationship who resides in the United States.  However, he also has two children with the woman to whom he is married in Mexico, and their mother is currently in jail in Mexico on charges similar to the ones faced by the defendant.  Consequently, he has a strong incentive to

return to Mexico to care for these children.

The United States has received a request from the Government of Mexico for the defendant's provisional arrest pending extradition based on Mexico's charges against him for drug trafficking, money laundering, and weapons violations. Where, as in this case, a person sought for extradition is also the subject of United States charges, the United States is permitted to and will commonly hold the extradition proceedings in abeyance pending the resolution of the United States charges. However, the United States remains under an obligation to take appropriate steps to ensure that the defendant will remain available for purposes of extradition, and United States law is clear that this heavy obligation must, absent extraordinary circumstances, be met by assuring that the defendant remains in custody. Wright v. Henkel, 190 U.S. 40, 61-62 (1903)("The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfil if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment."). Consequently, should it appear that the defendant will not remain in custody on the charges now pending against him in the United States, the United States will be prepared to initiate the provisional arrest for extradition to Mexico of the defendant, in order to meet its extradition obligations to Mexico.

The ICE detainer and the defendant's pending extradition situation with Mexico provide a strong argument that he would not or could not effectively be released if bond were granted here. Nevertheless, if he were to be granted bond in a manner that actually resulted in him being

released, there are compelling reasons to believe that the defendant would have the ability to flee this country. The defendant has both business and family contacts in the Republic of China and Mexico. Since the chemicals used to produce the ephedrine/pseudoephedrine were obtained from China, the defendant could easily re-establish operations there. Hong Kong SAR authorities seized approximately $11 million from a Hong Kong bank account owned by the defendant and his company, UNIMED. The defendant owns a home in Shanghai, China, valued at more than $14 million USD, which he bought in July 2004. The defendant's brother and mother both live in China. The defendant's brother has $4.5 million in a shared capital account in China; and the defendant's mother has a shared capital account and a bank account in China containing a total of about $3 million.

It is particularly important to note that in an interview in 2007 with one media outlet, the defendant reportedly stated that he fled Mexico in September 2006 but "sneaked back into" Mexico for a brief stay in October 2006. The United States has an extradition treaty with Mexico. If the defendant were released in this case, he may find a way to "sneak back" into Mexico, as he apparently claimed to have done in October 2006. If he were to be found, he could be extradited back to the United States, but likely not until he was prosecuted in Mexico on the outstanding charges there–a process which could take years. If he were to be released in this case, he may manage to "sneak" into Canada. If he were discovered there, he could be extradited back to the United States, but extraditions from Canada can also take a substantial period of time. However, if the defendant were to be released on bond and he somehow managed to "sneak" into China, he could not be extradited back to the United States, because the United States has no extradition treaty with China.

Finally, the defendant constitutes a clear and present danger to the community. The federal courts have recognized that drug traffickers, particularly those in positions of authority, are likely to continue engaging in drug related activities if released on bail and thus, constitute a danger to the community. See United States v. Knight, 636 F.Supp. 1462 (S.D. Fla. 1986). Accord United States v. Creekmore, 1997 W.L. 732435 (D.D.C. 1997)(Facciola, J.). The defendant operated his business by selling ephedrine/pseudoephedrine without regard for the destructive path it ultimately ploughs throughout the Untied States. As noted, if released, the defendant would have the ability to operate his business from China with his established business associates. Since selling ephedrine/pseudoephedrine is a very lucrative source of income for the defendant, it is not unreasonable to assume that he would have to re-establish the illegitimate operations to survive.

<u>Conclusion</u>

For all of the foregoing reasons, the Government respectfully requests that the defense motion to revoke order for defendant's detention without bail be denied.

Respectfully submitted

KENNETH BLANCO, Chief
Narcotic and Dangerous Drug Section


_____/s/_____
Wanda J. Dixon
Paul Laymon
Mary Mogavero
Robert Stapleton
Trial Attorneys
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Suite 8000
Washington, D.C.  20005
(202) 307-0377

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | :Cr. No. 07-181 (EGS) |
| | : |
| V. | : |
| | : |
| ZHENLI YE GON | : |

<u>PROPOSED ORDER OF DETENTION</u>

Upon consideration of the defendant's motion to revoke order for defendant's detention without bail, the government's response, and the entire record herein, it is, this _____ day of December, 2007,

ORDERED, that the defendant's motion is DENIED and that defendant remain held without bond pending trial. In support of this ruling, the Court makes the following findings:

1. There is a presumption that the defendant should be detained because he has been charged by Indictment with an offense for which a maximum term of imprisonment of ten years of more is prescribed under the Controlled Substances Act. 18 U.S.C. § 3142(e).

2. The defendant's personal characteristics support the conclusion that he is a risk of flight if released.

3. The defendant is a danger to the community in general as a result of his drug trafficking activities.

4. The defendant has not rebutted the presumption contained in the Bail Statute and accordingly, no condition or combination of conditions will reasonably assure the appearance of the defendant at trial. <u>See</u> 18 U.S.C. § 3142(e).

5. The defendant shall be committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving

sentences or being held in custody pending appeal. 18 U.S.C. § 3142(i)(2).

6.  The defendant shall be afforded reasonable opportunity for private consultation with counsel. 18 U.S.C. § 3142(i)(3).


DATE: _____                     _____
                                                      EMMET G. SULLIVAN, JUDGE
                                                      UNITED STATES DISTRICT COURT