IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The United States of America | ) |
| | ) |
| Plaintiff | ) File: 07-181 |
| | ) The Hon. Sullivan |
| against – | ) Oral Argument Prayed |
| | ) |
| Zhenli Ye Gon | ) |
| | ) |
| Defendant | ) |

**POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
SUPPLEMENTARY REPLY TO GOVERNMENT'S RESPONSE TO MOTION
TO RECONSIDER**

Defendant Zhenli Ye Gon, by and through undersigned counsel, respectfully submits his Supplementary Briefing in Support of Defendant's Reply with broadened factual, evidentiary and legal grounds in response to Government's Opposition to the Motion to Reconsider, in the light of the Honorable Court's oral ruling that the Respondent may supplement its Motion to Reconsider in his Reply to Government's Opposition.

In the Primary Briefing in Support of the Defendant's Reply to the Government's Response to Motion to Reconsider, Martin McMahon, Esq. the Chief Counsel has narrowly focused upon the issue of the Defendant's alleged eligibility to be bailed out from his pretrial detention. Numerous related legal, factual and evidentiary issues concerning criteria of "house arrest with electronic surveillance device" has been adequately discussed. This Supplementary Briefing is to respectfully file with this Honorable Court, upon Defendant's requests, with broadened legal and evidentiary aspects presented, based upon novel discovery of Defendant-claimed exculpatory evidence, to incorporate into the Primary Briefing.

Government's Response to Defendant's Motion for Reconsideration has virtually remained either irresponsive or evasive to the most critical issues raised in the Defendant's Motion to Reconsider: AUSA's repeated reckless failure in ignoring the Defendant's Constitutional rights to Speedy Trial and his statutory right under the STA

has irreversibly violated Defendant's rights to Speedy trial, is an irreparable error having triggered the STA clock to tick on July 23, 2007, consequently, the trial should have been commenced on or about October 2, 2007, pursuant to STA Act. For obvious reason, the STA has been irreparably violated.

Given to the government's relentless efforts to lock Defendant in an open-ended pretrial imprisonment without producing to this Honorable Court with any meaningful, probative prosecutorial evidence in its repeatedly failed fishing trip in "snail pace" as of today. Such severe violation of the Defendant's constitutional rights to Speedy Trial under Sixth Amendment, as well as his statutory rights specified in STA Act, may have rendered the Indictment and Information in support of this instant case with one possible disposition being sought by the Defendant: dismissal.

In reply to Government's allegation that the STA issue had been rejected by this Honorable Court during the prior hearing. That allegation may not be accurate because the STA issues and the government's serious violations thereof, were not argued, discussed, adjudicated or decided by this Honorable Court. The fact is that this Honorable Court may yet to rule this issue, *nunc pro tunc,* after it is debated. Counsel for the Defendant has noticed that the Government has now, in its third Motion for further tolling of the STA clock, made a positive attempt trying to patch up the error it has made in two prior consecutive occasions: failure to state the balancing test to justify the "ends of justice" STA tolling. Such a remedy may have come too later. The STA has already been violated and may not be reparable retroactively, particularly given to the fact that the Defendant, who is presumed to be innocent, highly likely innocent, from accusation charged, has been kept in an open-ended pretrial incarceration simply awaiting the AUSA's fishing trip reduced enough incriminating evidence, upon government unrelenting pursuit to keep him in pretrial imprisonment.

In reply to Government's Opposition to Defendant's Motion, this Defendant feels obliged to reiterate his position that the Government's seriously defective Indictment should be dismissed for the Government's constitutional and statutory violation of the Defendant's STA rights, as well as his rights for speedy trial under the Sixth Amendment

2

of the Constitution.  He explicitly reserve such rights for appeals, interlocutory or post
trial, if necessary.  Now, the Defendant feels imminent to briefly reply to issues raised by
the Government in its Response of Opposition.

1. **Government should not have been granted a Tolling from STA clock by
alternatively invoking 18USC 3161(h)(9), Neither does the Section provide
Statutory Basis for the Government to Remedy Its Violation of "Ends of
Justice" Tolling Set Forth in 18 USC 3161 (h)(8)**

In absence of the transcript of the last hearing,  it has now become even clearer
that if the Government should have been barred from being granted its "ends of justice"
tolling of STA clock pursuant to 18 USC 3161 (h)(8) due to the issue had long become
_moot_ for Government's repeated  failure to state the balancing test, the Government
should have not been granted with such a relief from STA by alternatively invoking
18USC 3161(h)(9).  Because the Government had, additionally and among others, failed
to meet the criteria set forth in Section 3292, defining one of the necessary elements for
its eligibility to obtain relief under 18USC 3161(h)(9): official requests made to foreign
court or foreign authorities. There is no records that has ever shown that the Government
has met the criteria defined by Section 3292 while it had raised motion for relief under
18USC 3161(h)(9).   Motion for Tolling of STA clock in apparent failure to meet the
criteria for "foreign evidence" definition defined in Section 3292 should not be granted.

Additionally, according to Government's allegation made in its Response, the
Government erroneously attribute the "silence on its reasoning for finding that the ends
of justice tolling were served by granting a continuance" to this Honorable Court.  Such
an allegation has simply covered up the Government's irreparable error of its own
repeated, reckless, contemptuous "silence".

First of all, it is the government which, for the sake of its open-ended fishing trip
for collecting incriminating evidence, that does not seem to have existed at any places,
against the Defendant, initiated its request for tolling of the STA's 70-day clock,
explicitly made such an request under 18USC 3161(h)(8).  It is also the Government it
has, for twice, repeatedly failed to include such balancing tests under the label of "ends of
justice" tolling.

18 SC 3161(h)(9) provides certain statutory grounds to toll the STA, if statutory requirement for such a tolling, for instance, definition of "official requests" made to a foreign authorities, are otherwise satisfied.    Assuming, arguendo, that the Government has been found to meet the statutory conditions for tolling under 18USC 3161(h)(9), rather than 18USC 3161(h)(8), "ends of justice".  However, 18 SC 3161(h)(9) is apparently not to create, neither should it be invoked, to overwrite, cover-up, or remedy the irreparable error made against statutory provisions under 18 SC 3161(h)(8).

The legal ground being invoked by the Government that sought, and achieved, repeated tolling from STA is the tolling under 18USC 3161(h)(8).  (Please see Government's Response, page 3, paragraph 1) While seeking for relief under 18USC 3161(h)(8), government had repeatedly, recklessly or contemptuously refused to follow the statutory provision to have a balancing test statement included in its paper, neither has it presented such balancing test in its oral argument before the Court, *repeatedly, even after the Defense counsel had already pinpointed such an error in Briefing*.  In foregoing light, Defendant's contention that the Government's violation, among others, of Speedy Trial Act (cited as Docket entry 35, page 3-7) may be *precise and undeniable*.  If Defendant's such position, represented in Defendant's Briefing opposing to the Government's second Motion for tolling of STA clock, had not been **considered**, argued, or fully adjudicated, *much less been rejected,* by this Honorable Court yet, it is then appropriate for the Defendant to raise the Motion for the Court to Reconsider, especially the Honorable Court expressively granted such a relief in the Court's Oral Ruling.

Said Government's repeated "silence" on balancing test while seeking for ends of justice tolling per 18USC 3161(h)(8) is not an insignificant matter.  Such a violation may lead to a dismissal of the Government's Indictment as operation of law. (Please see both 18USC 3161(h)(8)(a) and Zedner v. United States, cited *supra*).

 Defendant has noticed that on the third motion for further tolling of STA clock, the Government has made an attempt to "fix" the problem by including the balancing test.  It has also included a statement certifying that the preponderance of evidence has been found for the Government that the latter had made an "official request" to foreign

countries seeking for foreign evidence. Such a remedial measures may have come too late. These posto facto, nunc pro tunc remedial efforts may not be sufficient to correct the government's prior irreparable, reckless error as to severe STA violation, because whether or not government is eligible for third time relief of tolling the STA clock by bringing in all these remedial measures may have now become moot when prior tolling appears reversible, which may have rendered all future tolling requests *moot*.

**2. Government's Response has Failed to Address, Or Remain Evasive to, the Issue of Its Undue Delay In Its Open-Ended Fishing Trip, That Has Violated Defendant's Constitutional Rights Under Sixth Amendment For Speedy Trial, Given to His Open-Ended Pretrial Imprisonment While His Presumed Innocence Appears Highly Likely To Be Proven Not Guilty with Overwhelming Newly Discovered Exculpatory Evidence**

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial" (U.S. Constitution)  The Supreme Court identified the interests under the Constitutional Speedy Trial clause, holding:

"Inordinate delay between arrest, indictment and trial may impair a defendant's ability to present an effective defense.  But the major evils protected against by the Spedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense."  United States v. Marion, 404 U.S. 307, 320 (1971)

The Sixth Amendment protection of Constitutional Rights to Speedy trial, followed with statutory protection under federal legislation of Speedy Trial Act, is thus not merely intended to prevent prejudice to Defendant due to passage of time, such a constitutional/statutory rights is protected by the Due Process clause, it may also involved in Angalo-American traditional jurisprudence of Equity, given to the fact that the Defendant, presumed to be, and highly likely appearing, innocent from alleged "crime" charged, has been detained in a prolonged, open-ended pretrial incarceration.

The violation of Speedy Trial Act in this instant, seemingly frivolous prosecution appears even more inhumane and egregious in the wake of government's total collapse of its unfounded prosecution.  "To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime.  Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and

that may disrupt his employment, drain his financial resources, curtail his associations, subject him to [public obloquy, and create anxiety in him, his family and his friends". United States v. Marion, 404 U.S. 307, 320 (1971)

In this instant case, violation of speedy trial may have taken its worst evil, sunken to the bottom, where the Government has even failed to read or write the balancing test in rationalizing the end of justice tolling repeatedly for twice, leaving the Defendant to quietly swallow all such sorrow of such egregious delay of justice behind bars.    Thus, in the light of Zedner v. United States, the remedy for such a violation is dismissal of the Indictment, with or without prejudice.  However, this Defendant prays for dismissal with prejudice, in the wake of newly discovered evidence, either in exculpatory or in rebuttal.

Pursuant to the Honorable Court's oral ruling, this Honorable Court allowed the Defendant to enlarge the basis of his Motion to Reconsider, this Reply to Government's Opposition would also present the grounds for dismissal by substantive merits on broadened basis, as shown by the following newly discovered evidence:

### 3. Newly Discovered Evidence Is in Further Support of Motion to Reconsider

Defendant's Motion to Reconsider is not solely based upon legal issues under STA Act. During the September status Conference, the Government impressed to this Honorable Court that with the discovery of 11 boxful of evidence, the government would be able to find more inculpatory/incriminating evidence in support of its "probable cause" to prosecute.  With seven months having passed by, in addition to  approximately 16 more months of pre-indictment joint criminal investigation having passed by, the government's seemingly open ended fishing trip in "snail pace", has unlikely turned out any piece of inculpatory evidence in substantiating its poorly prepared Criminal Complaint/Indictment, instead, it has produced to Defendants with more and more evidence in exculpatory nature.  Piecing all these chains of rebuttal/exculpatory evidence together, it may have rendered what have been loudly invoked to support the Indictment to appear shattered and smashed, evidence wise.  The following post-STA violation discussion about Government's fiasco in prosecutorial evidence has pinpointed, item by item, the irreparable failure of the Indictment and Information.

The reason of such failure is simple: The Defendant claims that he has never involved in any illicit drug activities or conspiring with others to do so.  More and More evidence may have been inclined to pinpoint that the 19.797 tons of chemical "cousin" exported from the PRC beyond the Defendant's chain of custody, is not precursor chemical. This sort of factual truth may have been known to the U.S. Department of Justice at the first place when the USDEA, Mexican law enforcement, Ministry of Public Security have all made thorough on the scene investigation in the Exporter's place of business: Chifeng Arker Pharmaceutical Tech, Co. Ltd, in Inner Mongolia, China more than once.

The following newly discovered evidence, which either has been filed as attached exhibits with the Primary Briefing by McMahon, Esq.,, or will be displayed by Court Equipped Projector during the oral argument session, may help clarify Defendant's factual claim, that he is innocent from what he is being criminally prosecuted:

1. COFEPRIS Auditing and Evaluation Report dated July 29, 2006, Concerning UNIMED's business operation: Clearance Conclusion: Full Compliance of Mexican Federal Health Law.  With all items designed for inspection, examination and evaluation regarding UNIMED's buying, selling, importation, storage, distribution of such controlled substance as pseudoephedrine and ephedrine, the full score, i.e., numerical number "2"  in reference to "full compliance" of Mexican law, i.e., was unanimously given to by five (5) inspectors dispatched by the COFEPRIS. Noticeably, the COFEPRIS 07/29/2006 Accreditation demonstrated that 806 kilogram (0.806 metric ton) of remaining pseudoephedrine inventory was under lawful custody of UNIMED. A certified English Translation was well prepared;

2. COFEPRIS Auditing and Evaluation Report dated March 6, 2006, Concerning UNIMED's business operation: Clearance Conclusion: Full Compliance of Mexican Federal Health Law, which also indicated that 806 kilograms of ephedrine/pseudoephedrine products were under lawful custody of UNIMED as its remaining inventory under Mexican Government issued import permits, under normal regulatory control by COFEPRIS;  with certified English Translation;

3. COFEPRIS Auditing and Evaluation Report dated February, 2005, Concerning UNIMED's business operation: Clearance Conclusion: Full Compliance of Mexican Federal Health Law,  with certified English Translation.  The document provided the following most critical, and relevant information:

   A. Assessment/Auditing of UNIMED Pseudoephedrine/ephedrine bought and distributed under the regulatory control of COFEPRIS during the period from January 2002 through February 23, 2005, Pseudo-

ephedrine/ephedrine: Totally imported: 21,875kg; Distributed: 21,068.85 kg. Remaining inventory: 806.010kg.

B.  The COFEPRIS listed following legitimate purchasers during the period: *Rayele and Liomont Pharmaceutical Laboratory, and Deverot's Chemicals*.

C.  The Auditing Report revealed that huge margin of quote per numerous import permits issued to UNIMED had remained unused and thus abandoned, leading to government's cancellation of all these unused quotes:

   a.  During the period from January 2002 through February 2005, issued to UNIMED to import such controlled substances as ephedrine and pseudoephedrine were cancelled for being unused.  Permission IPQ-0321-2002 dated December 10, 2002 for 4000 kg of ephedrine was found unused, abandoned and permit therefore cancelled.  IPQ-0011-2003 dated for February 11, 2003;  permitting UNIMED to import 7000 kg of ephedrine: quote unused, abandoned and therefore government issued permit was cancelled; import permit IPQ-0010-2003 dated for February 11, 2003, permitting UNIMED to import 4000 kg of pseudoephedrine: quote found unused, abandoned and  therefore cancelled;

   b.  The COFEPRIS auditing report has presented such evaluation conclusion: "**The sale of controlled substances is only conducted to establishments documented *as legal***", with a full score of "2", meaning:  "total compliance"

   c.  The COFEPRIS gave the final conclusive remarks: "**To be in agreement with the occurrences of the present Act.**"

   d.  The auditing Report pinpointed: The annual balance of the U.N. (United Nations) for 2004 was carried out.

4.  Photocopy of registry documentation with the United Nations (UN)--UNIMED Pseudoephedrine related business records auditing clearance report kept by the United Nations (UN);

5.  Mexican Law Enforcement issued Blood Testing Reports, with certified English Translation, indicating that all inmates in relation to Defendant and Unimed case tested were found negative reaction to drug testing.

6.  Additional evidence regarding Mexican Government's admission that the Forensic Testing conducted by the Government Forensic Laboratory which concluded that the sample tested involved uncertain ratio, uncertain amount of N-Acetyl-Pseudoephedrine in addition to Hydroxyl Benzyl-N-Methyl Acetethantino, while the later component is not precursor chemical, **had been tainted**;

7.  A Pharmaceutical chemist, Professor Brown's expert opinion pinpointing the tainted forensic examination conducted by Mexican Government is scientifically faulty, hence rendering the finding uncertain;

8.  Mexican Government's Federal Health Law, 1997 and 1999 versions, as a Mexican departmental administrative regulation allegedly under empowerment

of Article 14 of that Nation's Constitution, in absence of Federal Enactment by the Federal Legislature, which fell in short in providing that N-Acetyl Pseudoephedrine is a controlled substance or precursor chemical;

9.    Introduction of Chifeng Arker Pharm Tech. Co. Ltd., AKA, Inner Mongolia Chiefeng Group Co. (MPGP), hereinafter referred to as "Chifeng Arker/PRC", a state owned enterprise as an integral part of the Government of the People's Republic of China (PRC), a subsidiary under Shanghai Industrial United Holdings Co. Ltd. (SIUHC), also a PRC state owned enterprise, whose stocks are listed in Hong Kong Stock Exchange. Chifeng Arker/PRC is the sole supply of ephedrine/pseudoephedrine products to UNIMED/Mexico under the regulatory, lawful control of the PRC Government, Mexican Government, the United Nations, partially, the Government oversight of the United States;

10.    Certification of clearance of inspection issued to Chifeng Arker/PRC, by U.S. Food and Drug Administration (FDA) under the Department of Health and Human Services, regarding pseudoephedrine by Chifeng Arker/PRC, on August 21, 2003;

11.    Archival pictures reflecting Chifeng Arker/PRC receiving "inspections" by the delegates from the USFDA under US Department of Health and Human Services;

12.    Mexican Law Enforcement issued inventory list of search and seizure.  Among 366 listed items in two volumes of government search and seizure inventory list, we are unable to locate what is alleged handwritten, "three-star (3*)" correspondence regarding what U.S. DEA coded in almost all drug cases it brought,  "flour" and "book", addressed to "Zhenlin", a completely unidentified stranger, nor can we locate a handwritten note on a recipe as to how to convert "Safrole", a precursor chemical in both the State of Mexico and the United States, into MDMA, a controlled substance in both countries as well.  The evidence is too voluminous for being attached electronically, it is kept for by Defendant momentarily and will be manually submitted separately upon request.

13.    Copy of a translated Decision rendered by the Mexican Deputy Attorney General's Office for Specialized Investigation in Organized Crime Concerning Seizure of Defendant's Vehicles, which, for its most critical part, has disclosed a well prepared "Anonymous Report", indeed, a highly professionally written anonymous Memorandum, whose author(s) has/have kept hidden in darkness, which willfully (mis-)presented details accusing the Defendant's "gang of" "illicit drug" activities, by employing such racial slur as "gang of 'El Chino' Chen Lee" ("Organized Criminal group namely Chinaman Zhenli").  The professionally fabricated "anonymous report" has groundlessly concocted all irrelevant, baseless times, places, persons, means and events into one dirty wok, cooked out large bowl of poisonous chop-sue, flatly mirroring what the term "grand conspiracy" means in its classical lexical root.

14.    Three affidavits issued by three mistreated inmates in the Federal Jail of Mexican State indicating U.S. prosecutors' misconducts in Mexico in making up a "drug case" without drug (respectfully resubmitted);

15.    U.S. Government's Indictment against the Defendant and USDEA Officer Eduardo Chavez's lone Affidavit in support of that Indictment which needs to be re-visited by this Honorable Court in the wake of such newly discovered overwhelming exculpatory evidence.

16.    Certification of Clearance of Examination done by European Directorate for the Quality of Medicine under the Council of Europe issued to Chifeng Arker/PRC;

17.    Archival documents proving that Chifeng-Arker/PRC is also the sole supplier of pharmaceutical/chemical materials to SmithKline & French Laboratories, Ltd., a reputable U.S. based Pharmaceutical Lab., a U.S. Equivalent to UNIMED Pharm in the State of Mexico, in respect of its huge capital/technology investment and of its projected business potential, if not destroyed by unjustified, state organized violence, most possibly, racially motivated;

**4.    Placing all these newly discovered evidence in the circumstances of what the Government's Indictment and Information accused, we may then immediately find how much credibility is left in that failed indictment.**

With all these well founded balancing evidence, Defendant would like to humbly and respectfully pray to this Honorable Court that there are full of alarming factors involved in this instant "drug" case which may have raised the U.S. government with high alert to the distinctive feature of highly probable cause of "wrongful and malicious prosecution":

a.    The Indictment is irreparably defective.  What was set forth in the Indictment and in Officer Eduardo Chavez' Affidavit, the mere charging document in support of the vaguely drawn Indictment, has head-on collision with the facts contained in newly discovered chain of evidence, either in rebuttal or exculpatory nature.  Concerning such critical factors as to when, where, whats, how, how much, both governments' presentation of facts appears severely inconsistent, self-contradictory, of little probative;

b.    An internationally high profile "drug kingpin" case as the result of an infamously corrupted foreign power's defamation, image tarnishing campaign using state resource, without a single particle, residue, waste, supporting ingredients of illicit drug ever found at all critical places, residence, offices, containers, cash stacks, clothing, blood or the suspects, within the defendant's chain of custody;

c.  An alleged grand conspiracy of illicit drug cartel without finding of co-conspirators in all government official documents;  Co-conspirators are fully packed in that notorious "memorandum" of anonymity from a shared dark side of the world;

d.  Evidence, either allegedly "incriminating", or exculpatory as seen overwhelming, goes simply against any unfound allegation of "U.S. link" to Defendant's alleged "illicit" drug activities;  There has appeared absolutely no any such linkage ever in existence;

e.  The key evidence in support of the entire case, the forensic examination ascertaining the chemical nature of the intercepted imported cargo, put it on-route to Mexican seaport by one of the world's most reputable, an U.S. FDA certified, business entity, the PRC owned Chifeng Arker, was found fraudulently tainted, which has rendered the U.S. prosecution followed  such anti-scientific, fraudulent forensic conclusion in inconsistent, ever-changing version, does not appear to have much probative value;

f.  While in absence of any evidence indicating illegal drug had ever been in existence in all places searched during the March, 2007 raid taken by Mexicans. The only traceable controversy is 19.797 metric tons of chemical, namely, Hydroxyl Benzil-N-Methyl Acetinomino intercepted, and seized, by Mexican Government, which, based upon its anti-scientific, defective forensic examination, by its two national forensic laboratories, having resulted in two different, inconsistent, self-contradictory findings.  The cargo, say, 19.797 tons of chemical, in controversy, can be traced to its physical handler, the exporter, the place of its origin: *i.e.*, Chifeng Arker Pharmaceutical Technology, Co. Ltd., under Shanghai Industrial United Holdings, both are PRC state owned, reputable enterprises, being integral part of the Government of the People's Republic of China.  Please kindly note that Chifeng Arker/PRC is one of the world's largest supplier of different pharmaceutical ingredients, including its brand name synthesized pseudoephedrine, but not limited to pseudoephedrine.  Chifeng Arker' was certified with U.S. FDA under U.S. Department of Health and Human Services, and was registered with the United Nations for its ephedrine related activities.  Additionally, the enterprise was also under the strict surveillance of the PRC's own law enforcement.  If the Indictment's allegation that a reputable pharmaceutical company would not risk itself in involving buying and selling the chemicals in question were true, Chifeng Arker/PRC is such reputable business, so is Unimed for its projected scale.  If the Indictment's allegation charging "mis-labeling" those 19.797 tons of chemical, the following question accidentally omitted is: who labeled that load of ocean-going cargo?  If that chemical, manufactured, tested, inspected, packed, monitored, dispatched, carried, shipped, insured by Chifeng Arker/PRC, has now been allegedly converted into "Pseudoephedrine", "derivative pseudoephedrine", "N-Acetyl-

11

pseudoephedrine", or "chemical concoction mixed with uncertain amount of chemical tested positive for pseudoephedrine", or "chemical cousins" easily convertible into pseudoephedrine",-- all these different, and ever-changing versions employed by both Mexican and U.S. Government—If such changes have ever occurred, Defendant Ye Gon or Unimed are not to blame.  Neither has ever involved in such transaction, even though it is a designated recipient.  Both Defendant Ye Gon and UNIMED are outside the chain of custody.

Initiation of prosecution, followed with open-ended aimless fishing trip, smells bad.   The anonymous report explicitly used such racial slur as "El Chino gang" to tarnish the Defendant.  While Officer Eduardo Chavez employed such logic to incriminate the Defendant: "No reputable pharmaceutical companies" would risk itself to involve in such transaction.  The question here is: Why Unimed, while involved hundreds of millions of dollar involvement and 24 assembly lines of cutting-edge technology were NOT a reputable business? Then would it risk itself in involving street thug's drug trafficking business? Simply because it is an "El Chino (Chinaman's)" business?

**5. In the Wake of Newly Discovered Evidence, a Revisiting of Government's Indictment May Further Fortify the Legal Grounds for Dismissal with Prejudice.**

Assuming arguendo, that the fraudulently conducted, and tainted forensic examination on the 19.797 metric tons of chemical products handled and put it on route to Mexico by Chifeng Arker/PRC were scientifically acceptable, even though it is actually not, one of several version of testing results claimed that the chemical agents, after sample being synthesized with other added elements, turned out to be "N-Acetyl Pseudoephedrine".  Assuming, arguendo, such claim has any element of truth, there appears legal uncertainty and non-conclusive whether Chifeng Arker/PRC's exportation of N-Acetyl-Pseudoephedrine is violation of either U.S. Law or Mexican Law.

In absence of Federal Legislative Enactment, Article 4 of Mexican Health Regulation of 1997 listed the related chemical agents as precursor chemicals as regulatory matters:

Ephedrine (Art. 4, (I)(d));

Pseudoephedrine (Art. 4, (I)(m)) (Exhibit 1);

The Regulation is silent on the regulatory issue as of N-Acetyl-Pseudoephedrine. DEA Officer Eduardo Chavez testified before the Grand Jury that N-Acetyl Pseudoephedrine is not a precursor chemical in the law of the United States. We did not find any legal grounds by searching the Mexican law that the chemical in question beyond touch of the Defendant is a precursor chemical. As to whether N-Acetyl-Pseudoephedrine is specifically a controlled substance, the amended Rule of Health Regulation on June 20, 2007, the post Ye-Gon case promulgation of the related Federal regulation as to legitimacy of N-Acetyl-Pseudoephedrine, still remains uncertain.

Moreover, Published on June 20, 2007, but effective on August 4, 2007, the new health rule provides: "Ephedrine and substances with a similar chemical structure or biological effects are prohibited stimulants; It also provides that "phenylephrine, pseudoephedrine and sinefrina are under monitoring but are not banned."

The unsigned Grand Jury Indictment alleged that the Defendant involved in conspiracy in manufacturing and trafficking 500 grams of Methanphetamine with the intent that it be sold into the United States, during the period from sometime 1999 through the day the Defendant was arrested, i.e., July 2007, while failing short in presenting names and identities of "co-conspirators" with the Defendant Ye Gon.

U.S. DEA Officer Eduardo Chavez' testimony may be seen as "information" attached to extremely brief and vague Grand Jury Indictment, an integral, evidentiary part of the Grand Jury Indictment, whose errors, if any, cannot be corrected with amendment, the only disposition is dismissal. Therefore, while referring to Officer Chavez' Affidavit, we will simply put: "the Indictment".

The Indictment, at the very beginning, accused the Defendant for the allegedly "illicit importation and diversion of precursor chemicals." One of the most prominent triggering events and concrete evidence in support of such allegation is 19. 797tons of chemical in dispute. In December 2006, the Mexican Customs Enforcement intercepted and confiscated 19.797 metric tons of chemical agent, which was exported and labeled as

"Hydroxy-Benzyl-N-Methyl-Acetethamino" by Chifeng Arkar/PRC. The importer and ultimate recipient of these chemical agents, according to all related Customs Clearance Documents, is Unimed Pharmachem Mexico, SA De CV. Chifeng Arkar, PRC, the sole supplier to Unimed Mexico, and also the highly acclaimed supplier of pharmaceutical raw materials, to other "reputable business", such as SmithKline-French Pharmaceutical Laboratory in the United states, including supply of Ephedrine, pseodoethedrine, and other related, and/or other made to be related pharmaceutical ingredients, pursuant to regulatory control.

Chifeng Arkar is a State owned Enterprise situated in Inner-Mongolia, China. Being an integral part of a foreign sovereign state as the People's Republic, Chifeng Arkar is believed to be one of the four China's major pharmaceutical raw material manufactures, distributors and exporters which are registered with the United Nations for the latter's monitoring over its transaction of precursor chemicals and other pharmaceutical ingredients, document wise. Additionally, Chifeng Arkar is the only PRC state-owned enterprise which has subjected its business transactions and activities with the U.S. Food and Drug Administration under the U.S. Department of Health and Human Services. That fact indicates, as prima facie circumstantial evidence, that Chifeng Arkar's exports, labeling, packaging, commercial inspection, customs declaration for exporting of its pharmaceutical agents, are under the oversight of related government agencies, hence highly transparent to the US. Government and Mexican Government. It is Chifeng Arker/PRC, being certified by USFDA, which physically handled the allegedly "mislabeled" chemical, while the Defendant and his Company were outside the chain of custody, the nature of such a business transaction is solely relying upon paperwork. If anything goes wrong, the government has to find and present evidence beyond such normal business transaction.

In addition to that 19.797 Metric tons of pharmaceutical agents in question, the mere document in support of the Grand Jury Indictment also listed the following transactions of exports, among others, labeled, declared and exported by Chifeng Arkar, PRC, on behalf of the importer: Unimed Mexico:

20 Metric Tons of "Hydroxy-Benzyl-N-Methyl-Acetethamino" imported into Mexico on December 12, 2005; and

29.4 Metric Tons of "Hydroxy-Benzyl-N-Methyl-Acetethamino" on January 6, 2006.  (DEA Officer Eduardo Chavez' Affidavit, a sole testimonial evidence in support of that unsigned grand jury indictment, page 2.)

Again, in absence of detrimental concrete evidence implicating Defendant's wrongful activities, such a finding may be merely drawn from search of paperwork. Paperwork itself appears free from defects.   "Hydroxy-Benzyl-N-Methyl-Acetethamino", which defendant demonstrated his state of mind to purchase from one of the world's most reputable manufacturer, Chifeng Arker, an FDA certified supplier. While "Hydroxy-Benzyl-N-Methyl-Acetethamino" does not fall into any category of precursor chemical.  According to one of the two National Forensic Examination Reports concluded by the National Forensic Laboratory under Mexican Attorney General, "Hydroxy-Benzyl-N-Methyl-Acetethamino" was tested and found from the samples. However, it added that uncertain amount of "ephedrine derivative" after "treating by adding other chemical agents outside the sample tested" was simultaneously found.  The U.S. Indictment has largely built its accusation upon such Mexican type scientific findings.  Logically, on the side of the importer, if what he ordered from supplier is "Hydroxy-Benzyl-N-Methyl-Acetethamino" as well documented, while the most authoritative Mexican law enforcement found the existence of "Hydroxy-Benzyl-N-Methyl-Acetethamino", and further found "Hydroxy-Benzyl-N-Methyl-Acetethamino" is lawful chemical, the Government has utterly no "probable cause" to prosecute the Defendant, unless, until it finds other evidence that the Defendant, on Mexican side, has personally, knowingly involved in conspiracy to have the "Hydroxy-Benzyl-N-Methyl-Acetethamino" messed up with other uncertain amount of precursor drugs.*

* "When the product is dissolved in water, hydrochloric acid was added, and it's heated to evaporation, pure hydrochlorite of pseudoephedrine is obtained, a chemical precursor to the manufacture of amphetamines." Central Administration for Customs Investigation  under General Customs Administration: Laboratory Analysis (326-SAT-IX-C-19135) The fact mirrors the following hypothetic scenario: "We added nitric acid into the sample of nitrogen based fertilizer, with added chemical processing (such as, but not necessarily is, "heating", we obtained TNT, a powerful explosive used for terrorist bomb-making."  Neither "taint" is permissible in forensic chemistry science.

Such a faulty evidence has been misused by the U.S. government to defraud the Grand Jury by twisting the scientific truth that "Hydroxy-Benzyl-N-Methyl-Acetethamino" is a single, homogeneous chemical organism with its distinctive molecular structural expression and characterization, rather than, as Mexicans lied, a mixed chemical compound constituted with legitimate hydroxyl Acetethamino component, and some uncertain amount of illegitimate N-Acetylpseudoephedrine".

When the Indictment went even wilder to accuse the Defendant to intentionally mislabeled the chemical he received or intent to receive.  The indictment failed in short asking who did the labeling? Unless there is evidence indicating otherwise, the normal business transaction is that the Manufacturer did the labeling or mislabeling. Government in its indictment has completely failed to present any evidence to overcome such common sense presumption.

Most importantly, what the Indictment falsely charged the above-mentioned two transaction happened during the period in which UNIMED's business operation was under the regulatory control of the COFEPRIS.  Its clean hand in these business activities was repeatedly certified by the COFEPRIS Survailence, Inspection, and Certification, whose last certification of inspection ended on July 28, 2006.  The COFEPRIS' certification covers the period may present a factual/legal presumption that the Defendant's business activities during the period lasting until July 28, 2006 is free from illicit drug activities involving questionable Pseudoephedrine.  Government may overthrow such presumption with its own evidence finding otherwise, which we have not seen any, however, the Government is not supposed to defraud the Grand Jury by covering up such exculpatory evidence before the Grand Jury.

**"A sampling of the substance conducted by the Mexican Customs Central Laboratory identified it as N-Acetylpseudoephedrine, a derivative of pseudoephedrine /ephedrine." (Id. P-3)**

While presenting such an allegation to Grand Jury, the Government failed to certify with any scientific certainty that N-Acetylpseudoephedrine is a derivative of pseudoephedrine/ephedrine, hence it is precursor drug.  Much less the Government has enlightened the Grand Jury that Defendant has played a role in converting Hydroxy-

Benzyl-N-Methyl-Acetethamino", a harmless chemical into "N-Acetylpseudoephedrine, a derivative of pseudoephedrine /ephedrine".  Further much less that the Government has cautioned the Grand Jury that the Forensic Examination by Mexican Authorities may have been faulted.

**"…after 2005, Unimed pharmaceutical did not have any authority to import, manufacture, distribute, or possess any pseudoephedrine or ephedrine related material…" (Id. Page 3)**

Testifying the above, according to the newly discovered three COFEPRIS Auditing Certifications, the Government has severely defraulded the Grand Jury by twisting the factual truth.  After 2005, it is true that UNIMED did not have the authority to import and manufacture pseudoephedrine, which it did not do.  However, to say it did not have the authority to "distribute or possess" is a willful misrepresentation of  facts. The three COFEPRIS Reports clearly demonstrated that UNIMED did have such authorities to "distribute and possess" regarding to the tons of remaining inventory possessed by UNIMED, under COFEPRIS regulatory control.  Such a willful misrepresentation has led to U.S. law enforcement to *wastefully* collect residues of pseudoephedrine in the UNIMED places of business on April 26, 2007.  Such misleading information also placed the Grand Jury under the false impression that all activities of UNIMED in relation to Ephedrine or Pseudoephedrine after 2005 is outlawed, therefore, punishable.

**"…mislabeling of shipments and positive results for the presence of ephedrine, that Ye Gon willfully intended to import a restricted chemical into Mexico, violating Mexican law, for the express purpose of manufacturing pseudoephedrine/ephedrine, a listed chemical, as defined by Title 21, US Code Section 802(34).(Id. P-4)**

There is no evidence that this Defendant did, or involved the mislabeling, even if assuming the alleged mislabeling has ever occurred.  One Mexican National Forensic Examination has at least proven there is lawful chemical agents in similar chemical term being tested and found.  It is common sense that when a buyer ordered something, that stuff had been labeled already.  The only exception is theory of so-called "designer drug"

normally for direct consumption, there is utterly no evidence to prove existence of such "designer's drug" conspiracy between this Defendant and the People's Republic.  If there were any mislabeling, such mislabeling may be the one, i.e., mislabeling this innocent, law abiding Defendant as an illicit drug dealer/trafficker or drug lord.

"N-Acetylpseudoephedrine", as being allegedly mislabeled to be Hydroxy-Benzyl-N-Methyl-Acetethamino", which may not be listed in U.S. Customs Nomenclature, is "not controlled in the United States", according to the Indictment, "it is controlled in Mexico by the Mexican General Law of Health', added by the Indictment (Id. P-2).

> **"…it is clear that Ye Gon and Unimed intentionally imported and manufactured pseudoephedrine/ephedrine for illegal purpose due to the fact that 1) Unimed did not have the proper authority to import, export, distribute or posses any such product and 2) no legitimate pharmaceutical manufacturer would risk criminal liability in purchasing such products from Unimed" (Id. Page 4)**

This part of the indictment has raised double most severe criminal charges before the Grand Jury: Import, ___and___ Manufactured pseudoephedrine as controlled substances.  If the U.S. government has such a certainty that what Chifeng Arker-PRC has exported is already Ephedrine/Pseudo-Ephedrine?  Does it need further "manufacturing"?  If the product exported to Mexico, needs to become Pseudoephedrine only after "Defendant's manufacturing activities, the pre-manufacturing chemical itself is then not "pseudoephedrine" before being "manufactured" by the Defendant. Government has actually proven neither.

"Manufacturing" pseudo-ephedrine is a big term, it will involve power supply, numerous ingredients, water supply, and team of working staff, safety measures to prevent explosion.  It will also produce pollution, traceable waste, particles through out the places, attaching to, thus traceable from containers, insolents, walls, grounds, wokers' clothing, hairs, blood.  Unfortunately, Government has seemed found none ten months after the March 16, 2007 raid.  In US DEA Investigator K. Hooton's Affidavit, the U.S. Government alleged that the Defendant, for such "clandestine manufacturing" purpose,

imported state of arts assembly line.  What DEA has failed in short to add is that such projected importation of assembly lines from Germany, Italy, Switzerland, plus factory designing technology  from the United States, are totaled 24 Assembly lines using the world's most advanced cutting-edge technology, making the UNIMED, not only the Mexico' but the entire Latin America's, top one greatest pharmaceutical conglomerate, just for the purpose to "clandestine mass production of illicit drugs", under the watchful eyelids of the enraged competitors, without divisions of army's protection.

"no legitimate pharmaceutical manufacturer would risk criminal liability in purchasing such products"?!

The Indictment's such speculative incriminating accusation has appeared to have head-on collision with the newly discovered COFEPRIS Auditing Report of 02/2005:

COFEPRIS listed the following  legitimate pharmaceutical manufacturers:

Liomont Pharm. Lab.;

Rayele

Deveort's Chemicals. (COFEPRIS Auditing Report, Feb. 23/24, 2005,  pp 6-7)

UNIMED, according to its huge investment scale and its designed potential with 24 assembly lines of cutting edge technology, is not a "legitimate pharmaceutical manufacturer" simply because it is owned by an "El Chino"?

**"…these large quantities of pseudoephedrine/ephedrine from the start were destined for the only other market which would require such quantities: the clandestine methamphetamine manufacturing market." (Id. P-4)**

The above-cited is the most serious willful misrepresentation of factual truth to defraud the Grand Jury.  It is totally goes against what newly discovered COFEPRIS Certification documented.  The COFEPRIS Clearance Certification of July 2006 has not only certified that the UNIMED's large quantities of pseudoephedrine/ephedrine from the start was legitimate.  It has been legitimate through out the entire period at least up till July 28, 2006.  To pinpoint the last date of the latest COFEPRIS auditing report ever found is significant: the period of government certified legitimacy of the Defendant's

alleged "controversy" business operation has overlapped with the prosecutorial documents' quoted time period of alleged "criminal activities": Another example of a head-on collision between certified factual truth and unfounded fraudulent accusation.

The U.S,Government apparently defrauded the Grand Jury by covering up such a critical exculpatory evidence.  Instead, it misled the Grand Jury that the Defendant, from day one of his importation of Pseudo-ephedrine, had sold such controlled substance to the underworld of the illegal drug dealers for the latter to mass producing Meths to feed the U.S. public.  This is simply a fraud.  The falsity of such misleading information may also be rebutted by the 2005 Clearance Registration of UNIMED's Pseudoephedrine with the United Nations.

> **"…Mexican intelligence which identifies a large clandestine meth lab presence , including recent seizures in 2006 of the two largest clandestine methamphetamine laboratories in the West Hemisphere.  Investigation into these clandestine methamphetamine laboratories *identified links*…" (Id. P4)**

Said "two largest clandestine methamphetamine laboratories in the West Hemisphere" cited by DEA Officer Eduardo Chavez was as follows: according to Mr. Chavez' quotes in his footnote: One in outskirt of Guadalajera, Mexico,  found in January 2006, the other in Jalisco, Mexico in December 2006." (Id. P-4)

With the colorful spectrum of ever-changing version of "law" on precursor chemical, of drastically changing version of nature of  "chemicals" in question, of the ultra-liberally interpreted version of the defendant's alleged inculpatory activities, the solo evidentiary part of the indictment seems to present a catch-all exculpatory clarification of such activities in the circumstances:

It has apparently defrauded the Grand Jury, if any there, by stating that "…all legitimate pharmaceutical laboratories operating in Mexico must go through COFEPRIS to obtain permits to buy, and/or sell pseudoephedrine/ephedrine."  (Id. P3) So misrepresenting the factual truth is to purposefully mislead the Grand Jury by implicating that the Defendant Ye Gon and his Unimed were outsiders beyond reach of the

COFEPRIS' regulatory control, or, they were caught for criminal activities by COFEPRIS, the well documented evidence has indicated on the contrary..

While such fraudulent, deceiving misleading of Grand Jury has reached its climax while the author of the sole testimonial witness testified to the Grand Jury, if any, by stating:

> "…these large quantities of pseudoephedrine/ephedrine from the start were destined for the only other market which would require such quantities: the clandestine methamphetamine manufacturing market." (Id. P-4)

> "…Mexican intelligence which identifies a large clandestine meth lab presence , including recent seizures in 2006 of the two largest clandestine methamphetamine laboratories in the West Hemisphere.  Investigation into these clandestine methamphetamine laboratories *identified links*…" (Id. P4)

Here, "*links*" between "large quantities of pseudoephedrine/ephedrine from the start"(from Chifeng Arkar/PRC's export and Ye Gon's Import),  and the clandestine methamphetamine manufacturing market"heading for the United States, are *identified* as so-called "U.S. Link", being presented in support of the completely unfounded felonies under 21 USC 959, 963 and 960, as well as in support of subject matter jurisdiction of a U.S. District Court. Unfortunately, such a fraudulently designed "link" and "identification of links" are completely de-linked:

In all places of meths labs through out the world: there is not a single particle of "Ye Gon" pseudoephedrine having ever been found;  While in places where residues of pseudoephedrine was found, there is no finding of "Ye Gon" chemical "cousins".  In all other places and circumstances through out the world, there is no single particle of "controlled substance" having ever been found or reported to have been found: In Ye Gon's Office, residence, on those hilly stacked brand new, seemingly never circulated cash in $100.00 denomination, a wrongfully labeled as illegal drug proceeds(!) with $100,000.00 packaged and officially sealed; and finally, in all suspects' blood and urine.

Any corner linking to the Defendant sees no link to illegal drug in this unprecedented "drug cartel" saga.

All such well documented "absences" did not prevent the prosecutors from misrepresenting to grand jury that U.S. link of Meths had been found against Defendant Zhenli Ye Gon.  With such a quantum leap, the U.S. Government obtained such a faulty Grand Jury Indictment, without being signed, without bothering to present any probable causes.  To make the charges like a genuine one, Officer Eduardo Chavez's Affidavit made an allegation concerning a hand-note referring to "Flour" and "book" signed by an "Amigo, and addressed to "Zhenlin", an irrelevant stranger because the Defendant asserted that he has never used such alias as "Zhenlin", neither has he been so-called. Government has defrauded the grand Jury by having failed to disclose that the brand "new" handwritten Note not included in Mexican Government's inventory list inspected by the Defendant thus far.  The Note was actually "hand-written Note" number II.   From Affidavit Statement issued by USDEA Officer K. Hooten on March 22, 2007, the USDEA falsely asserted a finding of a "hand-written note as the chemical recipe listed 20 metric tons of Safrole", "used in clandestine manufacturing of MDMA, a schedule II controlled substance", was found in Defendant's Mexican Residence, "in addition to cash and firearms".   For better record purpose, we call it "handnote number 1".  Defendant Ye Gon was confused that he has never involved in any single particle of Safrole through out his life time thus far. While Mexican Authorities also denied its involvement in finding of such Safrole-MDMA "handwritten recipe". (See K. Hooten's Affidavit Statement, page 6 and page 9)  That handwritten note number I no longer appears in government's charging documents.  However, its transfigured replica, now, a so-called "AMIGOS message", as handwritten note number II,  takes the original place of its predecessor. (See U.S. SA Eduardo Chavez: Affidavit in Support of Indictment, page 6)  The "Flour-book" Amigor Message has failed since its foundational requirements of Fed. R. Evid. 801(d)(2)(E) were not met and the documents were not relevant to the charged conspiracy. "Zhenlin" appears to be a different person in DEA's list.

In numerous circumstances, the U.S. Prosecutors have claimed that the the so-called "chemical cousins" can be easily converted into such controlled substances as

pseudoephedrine.  They have never stopped to think it twice that why such "easy conversion" should bother the defendant to spend hundreds of millions of U.S. dollars to build up such a great giangantic pharmaceutical conglomerate with the world's most advanced cutting-edge tech, a flagship of the Latin America's entire fleet.

"…the current black market prices for one kg of pseudoephedrine/ephedrine in Mexico is approximately $3200 to $4000 USD…" (p-5), which the Government takes the middle, US$3,600.00 per kg.  In the wake of newly discovered COFEPRIS Auditing Report, the UNIMED had at least wasted by un-using, leading to government's cancellation, 15,000kg of pseudoephedrine under the Mexican Government's four recorded import permits during the period from 01/2002 through 02/2005. The Indictment may not be able to answer such a common sense question: if the stuff were sold for USDEA averaged price for US$3,600 per kg, it meant that the Defendant had unreasonably thrown US$48,000,000.00 in water for allowing its 15,000kgs of licensed pseudoephedrine quote abandoned.

"On April 26, 2007, DEA FC and I traveled to the UNIMED manufacturing plant to analyze any chemicals and residues still present…including samples which tested positive for the presence of ephedrine." (p-3)  It has remained unknown to entire world why the USDEA has left the entire 19.797 metric tons of so-called "N-Acetyl-Pseudoephedrine", weeks before the governments decided to eliminate in May 15, 2007, while in custody of Mexican Government carefully untouched, but sneaked to Defendant's place of business to fumble around for "residues".  The Indictment has apparently defrauded the Grand Jury by willfully misleading the latter with false impression that no ephedrine, or its "residue" should have been allowed to be present in the Defendant's place of business.  This false information has an head-on collision with the newly discovered COFEPRIS Auditing report: not simply hunch of residues, but large pile of "residues", *i.e.*, statistically, 806 kg of "residues", are legally lying in the Defendant's lawful custody.    The FC's forensic examination on such precious residues were completed as later as November 17, 2007, more than half year after the sample taking.  Strangely, the long stalled Report has obviously left almost all critical scientific questions unanswered.

5.   Motion for Bill of Particulars

Government, in its Response to Defendant's Motion for Reconsideration, argued that the Defendant's filing with this Court his Motion for Bill of Particulars was not ripe because the discovery is on-going.  Defendant has noticed that Government seemed to have fine tuned its original position.  During the prior hearing, Wanda Dixon, Esq., AUSA, simply requested this Honorable Court to deny Defendant's Motion for Bill of Particulars.  Defendant understands that whether granting or denying Motion for Bill of Particulars are discretional matter leaving the Court to determine.  However, questions raised in Defendant's Motion for Bill of Particulars are inescapable, legitimate factual questions.  Without providing the minimum degree of clarity and particularity to such questions, the entire criminal prosecutions may likely appear a foul-play: what is "chemical cousin"?  Defendant's alleged illicit drug activities are "importing" alleged "precursor chemical" or "manufacturing" "precursor chemical" after getting non-precursor chemical imported?  Without Bill of Particulars, such ever-changing version of accusation will confuse all.  Defendant is pleased to see that the Government has fine tuned its position from seeking for kicking out of these motions to argue the timeliness of the Motion.  Defendant believes these motions are timely because severe consequences have been produced, and being kept producing, from such vague and confusing accusations in want of particularity.  Defendant is the person who has been physically victimized from such an inconsistent prosecution in lack of particularity every single minute given to his open-ended pretrial detention.

6. Law

Defendant respectfully moves that the Grand Jury Indictment charging the defendant for Conspiracy in drug trafficking in violation of  21 USC. §959, 21 USC. §960, 21 USC. §963,  and 18 U.S.C. §2 be dismissed pursuant to 18 USC 3161 (h)(8).  The Indictment, together with the Information, be dismissed with prejudice, for, among others, serious violation of Defendant's Constitutional Speedy Trial rights under Sixth Amendment and

his statutory right under STA.  Please See Zedner v. United States, 126 S.Ct. 1976, 1984 –1985 (2006).

The logic adopted in Zedner case may be self-evident in the light of 18 USC 3161 (h)(8), a statutory requirement for prosecutors' compliance of Sixth Amendment and STA Act.   "[i]f a defendant is not brought to trial within the seventy-day deadline, dismissal of the indictment is mandatory."  United States v. Doran, 882 F.2d 1511, 1517 (10th Cir. 1989).(2)  The "indictment shall be dismissed on motion of the defendant." United States v. Vaughn, 370 F.3d 1049, 1055 (10th Cir. 2004).  The tolling of STA clock sought and achieved  in the circumstances that is barred by Zedner, the STA has been legally violated, no tolling period or period of exclusion from STA clock should counted.  The Indictment and information (in this case, Officer Eduardo Chavez' Affidavit), should be dismissed as matter of law.

Furthermore, 18 U.S.C. 3162(a) provides, for the relevant part, concerning the dismissal of the indictment:

"In determining whether to dismiss . . . with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Prejudice to the defendant is among the factors the text of 3162 directs the district court to consider.  United States v. Taylor, 487 U.S. 326, 334 (1988); see also id. at 344-46 (Scalia, J. concurring).

An instant denial of the Government's Motion for undue delay, and entering an order of the dismissal of the Indictment with prejudice appear appropriate and necessary in light of the Defendant's constitutional rights and the principles of equity given to the fact that the Defendant was kept in pretrial custody, which could now face an prolonged term in punitive nature for the same charge without bail upon the government's baseless, bad faith charges:

"The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations.   The

speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. MacDonald, 456 U.S. 1, 8 (1982).

Consequently, in the light of the foregoing analysis, the appropriate disposition of this instant case is to dismiss the Indictment with prejudice.

## IV. <u>CONCLUSION</u>

Wherefore, Defendant respectfully moves that this Honorable Court dismiss the Grand Jury Indictment with prejudice.   In the foregoing light, and in the wake of ground breaking discovery of chain of evidence, Defendant, by through counsels, respectfully moves that the Indictment be dismissed pursuant to Rule 12 of Federal of Criminal Procedures. Alternatively, this Honorable Court may order an immediate hearing on oral arguments concerning Defendant's Motion.

Respectfully submitted by:


/s/Ning Ye, Esq. (MD26804)
Counsel for the Defendant
DC Office:
36-26 A Union Street, 3rd Floor
Flushing, NY 11354
718-308-6626
Email: ynyale@aol.com

CERTIFICATE OF SERVICE


On this 11th day of March, 2008, I electronically filed this Supplementary Briefing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following addressee:

Paul Laymon, Esq.

U.S. Dept. of Justice

1400 New York Avenue, NW, 8th floor

Washington, DC 20530



/s/Ning Ye, Esq.