UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | :Cr. No. 07-181 (EGS) |
| | : |
| V. | : |
| | : |
| ZHENLI YE GON | : |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR RECONSIDERATION OF THE ORDER OF DETENTION

Procedural Background

The United States respectfully responds to the defendant's fourth attempt for pre-trial release. Detention orders have been granted in this case by Magistrate Judge Deborah Robinson and Magistrate Judge Alan Kaye. Detention orders have also been entered by this Court on two occasions–September 7, 2007—this defendant's initial appearance before this Court, and December 20, 2007, when defendant sought to have the detention order rescinded. Each time the defendant has brought up the issue of his release pending trial, he has done nothing to mitigate the Court's findings that he is a danger to the community and a serious flight risk. In fact, the Court has explicitly found each time that no condition or combination of conditions will ensure the defendant's presence in court. Nevertheless, the defendant filed the instant motion to reconsider his pretrial detention. This time, his argument appears to be that he has presented new evidence that weakens the Court's finding that probable cause exists. However, since this new evidence consists of an unsubstantiated, self-serving letter written by defendant himself, and two undisputed COFEPRIS audits that do nothing to impact on the government's case against him, this motion too must fail. Since the defendant still does not carry his burden of presenting relevant new evidence regarding his danger to the community or his risk of flight, he must

remain held without bond pending trial.[1]

As previously noted in written pleadings and oral argument in this case, there is a statutory presumption in favor of detention because the defendant is charged with Conspiracy to Aid and Abet the Manufacture of 500 grams or more of a mixture and substance containing Methamphetamine, knowing that it would be unlawfully imported into the United States, in violation of 21 United States Code Sections 959 and 963, and 18 United States Code Section 2. This offense carries a statutory mandatory minimum penalty of ten years, and a maximum penalty of life imprisonment. Moreover, the defendant has no ties to the local community; however, he has strong family and business associations with individuals in Mexico and the Republic of China, the ability and means to flee if released from custody, and would pose a danger to the community unless he is detained.

## Legal Standard

To prevail on a motion for reconsideration, defendants "must demonstrate that there has been 'an intervening change in controlling law,' there is 'new evidence,' or there is a 'need to correct clear error or prevent manifest injustice.'" *United States v. Libby,* 429 F. Supp. 2d 46, 47 (D.D.C. 2006) (quoting *United States v. Yakou,* Crim. No. 03-449, 2004 WL 884545, at *2 (D.D.C. 2004)).[2] Although there are few opinions in this District elaborating on that standard, in another district that applies the same formulation it has been said that "[t]his is a demanding

---

[1] The government's prior responses to the defendant's bond motions and the entirety of the record herein are incorporated in this opposition by reference.

[2] Neither the Federal Rules of Criminal Procedure nor the Rules for the District Court for the District of Columbia provide for motions for reconsideration in criminal cases. This court, and others, have therefore imported similar standards from civil procedure. *See, e.g., United States v. Yannotti,* 457 F. Supp. 2d 385, 388 (S.D.N.Y. 2006) (noting that Federal Rules do not expressly provide for reconsideration but that Southern District of New York applies a local civil rule in criminal cases).

standard. It is not enough . . . that [the moving party] could now make a more persuasive argument." *United States v. Chiochvili,* 103 F. Supp. 2d 526, 528 (N.D.N.Y 2000) (denying motion for reconsideration of decision on suppression of evidence); *see also United States v. Shi,* 396 F. Supp. 2d 1132, 1137 (D. Hawai'i 2003) (applying the same standard as this District and noting, "[t]here is a 'compelling interest in the finality of judgments which should not lightly be disregarded.'") (citations omitted).

## ARGUMENT

**I.  The Defendant Has Not Demonstrated Proper Grounds For Reconsideration Of The Order Denying Pre-trial Release**

**A.  Defendant does not demonstrate that there has been an intervening change in controlling law**

As one of the standards for a motion to reconsider a court's previous ruling, defendant must show that either there has been an intervening change in controlling law or new evidence. The government addresses the alleged new evidence Defendant raised in his motion below. In his motion for reconsideration, Defendant fails to show that there has been an intervening change in controlling law as a reason for ending his pretrial detention. In fact, Defendant fails to address this issue at all. Therefore, an intervening change in controlling law cannot be the grounds upon which Defendant can request a motion to reconsider his pretrial detention.

      **B.**      **Neither the Letter written by defendant in 2004 nor the COFEPRIS reports from 2006 impact negatively on the Court's previous findings of Probable Cause in this case.[3]**

      1.  Defendant's 2004 letter.

Defense exhibit 1 was among the documents turned over by the government in discovery. It is a letter written by the defendant, and according to him, it purports to explain Unimed's importation procedures, its accreditation, and its permission to import pseudoephedrine. It further states that the defendant had a pharmaceutical customer for the pseudoephedrine, and complains of a theft of five bags of product. Contrary to defendant's assertions however, this letter does not contradict the affidavit filed in support of his arrest warrant. This letter is a self serving document, which defendant wrote to complain that his pseudoephedrine sulfate had not been released to him, that in the interim some five bags of it had been stolen, and that this delay was costing him money and rendering him in danger of being in noncompliance with the importation procedures. The claims in the letter are unsubstantiated, and while it may be true that the defendant told the Mexican authorities that his activities were legal (in fact, we would expect nothing less), the fact that the defendant claims that his activities were legal does not make them so. Moreover, the government has never said that the defendant was never authorized to import pseudoephedrine. The government's affidavit states that the defendant was not

---

[3] Defense exhibits 1, 2, and 3 are defendant's English translations of Spanish language documents provided to the defense by the government in discovery. The translations are not certified by an interpreter. For the purposes of this response, the government has used the defense translations. However, this does not imply that the government agrees with the defense translation of the documents. In fact, the government has had the defense English translations reviewed by a certified Spanish translator, and has found the defense version is missing text, and uses the improper translations and or false cognates for much of the information contained therein. For example, in defense exhibits 1, 2, and 3, the Spanish phrase "la materia prima" is interpreted as "prime material." However, according to two different certified Spanish translators, a better translation of that phrase, particularly in the context of this case and the subject matter of the documents, would be the English phrase "raw material."

authorized to continue to import pseudoephedrine into Mexico after July, 2005. Moreover, the defendant was never authorized to import pseudoephedrine into Mexico for illegal diversion purposes. Defendant's claim that he legally purchased pseudoephedrine and sold it to a legitimate customer on one occasion in 2004 is just that–a claim, and the defendant's exhibit establishes no more than that. Even if this claim is true, the government has never alleged that the defendant was not authorized to import pseudoephedrine for sale to legitimate buyers in 2004. It does nothing to refute the government's evidence that the defendant was not authorized to import pseudoephedrine after 2005, nor does it address whether defendant diverted any of his importations of pseudoephedrine to illegal uses.[4]

        2.   The COFEPRIS Audits from March and July 2006.

Defense exhibits 2 and 3 were also contained in the discovery defendant received from the government. The fact that COFEPRIS conducted audits of the defendant's company, UNIMED on the dates described is undisputed. However, the audits do not establish that the defendant was authorized to possess pseudoephedrine at that time, and in fact as previously stated, the defendant was not authorized to import or possess any additional pseudoephedrine products after 2005. During that time, it came to the attention of the COFEPRIS officials that UNIMED still had pseudoephedrine products in its possession after the law changed. In fact, defense exhibit 2, the March 2006 audit, COFEPRIS has as one of its stated objectives (among other things) to take stock of the balance of controlled medications including those that contain pseudoephedrine."(See defense exhibit 2, page 2, Bates no. NDDS005879). The exhibit

---

[4] In fact, the defendant's elaborate protestations regarding the theft of the five bags of pseudoephedrine sulfate may have been a ruse to detract investigators and establish a convenient alibi for the fact that he could not account for five bags of product purportedly imported for a legitimate customer.

documents COFEPRIS' understanding that UNIMED "has not marketed primary materials since the last balance to date." (See id., page 7, Bates no. NDDS005884). This fact is further illustrated by COFEPRIS' "additional comments" section, which notes that "[t]he balance of the aforementioned primary materials was calculated from February 23, 2005 to date, without any entries or departures of controlled primary materials." (See id., NDDS005885). Further, upon realizing that UNIMED was in possession of these leftover pseudoephedrine products, COFEPRIS authorized their sale. As noted in the March 2006 audit, on February 23, 2005, UNIMED had 9,000 kilograms of pseudoephedrine hydroclorate, 806.010 kilograms of pseudoephedrine sulfate, and no ephedrine hydrochlorate. On March 6, 2006 (the date of the audit), UNIMED still had the same amounts of those substances. The audit does not show the dates that these quantities were acquired, nor does it show the import and acquisition permit for them. (See defense exhibit 2, page 8 - 9, Bates no. NDDS005888 - 9).

Defense exhibit 3 is COFEPRIS' followup audit done on July 28, 2006. It has as one of its stated objectives "d) to take stock of the balance of controlled prime materials, and e) to secure expired prime materials for their subsequent destruction." See defense exhibit 3, page 2, Bates no. NDDS005931). This exhibit documents that on March 6, 2006, UNIMED had 9,000 kilograms of pseudoephedrine hydrochlorate. It also demonstrates that on April 19, 2006, there were two separate exits[5] of that product in the amounts of 300 kg and 2,660 kg respectively. Further, on April 21, 2006, there was an exit of 3,000 kg of the product, and on May 23, 2006, there was an exit of 2,040 kg of the product, for a total exit rate of 9,000 kg. Thus, it is

---

[5] This is another example of the inaccuracies contained in the defense English translations. Here, the defense translates the Spanish phrase "salidas según libro" as "exits by weight." Our certified Spanish translator states that the better translation would be "sales or outputs according to the ledger." However, for purposes of this response, the government will use the term "exits" as translated by the defense.

demonstrated that between the dates of the March 6 audit and the date of the July 28 audit, UNIMED had gotten rid of its entire left over inventory of pseudoephedrine hydrochlorate, without acquiring any more of that product. (See defense exhibit 3, page 8, Bates no. NDDS005928). However, the exhibit also demonstrates that UNIMED was unable to get rid of its left over inventory of 806 kg of pseudoephedrine sulfate. (See id., page 9, Bates no. NDDS005929).[6] In short, again, the "new evidence" proffered by the defense misses the mark–instead of demonstrating UNIMED'S authorization to import and sell pseudoephedrine, defense exhibits 2 and 3 demonstrate that the Mexican government was aware that UNIMED had a left over inventory of controlled products after the law changed, and document COFEPRIS' attempt to monitor the left over inventory and the attempts to get rid of it.

>   II.     **The fact that Chiefeng Arker was FDA Certified in 2003 has no bearing on whether pseudoephedrine shipments to UNIMED in 2005 and 2006 were properly labeled.**

The investigation in this case revealed that UNIMED had imported into Mexico approximately 20 and 29.4 metric tons of "N-Methyl-Acetylamino" on December 12, 2005, and January 6, 2006, respectively; and 37.485 metric tons of "Hydroxy-Benzyl-N-Methyl-Acetethamine" on August 28, 2006, and September 2, 2006. Defendant argues that his exhibit 5 demonstrates that this evidence is wrong, because as a Food and Drug Administration (hereinafter FDA) certified facility and a facility owned and operated by the Chinese government, Chifeng Arker did not mislabel any shipments. Defense exhibit 5 is

---

[6] The COFEPRIS audits do in fact refer to ledgers or "los libros de control." However, as previously explained, the government has not encountered anything specifically labeled that way among the documents received thus far. Of course, if the government encounters such documents, they will be turned over as part of discovery. Nevertheless, it remains to be seen how such documents can exonerate the defendant, particularly when he would not be expected to record illegal importations or sales of pseudoephedrine made after July, 2005.

difficult to read due to the quality of the copy and the size of the print.  However, it appears to be a letter written in 2003, from an FDA compliance officer to the General Manager at Chifeng Arker at the time of the letter.  The letter states that after a review of an inspection report completed in 2003, that the FDA classified the Chifeng Arker facility as acceptable.  It is beyond discussion that a letter regarding an unknown inspection which occurred at least two years before any allegation of mislabeling arose can hardly have any relevance as to whether a shipment received in Mexico some two or three years later was properly labeled.  Moreover, whether or not agents of the Drug Enforcement Administration visited Chifeng Arker is also not relevant to whether mislabeling occurred.  The relevant facts are these: on December 12, 2005, and January 6, 2006, UNIMED imported into Mexico products labeled as "N-Methyl-Acetylamino."  On August 28, 2006, and September 2, 2006, UNIMED imported into Mexico products labeled as "Hydroxy-Benzyl-N-Methyl-Acetethamine."  According to DEA forensic chemists, Hydroxy-Benzyl-N-Methyl-Acetethamine does not correspond to any known chemical.  N-Methyl-Acetylamino can be considered a partial chemical name; however, the chemical does not exist as it was listed on UNIMED's shipping manifests nor can it be identified as an intermediate product for analgesic production.  A shipment of Hydroxy-Benzyl-N-Methyl-Acetethamine was imported into Mexico by UNIMED on December 5, 2006.  However, when inspected and sampled by the Mexican Customs' Central Laboratory, it was identified as N-Acetylpseudoephedrine, a derivative of pseudoephedrine/ephedrine, which is something other than it was labeled.  This substance is controlled by Mexican federal law, because it can be easily converted into pseudoephedrine, an important ingredient used in the manufacture of Methamphetamine.  Defense exhibit 5, the letter written in 2003, and defense exhibit 6, which purports to consist of photographs of Chifeng Arker's facilities, have no bearing

on the relevant facts in this case. [7]

### III. No Condition or Combination of Conditions will reasonably assure Defendant's Appearance at trial and the Safety of the Community.

Defendant continues to argue that he should be released on "house arrest" in this case. However, he has yet to address how that will be sufficient to overcome the Court's findings regarding his appearance at trial and the safety of the community. Initially, he states that the fact that an INS detainer has been lodged against him would not bar his release on home detention. But once again, none of the cases he cites actually address the matter at hand. United States v. Buscemi was a case decided by a Magistrate Judge, and concerned an alien charged with unlawful reentry into the United States. United States v. Buscemi, 2004 U.S. Dist. LEXIS 27134 (W.D.N.Y. 2004). Buscemi sought dismissal of his superceding indictment based on violations of the Speedy Trial Act. One of the grounds for his motion was that the Speedy Trial provisions governing his initial appearance before the court were implicated as of the date that an INS detainer was lodged against him. Under those circumstances, the court found that the INS detainer was insufficient to bring the defendant into the custody of the government for Speedy Trial Act purposes. See id. at 30. Roldan v. Racette, 984 F.2d 85 (2nd Cir. 1993) is similarly cited improperly by the defense. Roldan petitioned for a writ of habeas corpus, and the magistrate judge considering his case construed his pro se petition as a challenge to his INS detainer. The magistrate judge found that the INS detainer did not satisfy the "in custody"

---

[7] Moreover, the government does not concede that the defense presentation at the December 20, 2007 court hearing established anything, much less that the presentation established defendant's intent to use of any chemicals noted above in the manufacture of phenylephrine or any other legitimate endeavor–especially since the shipment that was tested turned out to be a chemical that is not phenylephrine. Moreover, the defendant did not give any explanation as to how a chemical containing pseudoephedrine, which the defendant was prohibited from importing, could be converted into phenylephrine.

predicate of the habeas statute, and denied Roldan's petition for habeas relief against the INS. See id at 87-88. It should also be noted that the defendant here filed a habeas petition after the he was served with an arrest warrant in this case, and that on February 21, 2008, the Honorable Judge Richard Roberts dismissed that petition. 1:07-cv-01308, docket entry 6; see Gon v. Gonzalez et al., 2008 U.S. Dist. Lexis 12318.

United States v. Xulam is most egregiously miscited by the defense, because the language cited by the defense herein is not the holding of the court– it is a concession by the government found in a footnote. United States v. Xulam, 84 F.3d 441, 442, footnote 1 (DC Cir. 1996). In Xulam, the magistrate judge ordered the defendant's detention solely on the grounds that he was a risk of flight–expressly conceding that the defendant there "posed no danger to the community." See id at 442. INS had lodged a detainer against the defendant, and the government filed a supplemental memorandum to the court noting that it had no representations to make regarding INS' intentions, and that the existence of an INS detainer did not necessarily mean that the INS intended to take Xulam into custody if he were to be released by the court. See id. In footnote 1, the court also cited 8 C.F.R. § 242(a)(4) which states that under the circumstances of the case, the INS may request the holding agency to hold the alien for 48 hours to permit INS to assume custody.[8] At best, Xulam may stand for the proposition that in that case, the possibility of deportation alone did not support an automatic conclusion that the defendant posed a risk of flight. See United States v. Khraizat, 238 F.3d 425 (unpublished disposition)( 6th Cir. (Mich)(2000). However, the existence of the INS detainer is but one of the many factors which make the defendant in this case a strong risk of flight. Moreover, the analysis of the

---

[8] A search for the cited C.F.R. section revealed that the section was removed and reserved. However, similar language is found at 8 C.F.R. § 287.7(d)

defendant's detention must be based on both his risk of flight and his danger to the community.

Defendant also argues that his pending extradition to Mexico should not be a bar to his release on "house arrest." This argument must also fail. Initially, defendant seems to think that the government relied on one paramount factor when we established on three prior occasions that he should be held without bond pending trial. However, that is simply not the case. Here, the government posits several factors that demonstrate the defendant's risk of flight and his danger to the community, all of which have been fully developed in prior pleadings and oral arguments, and which will be incorporated by reference, but not repeated here. Defendant cites the case of United States v. Ramnath to support his position that his situation qualifies as a special circumstance that would warrant his release on "house arrest." United States v. Ramnath, 2008 U.S. Dist. Lexis 2251 (EDTX 2008). However, in Ramnath, the government did not oppose her release on the grounds that she was a danger to the community–the government only argued that she posed a risk of flight. The court granted Dr. Ramnath's bail motion, finding that prior to extradition, she had resided lawfully in the United States, that she had a valid medical license in the United States, that she had a husband and two minor children who were United States citizens, and that she had demonstrated by clear and convincing evidence that she faced a substantial likelihood of success in her manslaughter charges in the United Kingdom.

None of those factors are present here. The government has previously established probable cause for the charges in this case, and the weight of the evidence against the defendant is strong. The Court has found on more than one occasion that the defendant poses a serious risk of flight, and a danger to the community. The defendant has yet to address the Court's specific concerns about his risk of flight and his danger to the community if he were to be released. At best, his arguments here seem to be that his exhibits establish that he is a legitimate businessman,

and therefore cannot be a danger to the community.  But frivolous arguments aside, the defendant has not followed the standard of analysis provided by the Bail statute.  His suggestion that he be released to "house arrest" is completely unacceptable.  The only house that he has ever proposed to the Court belongs to an unnamed person, whom he does not know personally and who does not know him, coupled with that person's personal promise that he will submit himself to the jurisdiction of the court and that he will ensure that the defendant does the same.  The fact that this package is simply not sufficient in this or any situation is blatantly obvious.

Conclusion

For all of the foregoing reasons, the Government respectfully requests that the defense motion to revoke order for defendant's detention without bail be denied.

Respectfully submitted

KENNETH BLANCO, Chief
Narcotic and Dangerous Drug Section


_____/s/_____
Wanda J. Dixon
Paul Laymon
Mary Mogavero
Robert Stapleton
Trial Attorneys
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Suite 8000
Washington, D.C.  20005
(202) 307-0377

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | :Cr. No. 07-181 (EGS) |
| | : |
| V. | : |
| | : |
| ZHENLI YE GON | : |

PROPOSED ORDER OF DETENTION

Upon consideration of the defendant's motion to revoke order for defendant's detention without bail, the government's response, and the entire record herein, it is, this _____ day of March, 2008,

ORDERED, that the defendant's motion is DENIED and that defendant remain held without bond pending trial. In support of this ruling, the Court makes the following findings:

1. There is a presumption that the defendant should be detained because he has been charged by Indictment with an offense for which a maximum term of imprisonment of ten years of more is prescribed under the Controlled Substances Act. 18 U.S.C. § 3142(e).

2. The defendant's personal characteristics support the conclusion that he is a risk of flight if released.

3. The defendant is a danger to the community in general as a result of his drug trafficking activities.

4. The defendant has not rebutted the presumption contained in the Bail Statute and accordingly, no condition or combination of conditions will reasonably assure the appearance of the defendant at trial. See 18 U.S.C. § 3142(e).

5. The defendant shall be committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving

sentences or being held in custody pending appeal. 18 U.S.C. § 3142(i)(2).

6.   The defendant shall be afforded reasonable opportunity for private consultation with counsel.  18 U.S.C. § 3142(i)(3).


DATE: _____                      _____
                                                  EMMET G. SULLIVAN, JUDGE
                                                  UNITED STATES DISTRICT COURT