UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**          :
                                      :
                **Plaintiff,**        :   Criminal Action
                                      :   No. 07-181
**v.**                                :
                                      :
**ZHENLI YE GON,**                    :   June 2, 2009
                                      :   11:20 a.m.
                                      :
                                      :
                **Defendant.**        :   Washington, D.C.
                                      :
............................ :

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE EMMET G. SULLIVAN,**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

  For the United States:      **Paul W. Laymon, Trial Attorney**
                              U.S. DEPARTMENT OF JUSTICE
                              1400 New York Avenue, NW
                              Suite 8414
                              Washington , DC 20005
                              (202) 514-1286
                              Email: Paul.laymon@usdoj.gov

  For the Defendant:          **A. Eduardo Balarezo, Esq.**
                              LAW OFFICES OF A. EDUARDO BALAREZO
                              400 Fifth Street, NW
                              Suite 300
                              Washington , DC 20001-2719
                              (202) 639-0999
                              Email: Filings@balarezo.net

                              **Manuel J. Retureta, Esq.**
                              RETURETA & WASSEM, PLLC
                              601 Pennsylvania Avenue, NW
                              South Bldg., Suite 900
                              Washington , DC 20004-2601
                              (202) 220-3073
                              Email: Mjr.rw@verizon.net

APPEARANCES: (Cont.)

For the Defendant:                **Martin F. McMahon, Esq.**
                                  1150 Connecticut Avenue, NW
                                  Suite 900
                                  Washington , DC 20036
                                  (202) 862-4343
                                  Fax: (202) 828-4130
                                  Email: Mfm@martinmcmahonlaw.com


Also Present:                     Interpreters:

                                  **Wing Chang**
                                  **Linda Fang**

Court Reporter:                   **Scott L. Wallace, RDR, CRR**
                                  Official Court Reporter
                                  Room 6509, U.S. Courthouse
                                  Washington, D.C. 20001
                                  202.326.0566
                                  scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, JUNE 2, 2009**</u>

1

2   (11:18 a.m.)

3        THE COURTROOM CLERK:  Criminal Case 07-181, the United

4   States versus Zhenli Ye Gon.  Counsel, will you please come

5   forward and identify yourself for the record.

6        THE COURT:  Someone has a cell phone on.  Please turn it

7   off.

8        MR. LAYMON:  Paul Laymon for the United States, Your

9   Honor.

10        THE COURT:  Counsel.

11        MR. BALAREZO:  Good morning, Your Honor.  Eduardo Balarezo

12   on behalf of Mr. Ye Gon.

13        THE COURT:  Mr. Balarezo.

14        MR. BALAREZO:  Since my colleagues don't want to get up --

15        THE COURT:  You can introduce them, that's all right.

16        MR. BALAREZO:  Mr. McMahon and Ms. Hilgeman, Your Honor.

17        THE COURT:  All right.  Good morning.  Mr. Ye Gon.  Good

18   morning to everyone and to the interpreters.  All right.  All

19   right.

20        THE COURTROOM CLERK:  I haven't sworn the interpreters

21   yet.  Can I do that now?

22        THE COURT:  All right.

23        (**WING CHANG AND LINDA FANG, INTERPRETERS IN THE CASE,**

24                          **SWORN.)**

25        THE COURT:  All right.  Good morning to you both.  All

1    right.  Counsel, I read your pleadings.  I have another matter at

2    12:00.  I'll give defense counsel a few minutes to just summarize

3    just what your issues are at this point.  I want to focus

4    primarily on *Brady*, on the exhibit list, on the witness list, and

5    on discovery.  Those are the four major areas, but I'll hear

6    briefly from counsel.  I know some pleadings were filed late --

7    early this morning or late last night.  I've read that.  It

8    focused on *Brady*, and I'll issue a standing -- I'll issue an

9    order on *Brady* and that's not an issue that is open for any

10   discussion, because everyone knows what the government's *Brady*

11   obligations are.

12          Who wants to talk?

13          MR. BALAREZO:  Thank you, Your Honor.  Your Honor,

14   regarding the discovery issues that the Court has mentioned, the

15   exhibit list and the witness list, we believe that the Court's

16   order was very clear that the government had to turn over the

17   list for witnesses and exhibits and other items by the 18th of

18   May.

19          As we stated in our pleadings, what the government turned

20   over, quite frankly, was useless to us.  The Court's order was a

21   witness list of witnesses to be called at trial, exhibits to be

22   used at trial.  We got a list of hundreds of witnesses, hundreds

23   of exhibits.  We believe that the government, although they may

24   have technically complied with the Court's order, it's definitely

25   not compliant with the spirit of the order.  As the Court is

1    aware, this case is now two years old.  Our client has been

2    detained under various harsh conditions for that time.  We were

3    prepared to go to trial on June 22nd and, until the Court changed

4    that trial date to September, the government gave no indication

5    that it was not prepared to go forward 20 days from today.  And

6    for the government at this point to provide us a list of hundreds

7    of witnesses and hundreds of exhibits is --

8            THE COURT:  That's more than what you normally get in a

9    trial, though, isn't it?

10           MR. BALAREZO:  Agreed, Your Honor, but it's also -- they

11   dumped.  It's sort of an information dump on the defense and it's

12   so overinclusive and so --

13           THE COURT:  You're complaining about too much discovery?

14           MR. BALAREZO:  No, I'm not complaining about too much

15   discovery, I'm complaining about the government not complying.

16           THE COURT:  The government basically said, look, we're

17   covering all basis here, we're providing you with copies of all

18   the exhibits and evidence we have and a list of all the potential

19   witnesses and alternate witnesses in the event that people are

20   unable to get visas.

21           MR. BALAREZO:  Your Honor, I am not complaining about too

22   much discovery at all or too many witnesses.  What I'm

23   complaining about is --

24           THE COURT:  You're complaining that it's not in a usable

25   format for you?

1          MR. BALAREZO:  It's not usable, Your Honor.  It basically

2   puts us in a situation where, if we have a list of how many

3   witnesses it was, 355 names, I believe it was, You know, we're in

4   a position now to have to try to investigate, try to locate, try

5   to find information on people that will most likely never be seen

6   in court.  And the government again, given that they were

7   supposedly ready to go to trial in 20 days, their witnesses

8   should be a little more usable.  That's what I'm complaining

9   about.  I think the Court -- I don't think I'm speaking out of

10  school here.  If the government tells the Court today "We're

11  going to call 300 however many witnesses were on that list," the

12  Court will probably say, "No you're not," and in effect that's

13  what we're saying.  The government should be able to give us a

14  reasonable list of individuals that we need to deal with for

15  trial.  Same thing with the exhibits.  The government says we've

16  given them everything again and we can't complain about what

17  they've given us, but it's the same thing, 200 some odd exhibits,

18  some of which contain hundreds of pages.

19          You know, this, ultimately, I don't believe is going to

20  turn on documents, it's going to turn on witnesses, because the

21  documents do not -- will not provide the intent that the

22  government needs to prove on our client's part of his desire or

23  knowledge to import anything into the United States.

24          So, the documents are not the case, and this is another

25  information dump by the government.  And again, they might have

1    complied technically with the order, but they have not complied

2    with the spirit of the order, which was to give us the exhibits

3    that they intended to use at trial.

4         And again, my point, Your Honor, I keep repeating it, they

5    were supposedly ready to go to trial in 20 days.  It doesn't

6    appear that they would have been.  So those are the particular

7    issues we have regarding --

8         THE COURT:  What happened to the Chinese depositions?

9    What was the explanation given to you?

10        MR. BALAREZO:  Your Honor, the explanation -- the sum

11   total of the explanation that was given to us was an e-mail that

12   I think was referenced by Mr. Retureta in our motion to withdraw

13   our motion.  It says something along the lines of the depositions

14   are not going to happen.  And, Your Honor, that's a very -- it's

15   a very important issue and a very disturbing issue because I

16   think the government stood before the Court back in November when

17   we first litigated the issues of whether or not the Court would

18   allow the government to take the depositions, and I think the

19   Court asked the government what happens if these depositions are

20   not taken, and I believe the government said we don't have a

21   case.  Now, here we are six months later, everything's ready to

22   go, and they pull the rug out.  Presumably, they're ready to go

23   now, so I don't know what's changed from November until now that

24   they can go forward without the depositions, but the Court has

25   changed dates, the Court has done everything to accommodate the

1    government with respect to this, and now at the last minute for

2    the government to say, "well, well, sorry, we don't need them" is

3    either a little disingenuous or a little misleading to somebody

4    here.  But to answer your question shortly, there is no

5    explanation given as to why the depositions are not going to

6    happen.

7        THE COURT:  All right.  Mr. Laymon.  On that last point,

8    the government did tell me -- we spent a considerable amount of

9    time on that expert -- strike that -- on the deposition issue,

10   and I recall -- it's not, verbatim but I think counsel is

11   correct, the government basically said they don't have a case

12   unless they're able to take depositions in China, and everyone

13   did spend a considerable amount of time researching the issue.

14   There were arguments.  There was a ruling.  I know we spent a lot

15   of time debating the applicability of Judge Bates' decision and

16   other decisions.  What happened?

17       MR. LAYMON:  Judge, to try to get to the heart of the

18   matter, in trying to negotiate with the Chinese government, the

19   terms of the depositions, we encountered some stumbling blocks

20   over conditions that the Chinese government wanted to place on

21   the United States in terms of taking the depositions or in terms

22   of being able to take the depositions, such that as of last week

23   there was still some disagreement between the sides as to whether

24   and how the depositions could proceed.

25       THE COURT:  So the bottom line is you don't have

1     cooperation from China then?

2          MR. LAYMON:  Well, yes and no, Judge, because, as I've

3     learned in this case, things have a habit of turning quickly or

4     changing quickly, so that since --

5          THE COURT:  Is this case due for a change real quickly?

6          MR. LAYMON:  Well, Judge, let me say that since my --

7     since I contacted and notified defense counsel that we would not

8     be going to China or that we would likely not be going to China,

9     we have now reached agreement with the Chinese, apparently, on

10    being able to take the depositions, and I believe now that the

11    stumbling blocks that we had before have now been removed and

12    that we have an agreement, in essence, to come to China and

13    freely take the depositions.  So that puts the United States in a

14    difficult position of, perhaps, asking the Court to extend the

15    June 8th deadline to allow us to, in fact, take the depositions.

16         THE COURT:  The Chinese officials were aware of the

17    deadline, were they not?

18         MR. LAYMON:  I believe so, Judge, yeah, I believe they

19    were.  I would have to say yes.

20         THE COURT:  Why should I alter the schedule that's been

21    put in this case to accommodate China?  This man has been

22    incarcerated for what, almost two years now?

23         MR. LAYMON:  He's been incarcerated since July of 2007.

24         THE COURT:  I'm not inclined, unless there's some

25    compelling reason to do so, I'm not inclined to alter the

1   schedule this Court put in place.  The subject of depositions in

2   China was the subject that's occupied a considerable amount of

3   time and attention and focus by this Court and also the attorneys

4   for months.  So I'm not going to be sensitive to a request to

5   modify the deposition schedule and allow the attorneys to go to

6   China just because China says that terms and conditions are

7   appropriate for depositions there.  You can file whatever motion

8   you believe is appropriate, but I'm not inclined at this point to

9   alter the briefing schedule.

10          MR. LAYMON:  I hear what the Court is saying, and as I

11  indicated, Judge, I'm not asking today for you to alter --

12          THE COURT:  I know.  I raised the question.  It was the

13  last question I raised, and I thought about not raising it at

14  all, but I'm glad I did, maybe.

15          MR. LAYMON:  But I understand --

16          THE COURT:  Go ahead and file whatever you believe is

17  appropriate, but it's frustrating.  There's been a lot of

18  frustration in this case and other cases recently, and who's to

19  say that if I were to grant your request to take those

20  depositions that the landscape wouldn't change again and there

21  would be new stumbling blocks for depositions after you get

22  there.

23          MR. LAYMON:  Of course, that's possible, Judge, because

24  obviously that's happened before.  I'm reasonably certain,

25  though, that we've overcome that particular problem.

1          THE COURT:  All right.  Go ahead and file whatever you

2     believe is appropriate to file, and you should do that in a

3     timely manner.  If you're going to ask the Court to adjust the

4     briefing schedule and deposition schedule, we're -- the deadline

5     is June 1st for -- I mean, you're supposed to be at National

6     Airport now returning from China, but I certainly would not tell

7     you not to file anything.  I'm just sharing some thoughts, but go

8     ahead and file whatever you believe is appropriate, but you have

9     to address that issue.  I mean, what if the Court were to exceed

10    to the government's request to allow depositions in China, you

11    know, how do we address the changing stumbling blocks or renewed

12    stumbling blocks or new stumbling blocks?

13         MR. LAYMON:  I hear what the Court is saying, and if I do

14    file a motion, it will be expeditiously filed, Judge.

15         THE COURT:  Counsel, do you want to see your client.  If

16    it's okay with the marshals, it's fine with me.

17         MR. TABACKMAN:  I wanted to say the trial that I thought

18    was over on the 6th floor, it will be going on until 12:30 or

19    12:45.  We're on a brief break.

20         THE COURT:  I thought you were in closing arguments last

21    week?

22         MR. TABACKMAN:  We're in rebuttal and it's been delayed.

23    It's still going on.  And you know --

24         THE COURT:  And you're on a 15-minute break?  I accept

25    your representations.  All right.  He's going to break for lunch

1    when?

2         MR. TABACKMAN:  12:45, I believe.

3         THE COURT:  All right.  The prosecutors -- can you reach

4    them?  I don't want them to have to sit here for an hour.  Do you

5    have the numbers for them?  Do you have a cell number for the

6    prosecutor?

7         MR. TABACKMAN:  I have all of them.

8         (Telephone call made by the courtroom deputy.)

9         THE COURT:  That's Judge Green.  I'll be happy to talk to

10   Judge Green.  You can transfer it up here.

11        (Discussion had off the record.)

12        THE COURT:  All right.  That's how attorneys should get

13   along.  Let me just say a couple of things.  File whatever you

14   want to file with respect to those depositions, but you need to

15   file them immediately because I'm going to put in place a very

16   short briefing schedule for the China depositions.  I plan to

17   stick to the scheduling order in this case because this is a high

18   profile case.  I'm going to treat this case just as I've treated

19   Stevens, just as Judge Walton treated the Libby case, just as

20   Judge Friedman treated the Safavian case.

21        And I understand the government's arguments about the

22   rules providing for this and not providing for certain things,

23   but nevertheless, in an extremely complicated case -- and the

24   government has made that representation scores of times in scores

25   of proceedings before this Court, and this Court has been

1    persuaded that this is an extremely complicated case.  There's a

2    need for the case to proceed to trial in a very orderly fashion,

3    in a very fair fashion, and in a manner that's fair not only to

4    the government but that's fair to the defendant, and that's the

5    reason why the Court required the filing of an exhibit list,

6    required the government to tell the parties, to tell the Court

7    what the exhibits are, as opposed to technically complying with

8    the rule by providing the defendant with notice of every piece of

9    evidence that the government has.  That's going to frustrate --

10   If I were to allow that to proceed and to be the substitute for

11   the exhibit list, that would substitute this -- that would

12   substitute the orderly procedure to something that's not orderly,

13   to a disorderly procedure, and that's not what the Court's going

14   to do.  I recognize that the government was discovering its --

15   covering all basis in telling defense counsel this is everything

16   we have, these are all the exhibits that may or may not come in,

17   but we're at the point now of giving Mr. Ye Gon his fair day in

18   court on a trial date that's been set fairly.  It's not going to

19   change unless there's some compelling reason, and I doubt if the

20   compelling reason is to take depositions in China.

21         So, I'm going to insist on that, that the exhibits be

22   marked and that there be an exhibit list prepared consistent with

23   exhibit lists that the government frequently uses that gives the

24   defendant absolute notice of the exhibits that the government

25   plans to introduce at trial.

1          Also, the Court's going to require that the government

2     disclose who the witnesses are, experts as well as fact

3     witnesses, and if there's some compelling reason why, for

4     security persons or otherwise, why the identity of a witness

5     should not be disclosed pre-trial or this month, then I'll

6     entertain whatever request the government wishes to make for

7     noncompliance with a scheduling order for that very compelling

8     reason.  But absent compelling reasons, it's only fair, it's only

9     appropriate, and it's consistent with scheduling orders that

10    judges of this court have been using for years, including this

11    Judge, that the government disclose all the experts and fact

12    witnesses and all the exhibits.

13         Now, I don't know if there are 300 witnesses or not.  I

14    doubt the government intends to call 300 witnesses, and I think

15    that it's entirely appropriate to say that maybe, since that

16    large number of witnesses has been identified, that it's

17    appropriate to also carve out categories of witnesses.  In other

18    words, for example, those witnesses that the government will

19    definitely call in a category; maybe is another category; most

20    probable witnesses; and so forth and so on so you get down to

21    unlikely witnesses.

22         With respect to experts, I'm not going to allow cumulative

23    testimony to be adduced at trial.  No one wants to hear three

24    witnesses, and I'm not going to allow three witnesses to say

25    essentially that those three witnesses agree with the first

```
 1   witness that preceded the three witnesses.  There's not going to
 2   be any inappropriate vouching for the credibility of expert
 3   witnesses.  Again, there could be some flexibility.  I allowed
 4   some flexibility in Stevens.  There was a request for a large
 5   number of character witnesses.  I will allow some flexibility.  I
 6   will allow some cumulative testimony, very little, because
 7   there's no need for vouching, there's no need for the witnesses
 8   to hear the same testimony from two different people.  Some of
 9   the witnesses identified, some of the expert witnesses identified
10   by the government don't comply with Rule 16 notice.  We just have
11   a name.  We don't have the scope of the testimony, whether this
12   person is an alternate.  And again, I'm inclined to allow some
13   flexibility, and I look at the fairly typical drug and gun cases
14   that come before the Court, and it's entirely appropriate in
15   those cases and maybe it's appropriate here for some witnesses,
16   for the government to say there'll be an expert, a firearms
17   expert that will testify that this gun was operable -- and no one
18   needs to know who the person is, it will be the -- could be the
19   expert on duty at the D.E.A. on a given day -- and that's
20   normally appropriate.  Maybe there's some reason why that should
21   not be appropriate or could not be appropriate in this case, I
22   don't know, but I'm willing to be flexible.  But the government's
23   going to have to proceed fairly.  We have some time -- we don't
24   have a lot of time between now and the motions hearing date, and
25   the month of August should be dedicated to final preparation for
```

1   trial.  So I've said a lot.  And again, I'm willing to be

2   flexible, but we don't have a lot of time.  I'm going to insist

3   on -- and *Brady* material.  I don't want to spend a lot of time on

4   *Brady* because if no one knew about *Brady* before Stevens, everyone

5   does now, and I've crafted a standing order I'm going to issue.

6   Everyone is fairly aware of everyone's -- of the government's

7   *Brady* obligations, and that's just not an issue that's open for

8   debate.

9       So whatever the date is for final production of all *Brady*

10  material -- we'll agree on a date.  If the parties can't agree,

11  then I'll pick a date that's fair.  So I wanted to say all that

12  before I gave you a chance to respond.  So you've given -- and

13  again, I applaud the government.  I'll give some credit to the

14  government for erring on the side of caution and saying, here is

15  all the evidence that we have, but you're going to have to do a

16  little more work now.  You're going to have to identify the

17  exhibits you're wanting to introduce at trial, and I think that's

18  only fair and it's not inconsistent with how high profile cases

19  are tried in this Court.

20      MR. LAYMON:  Judge, let me speak to the exhibit list, and

21  in doing so compare it to the witness list that we provided.

22      The defense has categorized the exhibit list as something

23  of a document dump in its motions and here today.  It says that

24  we essentially just took all of the documents that we provided

25  them and made them an exhibit.  That is not accurate.  We

1    provided the defense well more than a hundred thousand pages of

2    documents.  That doesn't even count the photographs that we

3    provided or other documents on disks that we provided.  The

4    exhibit list is quite lengthy, I agree with that.  It is quite

5    lengthy.  But that exhibit list, Your Honor, represents a

6    considerable paring down of all of the evidence that we provided

7    to them and is, in my opinion, a relatively fair assessment of

8    the actual exhibits that we would actually introduce at trial.

9         I mean, the government went to great lengths in its

10   exhibit lists to be detailed and specific, and an example would

11   be that there were at least 21 shipments of precursor chemicals

12   by this defendant into Mexico, at least 21 that we identified.  I

13   think there's actually more, but we identified at least 21.  Each

14   of those shipments, Your Honor -- involved in each of those

15   shipments is a lot of documents, and we have specifically in our

16   exhibit list detailed each and every one of those documents.

17   So -- and that's what an exhibit list is supposed to be and

18   that's what it is.  And so when the defense, for example,

19   complains that, well, you just listed a tomo, a tomo being

20   sometimes a stack of documents this big (indicating) that might

21   contain 500 pages of materials and says, the defense is saying,

22   "Well, you've just listed a tomo; surely you're not going to put

23   in an entire tomo," and the response to that is, "Yes, because

24   that particular tomo is bank records" and part of this case

25   involves --

```
 1        THE COURT:  Is there going to be an expert to talk about
 2   those bank records?
 3        MR. LAYMON:  Sure.
 4        THE COURT:  Because that was a big issue in Stevens about
 5   dumping a ton of records on the jury.  They don't want to see
 6   that.
 7        MR. LAYMON:  No, they don't, but -- but we understand,
 8   though, that we have to admit the underlying documents and then
 9   have an expert explain what it is.
10        THE COURT:  What about that expert's report, though?
11        MR. LAYMON:  Well, when we get that expert's report, then
12   we'll provide it, but we don't have it.
13        THE COURT:  All right.  All right.  In fairness, in
14   fairness, I'm sympathetic to that, but we need the reports.  The
15   defendant needs fair notice of who the government's experts are
16   so they can go out if they want and qualify their own experts or
17   be in a position to impeach experts because they've testified
18   elsewhere or whatever.  So, we need the reports.
19        MR. LAYMON:  Judge, I don't mean to cut you off, but I'm
20   focusing on the question you just raised, the expert's report.  I
21   want to be accurate in this.  I don't have the actual report,
22   which is "expert says X, Y, Z," but what I did provide to the
23   defense, since I didn't have the report, was I provided the
24   working papers, the working documents.  The summaries of the
25   evidence that the experts provided to us I provided to them.  So
```

1    that -- I don't want to say that's a final report, but that is,

2    in essence, a report, because it effectively summarizes what they

3    would say in a report.

4        THE COURT:  Does the expert say "I reviewed X, Y and Z and

5    I have an opinion," whatever that opinion is, "and these are the

6    reasons for my opinion"?

7        MR. LAYMON:  Right.  And again, I want to make clear that

8    what I'm particularly talking about here, when I say I provided

9    working papers, that relates to the gambling documents, which is

10   very similar to what I'm talking about with banking records.

11       Now, those working papers, I'm not going to say that that

12   includes an opinion, because I don't think that's fair, but it's

13   fairly obvious what the opinion is when you look at these papers.

14   It is tantamount to a report.  But I guess the point I'm trying

15   to make, Judge, is that -- and I'll shift to the witness list in

16   a second, but the exhibit list is lengthy but it's a fairly

17   reasonable representation of the exhibits that we would actually

18   try to introduce at trial.

19       Now, is there some surplusage or fat in it?  There's

20   probably a little bit, yes.  Can we weed it out a little bit

21   better?  Probably, yes, we can, but it's not going to get

22   significantly shorter.

23       Now let me switch to the witness list.  It is true that we

24   did provide notice of 300 some odd witnesses.  And again --

25       THE COURT:  We're talking about a six-week trial, yes?

1    That's what the government estimated.

2        MR. LAYMON:  Right.  That's still our goal, Judge, and

3    obviously we're not going to call 300 witnesses.  So, to the

4    extent that the government can be criticized for providing names

5    that we're probably not going to call, that's accurate.

6        THE COURT:  I'm not here to criticize anyone, I just want

7    to put this case in a posture to go to trial.  That's all these

8    folks want.  They want a fair opportunity to defend against

9    whoever the government's witnesses are and what the exhibits are.

10   So I'm in the here to, you know --

11       MR. LAYMON:  I understand that, Judge, and I don't think

12   the Court is criticizing the government, but I do think that the

13   Court's suggestion that it gave a minute ago about the witness

14   list about, you know, list the witnesses that you're definitely

15   going to call, the ones that you're most likely to call, the ones

16   you may probably call, you might call, you probably won't call.

17       THE COURT:  And I'm sympathetic to the fact that some

18   people are coming from other countries and there may be a problem

19   with a visa and you've listed that and that makes sense.  Who

20   knows whether someone is going to be allowed to enter the

21   country.  And you've factored in alternative witnesses.  And in

22   fairness, the defendant should be -- they should be entitled to

23   know that someone is an alternative witness and won't be called

24   at all unless some other group of people can't be -- can't obtain

25   visas or whatever or something unforeseen has occurred with

1    respect to a witness who's more probable than not.

2         MR. LAYMON:  We can -- I mean, I can -- I think it's quite

3    reasonable what the Court is suggesting, that we go through the

4    witness list and categorize it in the manner in which the Court

5    is suggesting.  Obviously we will do that.

6         THE COURT:  What about cumulative witnesses?  With 23

7    expert witnesses, you're going to talk about drugs and money,

8    basically?

9         MR. LAYMON:  Well, I want to assure the Court, Judge, that

10   we're not in the business of calling cumulative witnesses, and

11   I'm not going to do that.  I understand your point.

12        THE COURT:  I know that.  I know you're not going to do

13   it, but -- none of these witnesses' testimony will be cumulative

14   to another witness's testimony?

15        MR. LAYMON:  Well --

16        THE COURT:  I don't want to waste a lot of time laying an

17   hour foundation and then basically the person testifies, "me

18   too."  I'm just not going to do that.  It's a total waste.

19        MR. LAYMON:  Judge, let me give you an example, and I'll

20   be very brief because I know we need to move on.  For example, I

21   gave notice of several -- probably many, depending on how you

22   want to describe it -- D.E.A. agents that we might call, and one

23   of the reasons for that, Judge -- and some may consider it

24   cumulative; I don't necessarily consider it cumulative -- but one

25   of the issues before the Court -- in fact, one of the essential

1   elements of the offense is that this meth was coming to the

2   United States or the defendant knew that it was coming to the

3   United States, so there's any number of ways to show that.  One

4   way to show that would be to show the meth wasn't going anywhere

5   else but the United States.

6        THE COURT:  That is a very interesting theory.  The

7   government's theory is it wasn't going to Canada or Switzerland

8   or other countries because there's already a market there?

9        MR. LAYMON:  No.  I think it's different from that, Judge.

10  For example, we know that the methamphetamine wasn't going to

11  China, for example, because, as you know, as the experienced

12  agents will testify, you don't ship precursor chemicals from

13  China to Mexico, make meth, and send it back to China.  That's

14  not done.  And one of the reasons it's not done is it's stupid,

15  number 1, but secondly --

16       THE COURT:  Why, because they can make it China?

17       MR. LAYMON:  Right.  There's already plenty of meth in the

18  orient; it doesn't need Mexican meth.  And number 2 and to

19  continue that same logic, Mexican meth doesn't go south to

20  Central and South America.  And while occasionally it might go to

21  Europe, it generally doesn't go to Europe.  The market is the

22  United States.  So let's say, for example, that we were to call

23  five D.E.A. agents from different parts of the world experienced

24  in this arena who said no, it's not, you know -- it doesn't come

25  here, that's not really cumulative.  It certainly overlaps to a

1    certain extent.  I wouldn't consider that to be cumulative, but I

2    understand what the Court is saying about cumulative witnesses.

3    I hear what you're saying.

4        THE COURT:  And if that's the government's theory, the

5    Court may allow some flexibility for a reason, for a cogent

6    reason.  I don't know.  I mean, different D.E.A. officers have

7    different experiences.  I don't know.  I'm certainly receptive to

8    any proffer to allow those witnesses to testify in a manner that

9    does not represent cumulative testimony, but I can understand the

10   government's argument.

11       MR. LAYMON:  I hear what the Court is saying about the

12   exhibit list and the witness list, and we're not trying to --

13   we're not trying to obfuscate here.  I think, as the Court has

14   pointed out, there are good reasons to list all of these

15   witnesses, and I hear what the Court is saying.

16       THE COURT:  And in fairness, in Stevens, the case -- and I

17   keep harking back because that's a case that the Court just

18   recently tried, but they were in excess of a thousand marked

19   exhibits and some were copious records, financial and otherwise,

20   but at some point there were decisions made by the Court to

21   eliminate voluminous pieces of evidence being admitted into the

22   record for purposes of simply not overwhelming a jury.

23       MR. LAYMON:  Right.

24       THE COURT:  All right.  The government's going to have to

25   do some more work on the witness list -- on the witness list and

1    the exhibit list.  Is it fair to say that the majority,

2    80 percent of the government's witnesses are, indeed, experts?

3         MR. LAYMON:  I'm sorry, Judge?

4         THE COURT:  Is it fair to say that 80 percent of the

5    government's witnesses, proposed witnesses are, indeed, experts?

6         MR. LAYMON:  At trial?  No.

7         THE COURT:  Really?

8         MR. LAYMON:  No, not at all.

9         THE COURT:  Not at all?  All right.  Anything else,

10   defense counsel?

11        MR. BALAREZO:  Your Honor, if I could just follow-up on

12   Mr. Laymon.  I just hear a lot of hedging here from the

13   government.  I have some very specific issues.

14        First of all, the deadline was the 18th.  Mr. Laymon knows

15   full well what his obligations were.  We're now two weeks or more

16   beyond that particular date.  If the Court is inclined then to

17   give him, based on what the Court has said, I would ask that it

18   be an immediate turn around of this material --

19        THE COURT:  What material?

20        MR. BALAREZO:  The exhibit list, I mean, the exhibit list

21   and the witness list, that the government provide those, I would

22   say, no later than this week.

23        THE COURT:  Why should the Court make the government pare

24   its witness -- pare its exhibit list down?  The government tells

25   me that it has a list of exhibits, some of which it may not

1    introduce.  Why should this Court require the government to be

2    more specific at this point in time?  In other words, the

3    government has, arguably, complied with the Court's directive to

4    provide you, defense counsel, with notice of any and all

5    potential exhibits that it may introduce.  And that's always the

6    standard because no one knows.  The standards -- theories change,

7    depending on what witnesses say, depending on the availability.

8    Sometimes a witness is unavailable.  Stevens was a fairly good

9    example.  At the end of the trial, the evidence admitted into the

10   record you could put in a banker's -- not even fill a banker's

11   box, although I think more than a thousand exhibits were indeed

12   documents.  So why should the government discharge its

13   obligation?  It's a lot of paper, and the government has said,

14   yeah, it may introduce a tomos.  It won't.  I'm putting the

15   government on notice now.  It's going to have to have some sort

16   of summary expert witness testify about those financial -- those

17   copious financial -- voluminous financial documents.  But why

18   shouldn't the government discharge its obligation?  It's a ton of

19   paper, but you have it all.  There's nothing that the government

20   has kept from you, which seems to me to be the best of all worlds

21   for a defense counsel.  Sure, it's a ton of paper and you have to

22   go through everything, but the government is saying, Judge, this

23   is it, there's nothing else.  And the government knows it can't

24   bring in anything else.  So you've got your work cut out for you,

25   but why hasn't the government done exactly what we want the

1    government to do?  And that's what the government should do.

2    Don't get me started talking about open files and -- that's for

3    another day, but the government's basically said, this is it, see

4    you in court.

5          MR. BALAREZO:  Your Honor, I appreciate the government

6    saying this is it.  I appreciate the government providing us a

7    hundred thousand pages of documents.  But what the government has

8    not addressed is the fact that most, if not all, of these

9    documents are either in Spanish or Chinese, and I don't

10    anticipate --

11          THE COURT:  Well, that's a different issue now.  You don't

12    have the English interpretation?

13          MR. BALAREZO:  Well, Your Honor, I think the government

14    needs to provide the translated versions of what they intend to

15    produce.  I mean, that's part of the problem here.  If they're

16    saying 257 separate exhibits, some of which contain hundreds of

17    pages individually, like these tomos, we need to see what these

18    exhibits are so that we can then review them, have them, perhaps,

19    translated on our own, make any challenges to the translations

20    that need to be made, and we can't wait for this to be done the

21    week before trial.  We have motions that are due now on the 22nd

22    of June in 20 days.  If the government intends to provide a pared

23    down list or whittled down list on the 20th, that doesn't give us

24    any time to review them to do what we have to do, and that hasn't

25    been addressed at all.  And given that the government intends or

1   says that it's going to at least probably try to admit most of

2   these exhibits, that's going to be a huge problem.  We're clearly

3   going to object to a document in Spanish being given to the jury

4   and some expert or some other witness saying, yeah, that's what

5   it says.  That's not how it goes.  They need to have an official

6   translation of each of these documents they intend to put forth,

7   and we need to be able to see those and review those documents

8   long before the trial date and long before the motion date so we

9   can raise any issues we have with those documents.  That's one

10  issue.

11          THE COURT:  Let me stop you there.  Let's deal with that

12  one.  I think counsel's absolutely correct, and, indeed, the

13  Court's going to need a version -- the Court's not going to just

14  sit here and allow some document in a foreign language that the

15  Court's not familiar with to be discussed and someone questioned

16  and provide answers if the Court can't even look at the document

17  itself.  What about the official version in English?

18          MR. LAYMON:  Well, Judge, again, counsel raises an issue

19  and it's a little -- I think it's a little --

20          THE COURT:  Don't say it's premature.

21          MR. LAYMON:  It's not premature.  I was going to say

22  there's more to it than they indicate.  Let's get right down to

23  the heart of the case, Judge.  And I'll tell you --

24          THE COURT:  That's a very significant point.

25          MR. LAYMON:  It is, and let me address it in this way, and

1    I'll be brief, I'll be concise.  The heart of the case, as I

2    mentioned before, starts with the 21 shipments of precursor

3    chemicals done by this defendant.  I made 21 files, and into

4    those files I put every document that I could find that related

5    to those shipments.  It might have been a sales contract, an

6    import permit, an export permit, an application for export, a

7    bill of lading, and so on and so forth.  There were many

8    documents.  Judge, most of those documents are in English because

9    that is the language of international trade.

10        Now, some of those documents do contain Mandarin.  There

11   are a couple of documents that are only in Mandarin, and there

12   are a couple of documents that are only in Spanish.  And again,

13   when I say a couple of documents only, as to each shipment, the

14   bulk of the documents are already in English because that is the

15   language of trading.

16        THE COURT:  How does defense attorney know that some of

17   those documents that are in Mandarin are not, indeed, exculpatory

18   documents?

19        MR. LAYMON:  Well, for one thing, his client reviews them,

20   and I'm sure he can -- his client can tell him what the document

21   is.  I mean, I've represented to the defense that the documents

22   are customs and export documents.  I know what the documents are.

23   I've had a Mandarin speaker look at them and tell me what they

24   are.  I know they're not *Brady* or exculpatory.  I know they're

25   just basically custom documents that happen to be written in

1    Mandarin.  But for those relatively few, and I'm talking about

2    again, focusing in on the 21 imports, Judge, there are relatively

3    few documents that are only in Spanish or only in Mandarin.

4        THE COURT:  It seems to me, absent some authority, it

5    seems to me what the Court should do is also order, and I will,

6    that the government should be precluded from introducing or

7    attempting to introduce any documents into the evidentiary record

8    in this trial that have not been previously translated into

9    English.

10       MR. LAYMON:  Absolutely, Judge, I agree with that.

11       THE COURT:  You need to pick a date, and we're running out

12   of time, though, because motions are due.  So, I mean, the

13   government has had these documents for years, and the government

14   has vast resources, so it seems to me we're talking about a day

15   or two from now.  It's no big guest as to the number of pages of

16   documents in foreign languages.  You say it's what, hundreds?

17       MR. BALAREZO:  Well, Your Honor, I think the box on the

18   government's table is what Mr. Laymon is talking about, the

19   Chinese-related documents which supposedly are the heart of the

20   case.  If that is the heart of the case, this case can be tried

21   in a week, but there are a lot of Mexican documents, reports,

22   permits, licenses that we do not have --

23       THE COURT:  Let me ask you this:  Are there objections to

24   the scope of an order that the Court just focused on?  Do you

25   have any objections to that?

1        MR. BALAREZO:  The only objection I would have, Your

2   Honor, is I think the order should have a specific date --

3        THE COURT:  I know that.  I know that.  But the order

4   would be that the government is precluded from attempting to

5   introduce into evidence any documents that have not been

6   translated into English by a date, and that date is very soon,

7   it's like this week.

8        MR. BALAREZO:  Your Honor, I don't have a particular

9   objection to the words of that order, but I think that it does

10  not take away the government's *Brady* obligations because, as the

11  Court said -- and Mr. Laymon basically puts the burden on our

12  client.  It's not our client's burden to read this stuff and --

13        THE COURT:  I totally agree.  I totally agree.  So all of

14  those documents, if they've been turned over as potential

15  evidence against the defendant, the defendant should have the

16  English version of all those documents.  The defense counsel

17  shouldn't have to rely upon their client's ability to understand

18  something that may be in Mandarin.  It may be a variation of

19  Mandarin, for all I know.  But it's -- I don't think the

20  government discharges its obligation by saying, Well, their

21  client can read it.

22        So, all the documents that the government has turned over

23  to defense counsel have been to be accompanied by an English

24  version by no later than, and that's the date.  What date is it?

25  What date is fair and reasonable?  Today is June 1st.  I'm sorry,

1   we just lost a day.  It's the 2nd.

2      MR. BALAREZO:  Your Honor, I think fair and reasonable

3   would be June the 5th, given the fact the case is two years old.

4   The Court gave the government a definite order to turn over these

5   documents by May --

6      THE COURT:  I thought the government was turning over

7   English versions of everything on an ongoing basis, rolling

8   discovery.  You weren't -- again, I'm not being critical, I'm

9   just asking.  I always just thought that's what was happening,

10  because no one ever brought up the problem that they couldn't

11  read something because it was in a foreign language.

12     MR. McMAHON:  Your Honor.  I agree.  Eighteen months ago

13  this gentleman stood in front of you and told you we would have

14  all the documents translated.  That was 18 months ago.

15     THE COURT:  Yeah, I thought we had this discussion before.

16  But look -- I'm certain we did because that was a legitimate

17  concern.  If I give them the 5th, I might as well give them the

18  weekend, so the 8th.

19     MR. LAYMON:  Judge, I can tell you that in terms of

20  Mandarin, specifically with Mandarin, it would a take at least a

21  minimum of two weeks.  I mean, there aren't that many Mandarin

22  documents, but there aren't many Mandarin translators around.  I

23  know we have Mandarin interpreters, but we have to find Mandarin

24  translators.

25     THE COURT:  Whose burden is that, though?  This man's been

1    locked up for two years.

2         MR. LAYMON:  I'm not suggesting that we sift the burden.

3         THE COURT:  It seems to me the government should have

4    interpreted those documents when the government received

5    possession from whatever source the government received

6    possession.

7         MR. LAYMON:  Again, Your Honor, we're talking about --

8         THE COURT:  If I do that, that means I've got to modify

9    this briefing schedule, which I'm not inclined to do.  We have a

10   firm motions date, the 29th and 30th of July.  I'll give the

11   government a week, the 9th.

12        What's your next point?

13        MR. LAYMON:  Judge, before we leave that point, I just

14   want to be clear.  You're giving us a week to have --

15        THE COURT:  To translate the foreign language -- to

16   translate into English version, English language, those documents

17   that the government has produced to defense counsel that are,

18   indeed, in a foreign language.

19        MR. BALAREZO:  Chinese or Spanish, so it's very clear to

20   the government, because --

21        THE COURT:  Is there some other language?  Are you okay

22   with that?

23        MR. BALAREZO:  Any language, but I think that those are

24   the only ones that we're worried about.

25        THE COURT:  All right.  I don't think I'm being

1   unreasonable.  I think -- I do recall a discussion about this

2   issue months ago about the English version of documents, but

3   that's a week, and I don't think I'm being unreasonable.

4        What's the next issue?

5        MR. BALAREZO:  Your Honor, the next issue is that the

6   Court had ordered, again by May 18th, for the government to try

7   to obtain from Mexico the samples of the subject drugs that were

8   allegedly in possession of the Mexican authorities or the courts

9   and to provide either the samples to us or to report to the Court

10  the --

11       THE COURT:  And the government responded that they

12  provided defense counsel with some D.E.A. notification of drugs

13  that are available, which is separate and apart from what you

14  just mentioned, right, with respect to the request to Mexican

15  authorities?  What's the status of that?

16       MR. BALAREZO:  Your Honor, if I could just finish that

17  thought.  I think that particular item goes hand-in-hand with the

18  Court's in-camera review of the MLAT request that the government

19  made, because I think the government has represented at various

20  times that it has made certain inquiries of the courts and of the

21  government of Mexico regarding these items, and it keeps coming

22  up saying, "well, they're not in our possession," and we were

23  never notified that the government had, in fact, given to the

24  Court those requests for in-camera review.  Given that the Court

25  has reviewed them, if there's nothing objectionable there, we

1    would make a request at this point to be able to review those

2    requests ourselves.

3          THE COURT:  Is there any authority for that?

4          MR. BALAREZO:  I'm sure we'll try to find some if the

5    Court wants any filings, Your Honor.  I can't give you one

6    offhand, so --

7          THE COURT:  Mr. Laymon.

8          MR. LAYMON:  On that particular issue, Judge?

9          THE COURT:  Yes.

10         MR. LAYMON:  Of course we would object to the disclosure

11   of the MLATs.  If the Court wants that issue briefed, we're happy

12   to do so.

13         MR. BALAREZO:  But the issue with the MLATs is what

14   request was made?  Did the government request these samples from

15   the government or the courts?  If they did not make those

16   requests, then we have a problem because the government has been

17   misrepresenting or misleading about what's been done.  These

18   samples -- not the Chinese documents, but these samples are the

19   core of the case against Mr. Ye Gon.  We do not have an

20   opportunity to have these samples tested.  That's the bottom

21   line, and that's going to be the bulk, if not all of their

22   evidence from our client that he had this chemical from China and

23   had it precursor to a methamphetamine, and this is something we

24   can't do anything about based on what the government is saying.

25   The government has the means and it has the ability to obtain

```
 1    these documents -- or these samples from the courts and/or the

 2    Mexican governments.  There's more than one sample, surely in a

 3    case --

 4         THE COURT:  I don't know if they have the ability or not,

 5    I just don't.

 6         MR. BALAREZO:  At the very least, they could have

 7    requested it, and the government has ways of doing things.  I

 8    think we all know that, but there are multiple samples in Mexico.

 9    All we need is one.  That's all we're asking for.  We want to be

10    able to confirm what these experts of theirs are saying.  That's

11    the second issue.

12         The third issue is the logbooks.  I think early requests

13    were made for the logbooks.  And I think in one of their last

14    filings the government concedes that, in fact, there are some

15    pages of the logbooks that the defense has been asking for for

16    over a year now.  So, if the pages -- I think the government's

17    position earlier was that the logbooks did not exist.  Then it

18    changed to the logbooks are not in our possession.  And then it

19    changed to, well, we do have some pages of the logbooks that have

20    been turned over, but we don't have them.  We need those

21    logbooks.  They are a contemporaneous record of --

22         THE COURT:  That's an issue that's come up time and time

23    again for Mr. McMahon and others.  Did the government request

24    logbooks?

25         MR. LAYMON:  Yes, Judge, we have, and --
```

```
1          THE COURT:  What about samples?

2          MR. LAYMON:  As well as the samples.

3          THE COURT:  With respect to the public docket, what can

4     you put on the public record?

5          MR. LAYMON:  For example, Judge, with the logbook entries,

6     after carefully reviewing the tomos that we've all had these many

7     months, if not years, we were able to find and I identified what

8     I believe to be COFEPRIS logbook entry forms or logbook entries

9     related to some of the ephedrine, pseudoephedrine shipments, and

10    those I included no those files that I previously mentioned to

11    you that we provided to the defense.

12         So we identified, we made a copy, even though they had a

13    copy, we made a copy of what I believe to be a logbook entry

14    form, noted the Bates stamp number on it, and then provided them

15    a copy of that with the actual shipment with the documents that

16    relate to that shipment.

17         Of course, there would be no logbook entry forms for the

18    bulk of the material which was the intermediate chemical that he

19    imported and --

20         MR. BALAREZO:  If I could stop him and -- has he seen the

21    logbooks for those?

22         THE COURT:  Let him finish.

23         MR. LAYMON:  The reason I know there are no logbook entry

24    forms, Judge, is because there's only a logbook -- there would

25    only be a logbook entry if the defendant told the FDA equivalent
```

1    in Mexico, COFEPRIS, that he was importing a controlled

2    substance.  They call it a psychotropic substance.  So, if he

3    asked for permission to import a psychotropic substance, then

4    there could potentially be an inspection by COFEPRIS by an

5    inspector from that agency that would result into an entry into

6    that logbook.  So, those I turned over, the ones that we had

7    related to psychotropic or controlled substance importation for

8    which there might be an inspection by COFEPRIS.  Those I turned

9    over.

10          Now, when we shift to the intermediate chemical, the

11   intermediate chemical --

12          THE COURT:  Wait.  Forget about chemicals.  Logbooks.  You

13   made a request for logbooks?

14          MR. LAYMON:  Yes.

15          THE COURT:  Of what, the Mexican equivalent of the FBI?

16          MR. LAYMON:  The FDA.

17          THE COURT:  All right, of the Mexican government; is that

18   correct?  Is that a fair statement?

19          MR. LAYMON:  Right, of their agency.

20          THE COURT:  And have you received a response from the

21   Mexican government?

22          MR. LAYMON:  What I have, Judge, are the -- what I have --

23   So, in a sense, yes, I have received a response because I have

24   from them individual entries into a logbook that would relate to

25   some of the psychotropic --

1          THE COURT:  What about the logbooks themselves?

2          MR. LAYMON:  I do not have the logbooks themselves.  I

3     have the entry.

4          THE COURT:  Have you been told that they exist?

5          MR. LAYMON:  I have not been told they exist.

6          THE COURT:  Have you been told that they don't exist?

7          MR. LAYMON:  I have been told that they don't exist;

8     however, I know that certain -- that there were inspections by

9     certain COFEPRIS -- again, their FDA equivalent -- I know there

10    were inspections by their inspectors, and I have what I believe

11    to be the written inspection forms or logbook entry forms related

12    to some of those shipments.

13         THE COURT:  All right.  But you've been told by Mexican

14    government that there are no logbooks there?

15         MR. LAYMON:  That there's not a logbook, per se.  One was

16    not found.

17         THE COURT:  All right.  What about -- has the Mexican

18    government told you that it has turned over to the United States

19    all evidence in its possession dealing with logbook entries?

20    Because if the books don't exist, they want the entries because

21    presumably the entries is what they'll argue shows a legitimate

22    business enterprise in Mexico, right?

23         MR. BALAREZO:  Your Honor, I'm just very confused, because

24    they've turned over pages from the logbooks but the logbooks

25    don't exist?  That makes no sense in my small mind.

1        THE COURT:  It may not make any sense, but that's what

2   counsel is saying, the books don't exist; the entries do.  But I

3   don't want to lead you.  Tell me.  You've asked for the logbooks

4   and logbook entries.

5        MR. LAYMON:  Judge, yeah, I think we may be getting -- we

6   may be stumbling over words here.  Let me be precise.

7        THE COURT:  From day one the defense counsel has been

8   asking you for logbooks which they believe will show that their

9   client operated a legitimate business, right?  That's their

10  theory.

11       MR. BALAREZO:  It's my understanding --

12       THE COURT:  The books -- I can see Mr. McMahon -- Indeed,

13  I can hear Mr. McMahon for the umpteenth time asking for the

14  books.  And he should, because he believes the logbooks are,

15  indeed, something that will be analogous to reasonable doubt, if

16  not more.  The government is saying they asked for logbooks for

17  Mexico.  All right.  Go ahead.

18       MR. LAYMON:  Let me be specific.  The government, the

19  government acknowledges that part of the defendant's business was

20  legitimate.  We know that he legitimately imported a number of

21  substances from China.  We acknowledge and have always

22  acknowledged that he legitimately imported some ephedrine and

23  pseudoephedrine from China that he then turned around and

24  legitimately sold to pharmaceutical companies in Mexico that he

25  was permitted to sell to.  So, we've provided -- I mean, we're

1   not trying to hide that fact.  We acknowledge that some of those

2   psychotropic imports that he made of ephedrine and

3   pseudoephedrine he sold legitimately, he had permission and sold

4   legitimately, but what the government is saying about most of his

5   ephedrine and pseudoephedrine -- some he sold legitimately

6   because he had to, that was his cover, but the majority of that

7   he diverted, and that's our contention.

8        Now, as to the ephedrine and pseudoephedrine shipments

9   that he sold legitimately, which we know he sold legitimately

10  because we talked to the pharmaceutical companies that he sold

11  them to, there would be logbook entry forms for those.  We've

12  turned those over, because what the logbook entry form represents

13  is their FDA equivalent inspector coming to his business and

14  saying, okay, I see that here, it's right here in front of me,

15  and he would make a report.

16       Now, it might be more accurate to say these are reports

17  from this agency.  Now, were they actually put into a book?  I

18  don't know because -- and I make that clear, Judge, because the

19  defendant was required to keep a book, and early on what

20  Mr. McMahon asked for was the logbook that the defendant was

21  required to keep showing these importations.

22       THE COURT:  And that's one of the books that they've

23  requested because from day one they've maintained that that book

24  was present in the home that was raided, correct?

25       MR. McMAHON:  In the plant.

1          MR. LAYMON:  In the office, it was actually in the office.

2          THE COURT:  So it was Mr. Ye Gon's logbook, I believe.

3          MR. LAYMON:  Right.

4          MR. BALAREZO:  We're asking for both of them.

5          THE COURT:  You've asked for any logbooks.

6          MR. LAYMON:  Right, because their request segued into,

7    well, the government is saying it doesn't have the logbook -- and

8    by "logbook," it's like a bound book, like a spiral bound book

9    that the defendant was required to maintain -- and we've always

10   maintained we don't have that.  We were -- You know, as far as we

11   know, that was not seized at the defendant's plant.  So then

12   their request kind of morphed into, okay, well, did the agency

13   maintain records of their inspections?  And so my response to

14   that, in disclosing the evidence, is yes, we have found reports

15   from their inspectors where they went out and looked at this

16   ephedrine or looked at the pseudoephedrine and made a report.

17   Now here it is.  So, if we had it, I turned it over.

18          THE COURT:  At the very least that would be *Brady*

19   material, right?

20          MR. LAYMON:  Well, I suppose it would be, Judge.

21          THE COURT:  And the defendant has an obligation to ask for

22   any evidence that the agency would have that's favorable to the

23   defendant, does it not?

24          MR. LAYMON:  Certainly, and we have provided that.

25          THE COURT:  All right.

1      MR. LAYMON:  And again, I acknowledge that some of that

2   ephedrine and pseudoephedrine that he imported he did sell

3   legitimately and, in fact, the government is going to prove that

4   that's part of our case, because again --

5      THE COURT:  The government is going prove that he was a

6   legitimate businessman?

7      MR. LAYMON:  Yes, sir.  Because, Judge, this is --

8      THE COURT:  I think that this probably can be addressed in

9   an appropriately crafted declaration that the government needs to

10   file indicating what efforts its made to recover this evidence

11   from the Mexican authorities, both the logbook -- we haven't

12   gotten to the drugs yet, but to the logbook, and, indeed, the

13   drugs, and I think there should be something in the file.  I

14   accept your representations, but there should be a declaration

15   from someone detailing what the efforts were and what the results

16   were.

17      Now, with respect to the samples --

18      MR. BALAREZO:  Your Honor, Your Honor, may I just -- with

19   respect to the logbook, there's a couple of things here.  My

20   understanding is that, as Mr. Laymon said, there were bound

21   books.  There was one maintained by my client and one maintained

22   by COFEPRIS which mirrored my client's logbook.  As I understand

23   it, the government has pages from those logbooks but they're

24   saying the logbook doesn't exist.  However that makes sense, I

25   don't know.  But the problem is the government is saying, well,

1    we've turned over the helpful documents.  I think the government

2    is, in effect, curtailing the ability of the defense to, A,

3    investigate, to represent our client, and to present a defense

4    because we don't know what those logbooks say without seeing

5    them.  Those logbooks, my understanding is, they contain a

6    contemporaneous record of every transaction made by my client's

7    business, however the government wants to characterize them, as a

8    legitimate, legitimate, legal, unlawful; that's not for them to

9    make.  We need to look at the this so we can present to the jury,

10   look, here's the logbook that was kept under Mexican law which

11   indicates everything that came in and everything that came out of

12   that factory.  It may be that the chemicals that the government

13   is saying were diverted for illegal purposes were sold to, you

14   know, Pepe Lopez, and maybe we can go find Pepe Lopez, but we

15   can't do that because the government has not provided those books

16   to us.

17        Now, what the government is doing is -- they've indicted

18   this man here for offenses, if they were offenses, that took

19   place in a foreign country.  When the defense wants to get items

20   that are helpful to the defense, it's very convenient for the

21   government to then say, well, we don't have it, we're going to

22   use everything that we can take from them against them, but you

23   can't have anything that may be helpful to you.

24        THE COURT:  What are you suggesting, that they're holding

25   back, that they're not producing evidence to you?

1       MR. BALAREZO:  Your Honor, I honestly don't know anymore.

2  I don't know.  All I know is this case is two years old.  We're

3  standing here before the Court arguing about things that we've

4  been asking for for months, if not years, and we've been getting

5  the same answers.  This man is getting --

6       THE COURT:  What are you asking me to do?

7       MR. BALAREZO:  I'm asking the Court to get a straight

8  answer, number one, from the government about the status of these

9  documents.  That's all.  I mean, have they made a request?  They

10  have the MLAT request that was provided to the Court.  I haven't

11  been able to look at them because the government won't disclose

12  them to us.  Have those reports or requests been made, number 1?

13  What other efforts have been made?  I think the government has an

14  obligation to use each and every available means at their

15  disposal to obtain these things so that we can defend our client.

16  I feel that we're going to start trial in September and we're

17  going to get sandbagged by things that we don't even know is out

18  there.

19       THE COURT:  No, that's not going to happen, because if

20  evidence starts to turn up, then it's fairly likely that the

21  evidence will not be allowed to become a part of the evidentiary

22  record in this case.

23       MR. BALAREZO:  And I keep harking back, Your Honor, trial

24  was scheduled for June 22nd, and here we are 20 days before that

25  date and we're spinning our wheels, the defense is spinning their

1    wheels trying to get things from the government here.

2          THE COURT:  With respect to the samples.

3          MR. LAYMON:  Judge, I think we have to identify what

4    samples we're talking about, because there are several samples.

5    First, let me say this.  The defendant, as I've indicated,

6    imported the substances into Mexico.  On several occasions

7    Mexican officials inspected the shipments at the border where it

8    came in, whether it was the airport or a seaport, and took

9    samples from several of those shipments, both the ephedrine and

10   pseudoephedrine shipments, and then later what was just labeled

11   the intermediate chemical.  So that's the first set of samples

12   we're talking about.

13         The second set of samples came from Mexican officials who

14   took samples at the defendant's lab.  The third set of samples

15   came from D.E.A. chemists who went to the same lab and took their

16   own samples.  So we're actually talking about three sets of

17   samples, samples from the shipments, samples from the lab in

18   Toluca that were taken by Mexican authorities, samples by D.E.A.

19   chemists from the same Toluca lab.  Okay.  So, starting to look

20   at each of those three, start with number three:  The D.E.A.

21   samples from the Toluca lab were taken shortly after the Mexicans

22   took theirs.  More than a year ago I told the defense, if you

23   want access to the D.E.A. samples, have at it.  Just tell me who

24   your chemist is, we'll get him in touch with the D.E.A., you can

25   arrange to get the samples that remain at D.E.A. from the Toluca

1    plant, and you can test them.  Offer still stands.  Haven't heard

2    a word from them.  All right.

3        The second set of samples.  The Mexican government samples

4    that they took from the same Toluca plant -- they took 105

5    samples from that plant; the D.E.A. took a bunch as well -- so

6    the second set of samples essentially repeats what the D.E.A.

7    already has.  Those samples, the Mexican government took from

8    Toluca.  I've been told by the Mexican prosecutors are in the

9    custody of the Mexican judge that is trying the defendant's

10   co-defendants, and that is what we have attempted to get from the

11   Mexican government, Your Honor, but have not been able to.

12       THE COURT:  All right.  I'll need a declaration in that

13   regard also that indicates the efforts made and the response,

14   because at some point, it seems to me, there's going to have to

15   be an appropriate instruction given to the jurors about evidence.

16       MR. LAYMON:  I know the Court --

17       THE COURT:  The judge possesses the evidence in the case?

18   I don't understand that.

19       MR. LAYMON:  That's the way they do it in Mexico.

20       THE COURT:  So, the prosecutors have requested samples and

21   the judge has refused?

22       MR. LAYMON:  Right.  The answer is that the judge has the

23   samples and he won't let them go until the trial of the

24   co-defendants in Mexico are completed.

25       THE COURT:  When do you anticipate that to take place?

1          MR. LAYMON:  Honestly, Judge, that could go on for another

2    year or more, because their trials -- their understanding of a

3    trial is -- they have a very fluid concept of what a trial is.

4    It stretches out over --

5          THE COURT:  They take testimony and then recess for a few

6    months or so?

7          MR. LAYMON:  Correct, that's how they do it.  Come back in

8    a few minutes, take another witness, or come back in a few

9    months, take another witness, recess, and in a couple of months

10   come back.  That's what they've been doing.  That's their manner

11   of trying a case.

12         THE COURT:  All right.  I think it's appropriate for the

13   government to file a declaration setting forth the efforts it's

14   made with respect to the logbook, the logbook pages, and the drug

15   samples, and the responses from Mexican authorities, and that

16   should be filed -- I think I said the 8th for the translation,

17   that that should be filed by -- Did I say the 8th or 9th of --

18         THE COURTROOM CLERK:  9th.

19         THE COURT:  That should be filed by the 9th, as well.

20         MR. BALAREZO:  Your Honor, may I?  In the government's

21   surreply to our motion, I believe they indicated and made known

22   that the government had previously made an offer to the defense

23   allowing us to follow-up on the D.E.A. analysis.  Quite frankly,

24   that was the first time that Mr. Retureta and I had heard about

25   it.  I accept the government's representation that that offer was

1   made, and I think we probably will take them up on it.  But the

2   problem is that both the samples from the Toluca plant and that

3   the D.E.A. took are, in our opinion, irrelevant, and I'll explain

4   why.  Regarding the actual analysis, I don't believe that we have

5   any such documents of the results.  I think it's a DEA-7.  If

6   they are, they're somewhere in these hundred thousand pages that

7   we've gotten.  I'd ask Mr. Laymon to give us each of these

8   reports, because obviously that's going to be --

9           THE COURT:  I'm sure Mr. Laymon will do that.  Won't you?

10          MR. LAYMON:  They have it, Judge.

11          THE COURT:  I'm sure they were turned over.

12          MR. BALAREZO:  And I'll be honest.  When the government

13  turned over all these documents to us this last time, we haven't

14  finished reviewing them, Mr. Retureta and I.  We're the ones that

15  are going through these things trying to find them, But we ask

16  that those be given to us.

17          But, Your Honor, quite frankly, those particular samples

18  and tests are irrelevant because they're not of the shipments

19  that are alleged to be the basis of the crimes here.

20          THE COURT:  They can't produce what they don't have,

21  counsel.  If, indeed, the government has requested samples and

22  the judge, for whatever reason, has refused to release samples,

23  then that's an issue that the Court will have to address at some

24  point.  They don't have it, they don't have it.

25          MR. BALAREZO:  And then the Court may also have to

1   address, then, the issue of whether or not Mr. Ye Gon is getting

2   a fair trial, given these situations where he cannot get

3   documents.

4        THE COURT:  The Court is always diligent about that, so --

5   I'm not sure we're at that point yet.

6        MR. BALAREZO:  We only have three months left.  I don't

7   know what else --

8        THE COURT:  All right.  But, you know, the declaration

9   will be filed and the declaration is what it is.  If they made

10  the request -- I don't doubt counsel, if the requests were made,

11  and I don't doubt that they haven't gotten the response that

12  you'd like, and it may well be that all of that will factor into

13  an appropriate instruction at some point.

14       MR. BALAREZO:  Very well.

15       THE COURT:  But in deed -- well, at some point.  Let me

16  ask this question to make sure I understand the drug samples.

17  The government's not attempting to introduce evidence of illegal

18  drugs for -- any illegal drugs, methamphetamine?

19       MR. LAYMON:  No, we're not attempting -- well, there's a

20  yes and no answer to that, Judge.  No, we are not attempting to

21  admit methamphetamine, and candidly there were no seizures of

22  methamphetamine in this case.

23       THE COURT:  Your theory is that there was the intent to

24  manufacture --

25       MR. LAYMON:  Correct.

```
1            THE COURT:  -- large amounts.

2            MR. LAYMON:  But, for example, when we refer to the

3     psychotropic drug samples, I guess you could say in a sense that

4     those were legal because in some sense he had permission from the

5     Mexican government to import them, but he didn't have permission

6     to divert them.  So, in a sense, they're both legal and not

7     legal.  So, to the extent we might try to get those kinds of

8     samples in, if we ever got them, then --

9            THE COURT:  If you ever got them.  You haven't gotten

10    them?

11           MR. LAYMON:  We don't have those.

12           THE COURT:  All right.  And you can indicate whatever

13    reason was given.  I don't know.  I mean, was there a reason

14    given by the judge in Mexico for not allowing a sample?

15           MR. LAYMON:  Well, specifically, when I talked to my

16    counterparts, the Mexican prosecutors, what they told me was that

17    the judge -- in their system, the judge has control of the

18    physical evidence like the drug samples.

19           THE COURT:  He or she isn't going to relinquish

20    anything --

21           MR. LAYMON:  He or she can't relinquish those during the

22    pendency of a trial.

23           THE COURT:  All right.  Let me give the court reporter a

24    short recess.  I've got to deal with this other matter at 1:00.

25    What else is there?  I understand your argument with respect to
```

```
1    physical evidence.  I think the government's discharged its
2    obligation.  I'm concerned about this deposition, these Chinese
3    depositions.  You want me to rule on that.  You're going to have
4    to file something soon.  We can talk about an accelerated
5    briefing schedule -- I'm talking about within a week or so -- a
6    briefing schedule.  What other points do you need to bring up?
7    I'm going to give the court reporter about a ten-minute recess.
8         MR. BALAREZO:  Hold on.  With respect to the samples, the
9    samples from the plant and I believe the D.E.A. samples that the
10   government made reference to, we'd ask the government to make a
11   proffer as to how they intend to show that those particular
12   samples in any way prove that the shipments that were made from
13   China to our client's plant were converted to pseudoephedrine or
14   anything else, because, as the government admits, our client had
15   a license and legitimately did process chemicals into that
16   particular end product, and how does the government intend to
17   show that that is not a lawful -- that the samples did not come
18   from the lawful product that my client had in his factory, as
19   opposed to --
20        THE COURT:  Is this a question you ever asked Mr. Laymon?
21        MR. BALAREZO:  What's this?
22        THE COURT:  Is this a question you ever asked him?
23        MR. BALAREZO:  Your Honor, there are a lot of questions
24   I've asked Mr. Laymon, but I kind of get the yes and no answer.
25   So, I have not asked that particular question, but I'll ask him
```

1    through the Court now for a proffer.

2         THE COURT:  Mr. Laymon.

3         MR. LAYMON:  I'm happy to talk to Mr. Balarezo.

4         THE COURT:  I'm interested in the proffer also.

5         MR. LAYMON:  All right.

6         THE COURT:  I don't want to back up.  Let me give the

7    court reporter a ten-minute recess.  We started quite some time

8    ago, and I'll give you a chance to focus on your proffer.

9         (Thereupon, a break was had from 12:31 p.m. until

10   12:42 p.m.)

11        THE COURT:  All right.  I'm not going to keep you too much

12   longer.

13        Mr. Laymon, you were going to make a proffer, though.

14        MR. LAYMON:  If I understand the request from the defense,

15   Judge, it has to do with the samples that were taken from the

16   Toluca lab.

17        THE COURT:  Correct.

18        MR. BALAREZO:  And the D.E.A. samples.

19        MR. LAYMON:  Right.  All right.  From 2002, Your Honor,

20   until the middle of 2005, July of 2005, Mexican law permitted the

21   defendant to import ephedrine and pseudoephedrine so long as he

22   did so pursuant to their regulatory provisions.  He had to get an

23   import permit, for example; he had to tell COFEPRIS, the Mexican

24   equivalent of their FDA, what pharmaceutical companies he was

25   selling it to and so on.  And so from that period of time, the

1    begin of '02 to July of 2005, had he complied with applicable

2    regulation, then he could have legitimately imported ephedrine

3    and pseudoephedrine into Mexico, and, in fact, he did that.  He

4    did that on a number of occasions, as I've indicated.

5         Mexico became concerned that ephedrine and pseudoephedrine

6    was being diverted to the bad guys to make methamphetamine.  And

7    so by July of 2005, they changed their law, and one of the

8    changes they made -- what they sought to do was to more tightly

9    control the importation of these ephedrine and pseudoephedrine

10   precursor chemicals.  So one of the things they did was that they

11   told pharmaceutical companies like Unimed, the company that the

12   defendant had, that with the change in the law they would no

13   longer be permitted to import or possess or distribute ephedrine

14   or pseudoephedrine.  So that effective from July 25th on --

15   excuse me, July 2005 on, it was illegal under Mexican law for the

16   defendant to import ephedrine and pseudoephedrine.

17        The government contends that by this time the defendant

18   was making tens, if not hundreds of millions of dollars selling

19   ephedrine and pseudoephedrine that he diverted to the black

20   market, and he wished to continue this business.  So what he did

21   was, and the evidence shows this, is that he negotiated with the

22   company in Inner Mongolia that he was buying the ephedrine and

23   the pseudoephedrine from.  And the conversation would have gone

24   something like what I'm about to describe.  It wasn't exactly

25   this, but this is an analogy.  He went to the company in Inner

1   Mongolia and he said to their general manager -- let's assume

2   that making ephedrine is a five step process -- What I want you

3   to do, Company in Inner Mongolia, is stop at stage 4.  Don't get

4   to stage 5, which is the finished product, just stop at stage 4,

5   and we're going to make up a name for this chemical and you

6   import that to me.  And that's what he did, such that he was then

7   able to take that almost ephedrine and pseudoephedrine, import

8   that into Mexico, and then very easily convert that into

9   ephedrine and pseudoephedrine at his plant in Toluca, and that's

10  exactly what he did.

11       And where, for example, he had ordered roughly 80 tons or

12  so of ephedrine and pseudoephedrine, once the law changed, he

13  then purchased, over the course from the end of 2005 to the end

14  of 2006, he actually purchased 125 metric tons of this

15  intermediate chemical that he brought to his plant in Toluca and

16  was very easily able to convert it to ephedrine and

17  pseudoephedrine in clear violation of Mexican law, which, of

18  course, didn't permit him to possess or distribute ephedrine and

19  pseudoephedrine.

20       So, this 125 tons of intermediate chemical that he,

21  essentially, secretly imported into Mexico and then secretly

22  converted into ephedrine and pseudoephedrine at his lab in Toluca

23  is what's represented by the various samples that are taken from

24  the Toluca lab in the spring of 2007.  Yes.  Spring of 2007,

25  after this whole thing unravels, Mexican officials and D.E.A.

1    officials go to his lab in Toluca, they take various samples from

2    the equipment that are there, and those samples, not

3    surprisingly, test positive for ephedrine and pseudoephedrine.

4        So, I think clearly, Judge, the relevance of that is that

5    it shows that he was converting the intermediate chemical that he

6    had gotten from his supplier in Inner Mongolia, he imported it to

7    Mexico taking it to the Toluca lab where he then changed it into

8    ephedrine and pseudoephedrine which he diverted into the black

9    market.  So the fact that Mexican officials or D.E.A. chemists

10   took samples from this Toluca lab and that those samples were

11   positive for ephedrine and pseudoephedrine is very important in

12   terms of proving this case.  Specifically I'm talking about the

13   D.E.A. samples, because we have those.  So I think the relevance

14   of it is clear.  It shows that, combined with the other evidence

15   that we would introduce, that he was unlawfully importing this

16   intermediate chemical, which he then was making into ephedrine

17   and pseudoephedrine.  So I think that's the relevance of it.

18       MR. BALAREZO:  Your Honor, if I may.  A couple of things

19   with respect to that five-minute proffer that I don't think

20   answered the question that was asked.  The question that was

21   asked is how is the government intending to prove that those

22   samples that were taken at the Toluca plant by the D.E.A. or

23   Mexican authorities show that my client was processing

24   pseudoephedrine or ephedrine from the shipments from China.  It

25   does not answer that because, as the government has already

1   conceded, my client had a lawful ability to have and process

2   pseudoephedrine and ephedrine prior to the shipments.  How does

3   the government intend to show that those tests aren't residues of

4   what my client lawful possessed?  That was my question.  And

5   again, we're making big jumps here, but --

6        THE COURT:  Mr. Laymon.

7        MR. LAYMON:  The easy answer to that, Judge, is that after

8   July of 2005, the defendant was not permitted to possess or

9   distribute ephedrine -- import, possess or distribute ephedrine

10  or pseudoephedrine.  Mr. Balarezo is implying that somehow the

11  ephedrine that he imported up to July 2005 is -- would explain

12  the samples at the Toluca lab.  Unfortunately for Mr. Balarezo's

13  position, his client didn't build that plant until after July of

14  2005; it wasn't operational until the early part of 2006.  So by

15  that time, of course, almost all of the ephedrine and

16  pseudoephedrine that the defendant had had long been sold.

17       THE COURT:  That's the government's theory?

18       MR. LAYMON:  Well, we know that because we know that he

19  had several tons -- in fact, he had up to nine tons of ephedrine

20  and pseudoephedrine sitting in his warehouse in Mexico City that

21  he was directed to sell and that he did sell.  But I mean, what

22  he's raising, of course, is simply a jury argument.  I would

23  expect them to argue to the jury, how do we know all this?

24       THE COURT:  And it's -- and it -- Well, I'll reserve any

25  opinion about argument, but that's what it sounds like it's going

1    to be.

2        MR. BALAREZO:  Your Honor, if I could just go back really

3    briefly to the samples.  I just want to bring one point up to the

4    Court.  My understanding is that December 12th -- December 2nd,

5    2006, the first shipment was seized in Mexico, a Dr. Castenada,

6    who was the chemist at the port, took apparently six samples,

7    tested them.  From what I understand, the tests were

8    inconclusive, at worst; negative, at best, for any sort of

9    controlled substance.  That was in December of '06.

10        Our information is that shortly thereafter, maybe a month

11    or two thereafter, D.E.A. agents went to Chiefing Arker, the

12    source of that shipment in China, and that they were provided

13    samples by the factory, by the plant in China, samples which were

14    directly, I believe, from the same batch, if you will, that was

15    shipped to Mexico.

16        We don't have -- I've never heard the government mention,

17    I've never heard the government say nor provide any documentation

18    regarding those samples that the plant in Chiefing Arker gave to

19    the D.E.A. which were directly related to the shipment that

20    basically started this whole case.

21        We believe, based on Dr.  Castenada's analysis of those

22    samples that she took at the port, which were again either

23    inconclusive or negative for a controlled substance, that the

24    samples that were given to the D.E.A. in China would be the same.

25    And if that's the case, that is absolute *Brady* which has not been

1   disclosed; as a matter of discovery has not been disclosed, and

2   we would ask the government to here make a proffer to the Court

3   about whether or not, A, those samples were given, whether they

4   exist, what the results were, whether or not the government has

5   made any request of China for any of those samples.  Because,

6   again, anything in China would not be in the hands of Mexican

7   courts, and additionally whether or not the government

8   specifically requested from the Mexican courts or the government

9   those six samples that Dr. Castenada took at the port.  Because

10  if there were -- Well, I'd like to hear that, first of all.  Have

11  they made those request?  Because, again, the government is

12  saying a lot of things --

13       THE COURT:  Did you make that request in writing or orally

14  to the government on a prior occasion, counsel?

15       MR. BALAREZO:  Mr. McMahon can answer this one, Your

16  Honor, if you want to hear from him.

17       THE COURT:  Let me just hear -- you've asked -- have you

18  or not?  Did you get an answer before?  What was your answer

19  before?  Because some of this is repetitive.

20       MR. McMAHON:  This is classic Laymonesq, Your Honor.  I

21  couldn't recall.

22       THE COURT:  What's your response?  Because I heard the

23  government's theory articulated before.  Your answer to that

24  question, counsel.

25       MR. LAYMON:  Mr. McMahon is specifically referring to

1   samples that were taken from the last intermediate shipment which

2   came into Mexico in December of 2006.  The government has

3   specifically requested the samples from all intermediate

4   shipments.  There were six such shipments.  It was my

5   understanding that three of them were inspected at the port and

6   samples were taken from three of the shipments, including the

7   December 2006 shipment.  I possess lab reports, which I turned

8   over to the defense in reference to the December 2006 shipments.

9   So, yes, they were requested.  I have lab reports.  I turned them

10  over.

11      THE COURT:  What do those reports show?

12      MR. LAYMON:  It shows that there are -- there's two

13  reports, Judge.  There's an initial analysis that Mr. McMahon is

14  referring to.  He calls it the Dr. Castenada report.  I don't

15  ever remember her name.  But there's an initial report made by

16  Mexican chemists in which they are unable to identify,

17  conclusively identify the product that they tested because they

18  didn't have enough equipment, and then the samples were sent to a

19  more sophisticated lab, and then there's a finding that it's a

20  precursor -- that it's essentially ephedrine or pseudoephedrine,

21  as I described it.

22      THE COURT:  Are you saying you don't have the reports?  I

23  heard this before on at least one other occasion.

24      MR. LAYMON:  They have them, Judge, because, in fact, the

25  first lab report that the Mexicans took, they're the ones who

1    brought that to my attention.

2        MR. BALAREZO:  Your Honor, the -- the issue itself is not

3    so much the lab reports, it's, again, the samples.  The initial

4    tests in the lab -- at the port were, at best, I think

5    inconclusive or were unable to identify the substance.  They were

6    then sent to Mexico where an expert that we may use has indicated

7    that the process that was used at the Mexican labs to show that

8    it's now a controlled substance is a process that is not

9    standard; that, in effect, creates something that wasn't there,

10   and that's the importance of the samples.  We need to have the

11   samples in order to have our people test these things to see if

12   the testing that was done by the Mexican laboratory itself was --

13       THE COURT:  This gets back to the government's request of

14   samples.

15       MR. BALAREZO:  And again, my simple question --

16       THE COURT:  If the government has requested samples and

17   the government's been refused samples, then it may well result in

18   an appropriate instruction or other ruling that's appropriate.

19       MR. BALAREZO:  I thought I just heard Mr. Laymon say he

20   requested the tests, the analysis; not the samples, but one more

21   point.  And my other issue is --

22       THE COURT:  What about the samples, counsel?

23       MR. LAYMON:  Judge, I thought I just clearly said that the

24   government requested the samples from all of the intermediate

25   shipments, including the one that we're now talking about which

1    is the December 2006 shipment.

2         THE COURT:  So there's no confusion, I think that should

3    be part and parcel of the government's declaration that it has to

4    file by the 9th that deals with the logbooks and the other

5    requests for samples from the Mexican government and/or judicial

6    authorities.

7         MR. BALAREZO:  And also the samples from China, Your

8    Honor, that was not addressed at all, the ones we believe were

9    given by the Chinese plant to the D.E.A. or U.S. law enforcement.

10        THE COURT:  For every request that the government -- that

11   the United States has made of a foreign country, a foreign

12   government for samples of drugs, the government needs to state in

13   its declaration to be filed on the 9th what its efforts were and

14   what the responses of those foreign governments were to the

15   government's request, and that's by the 9th.

16        MR. LAYMON:  We'll do that, Judge, but let me just respond

17   to Mr. Balarezo.  He seems to think that the D.E.A. went to the

18   company in Inner Mongolia and got samples.

19        MR. BALAREZO:  Right.

20        MR. LAYMON:  No, that never occurred.  We sever received

21   samples from the company in Inner Mongolia.  I think what he's

22   mistaking is that, I believe it was 2002, that the

23   American representatives from the FDA went to that company and

24   inspected it.  That has nothing to do with the case or the D.E.A.

25        THE COURT:  All right.  All right.  The Court's directive

1    is clear.  The government knows what it has to produce in its

2    declaration to be filed by noon on the 9th.  That's the only new

3    thing, by noon on the 9th.

4         *Brady*.  I am concerned about is this recanting witness.  I

5    agree with defense counsel that the circumstances regarding how

6    he recanted, who was present, et cetera, and the proposed order

7    are appropriate.  I'm prepared to sign that order.  Why is it

8    that defense counsel is just learning about the recanting witness

9    at this time?  It appears that the recanting testimony occurred

10   some time ago.

11        MR. LAYMON:  It did.

12        THE COURT:  So, why are they just learning about this now?

13        MR. LAYMON:  Well --

14        THE COURT:  When did he recant?

15        MR. LAYMON:  I don't recall, Judge.  It's been many months

16   ago because it was during the time that I interviewed him.  So, I

17   don't recall if that was -- I have my interview notes, and I can

18   certainly figure out the date.  I just don't recall specifically

19   when it was.

20        THE COURT:  The government is under an obligation to

21   produce *Brady* material, and that is certainly *Brady* material when

22   it occurs, when it's aware that it has information that's

23   favorable, and certainly a recanting witness -- all right.  I'm

24   concerned about that, but I'm going to issue an order, a very

25   straightforward order that directs the government to produce any

1   and all *Brady* material.  And if the government has any questions

2   about what its *Brady* obligations are, you can ask the Court and

3   I'll be happy to spend whatever time is necessary telling the

4   government what its *Brady* obligations are.  But I don't think

5   that, you know -- this is something that judges shouldn't have to

6   do on a case-by-case-by-case basis.  But I will issue an order,

7   and I will stand by that order, requiring the government to

8   produce -- search its records and discharge its *Brady* obligations

9   consistent with *Brady* and it's progeny by no plater than the 9th,

10  and that's all *Brady* material that's not heretofore been

11  produced.  I can't make it any clearer than that.

12        Mr. Laymon, you've been practicing for a long -- many

13  years.  You don't have any questions about the government's *Brady*

14  obligations.

15        MR. LAYMON:  No, I don't.  I understand what you're

16  saying.

17        THE COURT:  I know you don't, and I accept your

18  representations.  I'm concerned, though, why -- I need to get an

19  answer, though.  Why didn't that information -- why wasn't that

20  information revealed to defense counsel?  You realized it was

21  *Brady* at the time that he recanted.  That's powerful.  This is a

22  principal government witness.

23        MR. LAYMON:  Um, if -- if he were the testify, he would be

24  a principal government witness.

25        THE COURT:  Right.  Well, now he's damaged goods, but

1    that's favorable to them, though.

2          MR. LAYMON:  Why didn't we disclose that fact, Judge?

3    And, of course, your question is, why didn't we disclose it

4    earlier?

5          THE COURT:  Right.

6          MR. LAYMON:  Well --

7          THE COURT:  Be careful.  I have a high regard for you, but

8    I need to get an answer to that question, though.

9          MR. LAYMON:  You know, I think the answer to that

10   question, Judge, is that at the time -- I know that when I

11   interviewed this particular witness -- When I say he recanted, he

12   didn't entirely repudiate his testimony, so I don't want to make

13   this into a black and white situation.  He repudiated some of his

14   testimony.

15         THE COURT:  He's no longer a principal government witness.

16         MR. LAYMON:  No, he could still be.  No, he could still

17   be.

18         THE COURT:  But you agree there's some impeachable

19   material there.

20         MR. LAYMON:  Most definitely, most definitely.

21         THE COURT:  All right.

22         MR. LAYMON:  And it's like every situation with a witness,

23   Judge.  It's not, as I say, it's not entirely black and white.

24   He did repudiate some --

25         THE COURT:  That was a big Stevens issue.  You know that.

1      MR. LAYMON:  I do know that, right.

2      THE COURT:  Yeah.  You know what, it just boggles the mind

3  why the government doesn't discharge its obligations in a timely

4  manner.  A witness changes his testimony, even so slightly, where

5  the government recognizes that it's material, even material --

6  putting aside materiality -- that's favorable to the defendant,

7  why don't prosecutors just pick the phone up and say, look, I've

8  got an obligation to tell you something?  Is it because it hurts

9  or something?  What is it?

10      MR. LAYMON:  I can't answer for other prosecutors, Judge.

11  I --

12      THE COURT:  All right.  Answer for yourself, then.

13      MR. LAYMON:  Well, for myself, I think the situation is

14  that, with this particular witness, Escandon, it was clear to me

15  why he was repudiating some of his testimony, and that was

16  because he was in trial or he was soon to be in trial in Mexico,

17  and he had to repudiate it because he had given a very full and

18  detailed confession to the Mexican authorities which was reduced

19  to writing.  It was, I don't know, eight or ten pages.

20      THE COURT:  Which cast aspersions on his expected

21  testimony in this case?

22      MR. LAYMON:  Well, no.  In his initial confession, of

23  course, he implicated the defendant and himself in the conspiracy

24  that is charged here.  Later when we interviewed him, he did -- I

25  would fairly say he repudiated the essence of what he had to say.

1      THE COURT:  With respect to Mr. Ye Gon.

2      MR. LAYMON:  He talked openly with me about his knowledge

3  and relationship with the defendant, but he, in essence,

4  repudiated his role in the wrongdoing that he had earlier

5  confessed to.  So --

6      THE COURT:  It's like, where does the truth lie, then, but

7  that's favorable to the defendant.  All right.  Judges don't get

8  any pleasure in imposing sanctions, and I'm not going to say

9  anything more about *Brady* other than the government is on notice

10  that whatever *Brady* information that's not been heretofore

11  disclosed, it has to do so by the 9th, a week from today.  What

12  else?  Counsel.

13      MR. RETURETA:  Your Honor, if I may.  There is one more

14  component to -- actually, two more components to the *Brady* issue.

15  The notice that the government provided us spoke of Escandon Paz,

16  but there are two other *Brady* notices that were provided.  One

17  involved Michelle Wong.  We're aware of Michelle Wong.  There's

18  another *Brady* notice in there that we have not brought to

19  Mr. Laymon's attention or have not confronted him because we were

20  so struck and shocked by what we heard about Escandon Paz.  I

21  would ask the Court that, as it signs our proposed order today,

22  that that order be modified to encompass all of the *Brady* notices

23  that were provided --

24      THE COURT:  Submit a proposal.  Redo it and submit it

25  electronically.

1        MR. RETURETA:  Certainly.

2        THE COURT:  I'll issue that, probably, and also my version

3   of the *Brady* order.

4        MR. RETURETA:  And, Your Honor, if we may ask the Court to

5   approach briefly just to place a matter on the record regarding

6   this matter.

7        THE COURT:  Regarding the *Brady* issue?

8        MR. RETURETA:  Yes.

9        THE COURT:  All right.

10       (Following sidebar discussion had on the record:)

11       MR. RETURETA:  Your Honor, I just wanted on to put on the

12   record that what really bothers us about this issue.

13       (Discussion had off the record between the Court and

14   interpreter.)

15       THE COURT:  That's an issue that has to be worked out for

16   the trial.

17       MR. RETURETA:  The time period of the disclosure is

18   troubling, given what was happening at the time.  We were

19   engaged -- We just want to put this on record.  We were engaged

20   in debriefings at that period of time.  We were meeting with

21   government agents, government prosecutors; we were preparing to

22   meet with Mexican officials.  So, I think we need this as quickly

23   as possible, and I think earlier than next week.  I would propose

24   in my order tomorrow, because I think it's a simple release of

25   information, at least a day or two, just give us some information

1    because I think this is a huge issue, a huge issue of prejudice.

2         THE COURT:  The 4th at noon.  That's two days from today.

3         MR. RETURETA:  Thank you, Your Honor.

4         MR. McMAHON:  Your Honor, could I just ask -- and, of

5    course, this is in the course of our discussion, have you had an

6    opportunity to do the in-camera inspection?

7         THE COURT:  That's under advisement.

8         MR. McMAHON:  Okay.  Thank you.

9         (Sidebar discussion concluded.)

10        THE COURT:  All right.

11        MR. RETURETA:  Your Honor, I think just one more note on

12   the *Brady* issue.  As we learn of this and then we go through the

13   conclusion, I believe, of the Chinese deposition episode, and

14   given the representations that the government has made, and given

15   our motions hearing due date, our motion filing due date of the

16   22nd, I think we are left with a case that is ripe for a

17   preliminary determination of conspiracy here.  Usually we file

18   these motions in some of these large conspiracy cases and we hope

19   to have some type of information, we hope to try to have this

20   preliminary determination before this goes before a jury.  But

21   based on what the government has told us, how they have this

22   case, what they can prove, and the discussion today, because I

23   think the discussion today is going to be representative of what

24   may be happening at trial, we have not heard word one of a

25   connection to the United States, and the only proximity that we

1  get to that is what we're now learning of recantations from

2  government witnesses.  So, I just wanted to raise that issue as

3  we move towards that motions filing deadline and the Court is

4  considering whether or not the government wants to resurrect the

5  depositions that I remind the Court were an issue as of late

6  April of this year when we began to ask of the government what is

7  happening with China.  We ran through April.  We ran through May.

8  We postured for June.  There are large issues that loom for the

9  government's case that need time for us to receive discovery,

10 digest it, file our motions by the 22nd.  And even the schedule

11 that we have now is an accelerated schedule.  It was built

12 because we had modified that original trial date of June to the

13 September trial date.  So I would just ask the Court to keep that

14 in mind, and I would ask the Court to keep in mind that what is

15 happening now with some of this evidence is deeply troubling for

16 this position of this case at this time.  It's two years after

17 this man was brought to the -- was placed in custody.

18       THE COURT:  All right.  I think I told Mr. Balarezo, file

19 his proposed order electronically with respect to the *Brady*

20 issues and I'll consider the additional request.

21       With regards to the Chinese depositions, the depositions

22 in China, the government wants to proceed with that.  File your

23 motions by noon on Thursday.  Any response -- I can't give you

24 any longer than Monday noon.  Any replies by the 10th at noon.

25 And I -- I'm not going to be sensitive to putting in place

1   another schedule for depositions in China.  I mean, China was on

2   notice for months that the government wanted to proceed with

3   depositions there, and I accept counsel's representations that

4   there were some stumbling blocks that couldn't be resolved to

5   preclude the depositions from being taken prior to June.  But I'm

6   not going to conduct the business of this Court consistent with

7   the whims of China or any other country for that matter.

8          Anything else we need to talk about?

9          MR. LAYMON:  Judge, the defense had a deadline of

10  yesterday to disclose to the government its list of experts, as

11  well as any reciprocal discovery.  I think the Court stayed that

12  for a time.

13         THE COURT:  I did.

14         MR. LAYMON:  If I'm not mistaken.

15         THE COURT:  I did.  Let me hear from defense counsel.

16         MR. RETURETA:  Your Honor, I believe we asked for two

17  additional weeks after the government complied with their

18  obligation for our production.

19         THE COURT:  Well, look.  I want the information -- I want

20  the government to put those people in categories.  There's not

21  going to be any cumulative testimony.  I want full compliance

22  with Rule 16.  And, you know, I'm not going to play games with

23  this.  If the government doesn't comply with the Court's

24  directive, then the government won't try this case with experts.

25  And if the government doesn't abide by its *Brady* obligations, I

1    can tell you the sanctions will be severe.  So how much more time

2    do you need to refine your expert list and provide the reports

3    that you have to provide pursuant to rules of criminal procedure?

4        I'll give you two days.  That's it.  The man's been locked

5    up two years.  You've got two days, noon.  Do it.  If you don't

6    comply with the rules, then there won't be any experts

7    testifying.  And I'm putting the government on notice, if there

8    are *Brady* violations, the sanctions are going to be severe.  The

9    fact that the government knew that a witness had recanted months

10   ago and didn't disclose that information to defense counsel is,

11   indeed, sanctionable in itself.  I'm not going to impose

12   sanctions.  A hint to the wise should be sufficient.  You cannot

13   be aware of favorable information and not take steps to disclose

14   your obligations to the defense attorneys.  And why prosecutors

15   do that day in and day out, boggles the mind.  You have an

16   obligation.  Like it or not, you have an obligation to comply

17   with the law.  I'm not going to sanction you, counsel.  It may

18   not be that easy the next time.  I'm putting you and your team on

19   notice.  Got it?

20        MR. LAYMON:  I understand, Your Honor.

21        THE COURT:  Anything else we need to talk about?

22        MR. RETURETA:  No, Your Honor.

23        THE COURT:  Mr. Ye Gon, how are you?  You've been moved?

24   Are the conditions better than they were?

25        THE DEFENDANT:  Oh, yes.

```
 1        THE COURT:  It's still prison, but I wanted to get you out
 2   of where you were.  And again, all the thanks goes to Bill Jessup
 3   of the Marshal Service for doing that.
 4        THE DEFENDANT:  I hope I can read some documents.
 5        THE COURT:  You don't have to say anything.
 6        MR. BALAREZO:  I'm sorry.  He has been moved.  He's at
 7   the Central Virginia Regional Jail known as Orange.  However, he
 8   is still in a high security lockdown status, basically.  And as
 9   opposed to the D.C. jail where he had access to all of his
10   documents, what they're telling us at the jail is that he
11   initially only had access to five documents, five different
12   sets, and I have spoken with the people there.  They're willing
13   to allow him to have only one box of documents at a time, which
14   means every time we go we have to switch one out.  But the
15   problem would be, as it gets closer to trial, given the volume
16   of documents here, he really needs to have access because a lot
17   of them are in other languages.  They are things that he
18   understands that he needs to communicate to us, and going one
19   document at a time is not -- or one box at a time is not
20   tenable.  So, we'll file a motion or a proposed order asking
21   that he be allowed to have access to whatever case documents he
22   requires for the preparation.
23        THE COURT:  Is that a federal facility or local?
24        MR. BALAREZO:  It's a Virginia jail, Your Honor, but
25   they're under contract to the marshals, so perhaps there's the
```

1   hook.

2       THE COURT:  All right.  File whatever you believe is

3   appropriate and attach a proposed order for the relief that

4   you're seeking.

5       MR. BALAREZO:  Thank you.

6       THE COURT:  Anything else?

7       MR. BALAREZO:  No, Your Honor.  Thank you.

8       THE COURT:  Thank you.  All right.  Parties are excused.

9       Just one last thing on this *Brady* issue, Mr. Laymon, and

10  make sure you put down the part where I said I have a high regard

11  for him.  I still do.  But, you know, turn the tables around.

12  How would you feel if you're representing someone against the

13  government and you don't get the information that you're entitled

14  to in a timely manner to use that information?  You'd be upset,

15  wouldn't you?

16      MR. LAYMON:  Certainly.

17      THE COURT:  All right.  That's all I have to say.  I still

18  have a high regard for you.  Have a nice day.

19      MR. LAYMON:  Thank you, Judge.

20      THE COURT:  All right.

21      (Proceedings adjourned at 1:19 p.m.)

22

23

24

25                    **C E R T I F I C A T E**

1

2          I, Scott L. Wallace, RDR-CRR, certify that
   the foregoing is a correct transcript from the record of
3   proceedings in the above-entitled matter.

4

     _____          _____
5   Scott L. Wallace, RDR, CRR                  Date
      Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25